**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ARSENAL INTERMEDIATE HOLDINGS, LLC, *et al.*,[1] | Case No. 23-10097 (_____) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MICHAEL WYSE IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Michael Wyse, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of Arsenal Intermediate Holdings, LLC ("Arsenal Intermediate"), Arsenal Insurance Management, LLC ("Arsenal Insurance"), and Arsenal Health, LLC ("Arsenal Health" and, collectively with Arsenal Intermediate and Arsenal Insurance, the "Debtors" or the "Company"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases").  I have served in this role since December 21, 2022.

2.      I am also the Managing Partner of Wyse Advisors LLC ("Wyse Advisors"), headquartered in New Jersey.  I have over 20 years of leadership experience in a variety of industries, focusing on financial consulting and advisory services.  During that time, I served in the roles of chief restructuring officer, chief financial officer, investment banker, and financial advisor.  In addition, I have served as an independent director for numerous companies in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Arsenal Intermediate Holdings, LLC (2513), Arsenal Insurance Management, LLC (3990), and Arsenal Health, LLC (5247).  The Debtors' mailing address for the purposes of these chapter 11 cases is 7027 Halcyon Park Drive, Montgomery, Alabama 36117, c/o 3H Agent Services, Inc.

distressed circumstances.  I hold a Bachelor of Business Administration degree and a Master of Business Administration degree from St. Bonaventure University.

3.      In my capacity as CRO, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration (this "Declaration") to provide an overview of the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and the First Day Motions (as defined below).  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with employees and other representatives of the Debtors, and information provided to me by the Debtors' professional advisors, including: (i) Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), restructuring counsel to the Debtors; and (ii) Wyse Advisors, which has provided the Debtors with additional personnel since December 21, 2022 to support me as CRO.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.      As described more fully herein, the Debtors operate a captive insurance and alternative risk management company, which includes developing captive feasibility studies and business plans, assisting with the selection of captive domiciles, assisting customers as they navigate the captive formation and approval process, and ongoing captive management services, including governance and regulatory compliance services.  As described in more detail below, the Debtors have suffered significant customer attrition precipitated by, among other things, the actions and ultimate termination of the Company's founder and former owner and chief executive officer, Norman Chandler, in October 2022.  As a result, the Debtors are facing acute liquidity issues.  Over the course of the ensuing months, the Debtors and their professional advisors

explored all available strategic, business restructuring, and sale options.  Following these efforts, the Debtors determined that the best course of action to maximize value for the benefit of all stakeholders is to pursue the sale of their assets through a chapter 11 bankruptcy proceeding, including the orderly transition of their customers and customer agreements to reliable third parties, and make creditor distributions through a Subchapter V plan.

5.    The Debtors commenced the Chapter 11 Cases on the date hereof (the "Petition Date") to accomplish this goal.  To minimize the adverse effects on their business of filing for chapter 11, the Debtors filed a number of motions contemporaneously herewith seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations that are necessary to fulfill their duties as debtors in possession and to continue to operate their business without interruption.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimum disruption, loss of productivity, or value, and that each First Day Motion constitutes a critical element in achieving a successful and expeditious outcome in the Chapter 11 Cases.

6.    To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of the Chapter 11 Cases, this Declaration is divided into five parts.  Part I provides an overview of the Debtors' business, the Debtors' organizational and capital structure, and certain ongoing litigation involving the Debtors' founder, Mr. Norman Chandler.  Part II describes the events leading to the filing of the Chapter 11 Cases.  Part III describes the Debtors' efforts to obtain and negotiate the DIP Facility (as defined below).  Part IV describes the Debtors' goals in the Chapter 11 Cases.  Part V provides the factual support for the relief requested in the First Day Motions.

**PART I**
**COMPANY OVERVIEW**

**A.    The Company's Business**

7.    The Company was founded in 2006 as an independent captive management and alternative-risk manager.  It provides broad customer solutions in risk management for captive insurance companies and various other insurance entities through its office location in Alabama. Previously, the Company also had a presence in Georgia, Florida, Tennessee, Texas, and Vermont. In connection therewith, the Company has received various accolades, including recognition as the Independent Captive Manager of the Year in the U.S. Captive Service Awards organized by *Captive Review* magazine in 2016 and 2020.  The Company received finalist nominations for the same award in 2014, 2015, 2017, 2018, and 2019.

8.    The services offered by the Company include, among other things: (i) providing expertise in the formation and licensure of captives; (ii) managing captives; (iii) interacting with various state regulators; (iv) managing third party administrators; (v) conducting conferences, seminars, and training sessions for various insurance professionals and regulators; and (vi) managing underwriting and enrollment services for health plans and risk pools.

9.    Debtors Arsenal Insurance and Arsenal Health (together, "Arsenal") are both operating entities and provide different types of services to their customers.  Arsenal Insurance assists with the formation and management of captive insurance companies (primarily in the single-parent captive end market) for property and casualty risks, as well as risk retention groups, and managing risk pools.  Arsenal Health administers self-funded employee benefits programs for its health plan sponsor customers.  Debtor Arsenal Intermediate is a holding company.

10.    A brief overview of captive insurance companies, risk retention groups, and self-funded employee benefits programs is below:

i. **Captive Insurance Companies**.  There are various forms of captive insurance companies, the most basic of which is a single-parent captive.  A single-parent captive insurance company is a licensed and regulated insurance company that is formed and wholly-owned by an organization to insure its risks, including, for example, the costs and exposures of employee benefit plans.  It is a formalized form of self-insurance that allows an organization to closely tailor its insurance coverage to its needs, while simultaneously providing certain tax planning benefits.  Using a single-parent captive insurance company permits organizations to pay insurance premiums to their own wholly-owned captive insurance company and thereby retain any profits or losses, as opposed to paying premiums to a third-party insurer where the profits or losses are retained by the third-party insurer. The captive insurer issues insurance policies, collects premiums, and pays claims for its affiliated entities or controlled non-affiliated insured entities for the insurance coverages permitted to be placed in the captive.  The basic structure of a single-parent captive insurance company is below:

Basic Single-Parent Captive Structure



30028964.19

ii.      **Risk Retention Groups**. Risk retention groups (which may also be captive insurance companies) are insurance companies that provide liability coverage to commercial businesses.  They are owned by their members, which must operate similar businesses and carry similar risks.  For example, medical practitioners or dentists may own and/or participate in a risk retention group with entities that are similar or provide like services and retain similar insurable risks.  The members of a risk retention group join as the combined group and may be able to combine their purchasing power to reduce costs and obtain customized coverage.  Risk retention groups are owned by their members, who share in any profits and losses.

iii.      **Self-Funded Healthcare Benefit Plans.**  A traditional self-funded healthcare benefit plan, such as the ones administered by Arsenal Health, is a health insurance plan funded through contributions from its plan sponsor to the plan on behalf of plan participants—the plan sponsor's employees and their families.  The plan is responsible for paying each participant's claims up to a certain annual threshold.  In Arsenal Health's case, that threshold is typically $10,000 per participant—*i.e.*, the plans administered by Arsenal Health are responsible for paying medical claims up to that amount for each participant on an annual basis, in addition to administrative expenses.

Plan sponsors typically contract for medical stop loss insurance coverage with an insurer, which is responsible for claims in excess of $10,000 per participant, in the case of Arsenal Health administered plans.  For Arsenal Health's clients, the stop-loss provider was Iron Reinsurance Company, Inc. ("Iron Re"), a mutual captive insurance company managed by Arsenal Insurance.  However, as discussed more fully below, Arsenal Insurance recently terminated its contract with Iron Re.

In the majority of the self-funded plans administered by Arsenal Health, all plan participants' claims within the $0-10,000 layer remain the responsibility of the plan, and if the sum of those claims and expenses exceeds the sum of monthly contributions intended to cover that layer of claims, the plan sponsor (*i.e.*, the employer) is responsible for funding that deficit.[2]  As described below, Beyond Risk alleges certain misrepresentations by prior management regarding the nature of Arsenal Health's health plan offerings, obscuring the fact that clients' financial responsibility could exceed their monthly contributions.

To facilitate Arsenal Health's administration of these self-funded healthcare benefit plans, each of Arsenal Health's customers typically entered into a series of contracts, including (i) an Administrative Services Agreement between each plan sponsor and Arsenal Health containing the terms on which Arsenal Health would administer the client plan and (ii) a Medical Benefits Stop Loss Policy issued to the plan sponsor by Iron Re containing the terms of the stop-loss coverage.  Arsenal has not acquired any new customers since the Iron Re contract was terminated.

## B.    Acquisition of the Company by BR Intermediate Holdings, LLC

11.    On December 23, 2021, Debtors Arsenal Insurance and Arsenal Health were acquired by BR Intermediate Holdings, LLC ("BR Intermediate"), a Delaware limited liability company.  BR Intermediate is part of Beyond Risk, a Delaware enterprise and an independent provider of risk management solutions.  As discussed below, BR Intermediate has agreed to provide DIP financing to the Debtors to support the Chapter 11 Cases and the Debtors' sale process.

---

[2]    By information and belief, at least one of the self-funded plans administered by Arsenal Health had claim limits that remained the responsibility of the plan sponsor at amounts as high as $60,000 per participant.

12.     The Company's organizational structure is depicted in the chart attached hereto as **Exhibit A**.

**C.     Litigation by Beyond Risk Related to the Acquisition**

13.     On January 26, 2023, Beyond Risk Topco Holdings, L.P. and BR Intermediate (together, the "<u>Plaintiffs</u>") commenced an action (the "<u>Delaware Action</u>") against Norman Chandler, Lansera, Inc., Atlantis Group, LLC, and Justin Law (collectively, the "<u>Defendants</u>") in the Delaware Chancery Court seeking damages for contractual indemnification, fraud, and aiding and abetting fraud arising out of the Defendants' alleged conduct, including making or aiding materially false and misleading statements designed to induce the Plaintiffs to acquire Arsenal.

14.     In the Delaware Action, the Plaintiffs allege that, shortly following their acquisition of Arsenal, two of Arsenal Health's top six clients informed Arsenal that they would not be renewing their contracts.  Upon a review of the client contracts and the health plans, the Plaintiffs determined that the two plans had incurred significant deficits, totaling several millions dollars in the aggregate, in sharp contrast to the due diligence provided by the sellers, Chandler and Lansera, Inc., in the sale process.

15.     After learning of the major deficits, the Plaintiffs allege that they reviewed the terms offered to the clients by Arsenal and determined that the premiums had been significantly underpriced.  Upon further investigation, the Plaintiffs determined that this underpricing was pervasive and the resulting deficits were intentionally concealed by Chandler, Arsenal's former Chief Executive Officer, and Justin Law, Arsenal's former Chief Operating Officer.

16.     The Plaintiffs further allege that Arsenal marketed its health plans so as to lead Arsenal's customers to believe that their healthcare expenditures were capped, when in reality they remained obligated for costs and expenses in excess of their monthly contributions, up to the full

amount of the self-insured layer.   To perpetuate this misrepresentation, Arsenal's former management allegedly (i) included misleading provisions in informational materials prepared for brokers, plan sponsors (employers), and plan participants; (ii) caused Iron Re to pay deficits incurred by client plans that accumulated claims and expenses in excess of their contributions within the self-funded layer, and (iii) failed to recoup those deficit payments from the client plans and plan sponsors on Iron Re's behalf.   As a result, customers allegedly relied on Arsenal's marketing of the health plans and misunderstood the self-funded nature of their health plans, the health plans were underpriced, and Iron Re became significantly underfunded due to the lack of collection of self-funded deficit obligations.   Ultimately, Arsenal was forced to terminate its agreement with Iron Re due to Iron Re's failure to pay amounts owed thereunder and failure to provide material information as required by the agreement.

17.    The Delaware Action alleges that Chandler and others made misrepresentations concerning these and other aspects of Arsenal's business and its compliance with contractual, statutory, and regulatory obligations.

18.    After these alleged misrepresentations were discovered, on October 18, 2022, Chandler and Law were terminated for cause from their positions as officers of Arsenal.   Arsenal worked expeditiously to prevent any further wrongdoing, including by ceasing underwriting of new and renewal Medical Stop Loss Insurance coverages to clients due to the underfunded status of the carrier, terminating its relationship with Iron Re, and working to minimize the economic impact to health plan sponsors and employees and other clients impacted by Iron Re's underfunded status.

### D.     Pre-Petition Debt Structure

19.     Based on the Debtors' most recent balance sheet for the period ending December 31, 2022, the Debtors' pre-petition debt structure, on a consolidated basis, consists of (i) no secured debt,[3] (ii) unsecured trade debt of approximately $240,000.00 in connection with amounts owed to vendors and landlords, among other things, (iii) approximately $1.8 million in unsecured debt owed to a non-Debtor affiliate related to pre-petition intercompany transactions that have since ceased,[4] and (iv) other potential non-contingent unsecured debt of approximately $330,000.00 in connection with accrued payroll and other employee obligations, accrued taxes, payments related to certain insurance policies that were recently extended, and other *de minimis* obligations. Because the Debtors' aggregate, non-contingent, liquidated debts (excluding debts owed to insiders or affiliates) are less than $7.5 million, the Debtors submit that they fall well below the eligibility threshold for purposes of section 1182(a)(1) of the Bankruptcy Code and, therefore, are eligible to pursue the Chapter 11 Cases pursuant to Subchapter V of the Bankruptcy Code.

### PART II
### EVENTS LEADING TO THE COMMENCEMENT
### OF THE CHAPTER 11 CASES

20.     Due to the alleged mismanagement and misrepresentations of former management described above, the Debtors have steadily lost customers and revenue over the past year. Since January 2022, the Debtors' monthly revenue declined from approximately $474,000.00 in January to approximately $77,000.00 in December 2022. Over the past year, the Debtors lost

---

[3]     Pre-petition, certain of the Debtors were guarantors under a non-debtor affiliate's credit facility. Prior to filing, the lender under such facility agreed to release such Debtors as guarantors. The Debtors recently became aware of one potential lienholder who filed a financing statement years before Arsenal was acquired by Beyond Risk. The Debtors will notify the potential lienholder of the Chapter 11 Cases and determine whether the lien is still effective.

[4]     This number has been updated to reflect the estimated amount owed as of the Petition Date.

approximately ninety-five percent of their customers.  Without the revenue to support their staff, the Debtors had no choice but terminate approximately sixty-two percent of their employees in 2022.  The Debtors' business has not been profitable for nearly a year.

21.     Given the deteriorating financial and cash position of the Debtors, it became apparent that a bankruptcy process was necessary.  Accordingly, in December 2022, I was appointed as CRO of the Company, Wyse Advisors was retained to provide additional support staff, and Young Conaway was retained as the Company's bankruptcy counsel.  In my capacity as CRO, I was delegated the authority to direct the day-to-day management of the Debtors' restructuring efforts, to manage cash forecasting and liquidity management procedures in connection therewith, to market the Debtors' assets for sale, and to independently negotiate the terms of any debtor-in-possession financing, among other things.

## PART III
## THE NEGOTIATION OF THE DIP FACILITY

22.     Shortly following my appointment as CRO, I authorized the Debtors' advisors to initiate the process of securing debtor-in-possession financing to fund a potential chapter 11 filing and facilitate the Debtors' sale and plan process.  The Debtors' professionals promptly reached out to BR Intermediate and various third parties to determine their interest in providing financing, including on an unsecured basis.  Under my direction, the Debtors' advisors contacted five parties, in addition to BR Intermediate, that are in the business of providing debtor in possession financing. Despite the Debtors' efforts, BR Intermediate is the only party who offered to provide financing to the Debtors.

23.     Accordingly, to finance the Chapter 11 Cases, and provide sufficient liquidity to preserve the value of the Debtors' businesses and customers for an orderly transition to an

appropriate manager while the sale and plan process is pending, the Debtors negotiated the terms

of a debtor-in-possession financing facility to be provided by BR Intermediate (in such capacity,

the "Lender").  The Lender agreed to provide the Debtors with the DIP Facility after arm's-length,

good faith negotiations.  The DIP Facility includes various milestone for the Chapter 11 Cases and

is structured to provide the Debtors with sufficient liquidity to conduct a fulsome and flexible

customer transition and sale process of the Debtors' remaining assets, thereby maximizing the

value of the Debtors' estates with minimal customer disruption.

24.     In anticipation of the Debtors' immediate need for financing, the Debtors, in

consultation with Wyse Advisors and under my supervision, performed a review and analysis of

their projected cash needs.  Based upon that review and analysis, the Debtors and Wyse Advisors

prepared an initial budget outlining the Debtors' postpetition cash needs (as amended, modified or

supplemented from time to time with the Lender's written consent, the "Budget").  The Debtors

believe that the Budget is an accurate reflection of their funding requirements and will allow them

to meet their obligations, including administrative expenses, in the Chapter 11 Cases.  The Debtors

also believe that the Budget is fair, reasonable, and appropriate under the circumstances.

25.     The Debtors, who hold no cash on the date hereof, are in need of an immediate

infusion of liquidity to ensure sufficient working capital to operate their business and administer

their estates.  More specifically, the Debtors, in consultation with their advisors, determined that

the DIP Facility is necessary to, among other things, ensure (i) payments to employees, certain

third-party vendors, utilities, taxing authorities, and insurance companies, among others, who

provide essential services needed to operate, maintain, and insure the Debtors' assets; (ii) ensure

the timely payment of chapter 11 administrative expenses; (iii) instill confidence in the Debtors

from their customers, employees, and vendors; and (iv) promote a successful sale process.

26.     With respect to DIP financing, the Lender has committed to enter into a $2,250,000.00 secured, super-priority, debtor-in-possession term credit facility (the "DIP Facility") that will be used to provide the Debtors with sufficient funding to sustain their operations during the Chapter 11 Cases.  $550,000.00 of this commitment will be available immediately upon entry of an order (the "Interim DIP Order") of the Court approving the DIP Facility on an interim basis.  In exchange for the DIP Facility, the Debtors have agreed, among other things, to grant the Lender (i) allowed superpriority administrative expense claims in the Chapter 11 Cases for the DIP Obligations and (ii) automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim DIP Order).

27.     Based on the foregoing and current market conditions, it is my belief that the DIP Facility represents the best, and indeed only, option available to address the Debtors' immediate liquidity needs and that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.  Although the Debtors are obligated to repay the amount of the DIP Facility in full, the DIP Facility undoubtedly alleviates the Debtors' liquidity crisis.  In doing so, the DIP Facility provides the Debtors with a clear path to maximizing value in the Chapter 11 Cases.  The DIP Facility serves an important piece in the Debtors' overall chapter 11 efforts because it provides the Debtors with the time and resources necessary to continue their discussions with their customers, market their assets for sale, and achieve their overarching goal of maximizing the value of the Debtors' estates for the benefit of the Debtors' creditors and other stakeholders.

28.     Accordingly, I believe that the DIP Facility is in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the Motion.

## PART IV
## GOALS OF THE CHAPTER 11 CASES

29.     Given their challenging financial position, the Debtors' paramount goal is to maximize the value of their estates for the benefit of their creditor constituencies and other stakeholders, while providing customers with an orderly transition of services to a third party manager.  Following careful consideration of all alternatives, the Debtors have determined that implementation of a sale and plan process in accordance with the milestones and other terms set forth in the DIP Credit Agreement represents the best way to maximize the value of the Debtors' businesses.

30.     In furtherance thereof, within the next few days, the Debtors intend to file a motion for approval of streamlined procedures to govern a series of discrete asset sales of their outstanding accounts receivable, tangible property (including furniture, fixtures, and other similar items), and intellectual property and the potential assumption and assignment of their customer contracts and leases.  As required by Subchapter V, the Debtors also intend to file a chapter 11 plan well within ninety days to distribute the proceeds of these sales and the Debtors' other assets.  I believe that implementing these transactions, following market-testing during the Chapter 11 Cases, will maximize the value of the Debtors' estates for the benefit of all of their stakeholders.

31.     While the sale and plan process is ongoing, I believe that the DIP Facility will provide the Debtors with sufficient liquidity to continue their ordinary course operations and to pay the administrative costs, both operational and statutory, required in the Chapter 11 Cases.

## PART V
## SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS

32.     Contemporaneously herewith, in addition to the Motion to approve the DIP Facility (discussed above), the Debtors have filed a number of First Day Motions seeking orders granting

30028964.19

14

various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these Chapter 11 Cases. The First Day Motions include the following:

- *Debtors' Motion for Order Authorizing the Joint Administration of Related Chapter 11 Cases*

- *Debtors' Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent*

- *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment, (III) Establishing Procedures for Resolving Requests for Additional Assurance, and (IV) Granting Related Relief*

- *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue Prepetition Insurance Policies and Pay All Prepetition Obligations in Respect Thereof and (II) Authorizing Banks to Honor Related Checks and Transfers*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees; and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Employee Wages, Salaries, and Other Compensation and (B) Continue Employee Benefits Obligations and Pay Related Administrative Obligations; (II) Authorizing Debtors to Honor Any Workers' Compensation Obligations; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued (A) Use of Cash Management System; (B) Use of Prepetition Bank Accounts and Certain Payment Methods; and (C) Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims; and (II) Granting Related Relief*

33.     The First Day Motions seek authority to, among other things, obtain financing, honor employee-related compensation and benefits obligations, satisfy any outstanding tax obligations, maintain suitable and appropriate insurance coverage, and continue the Debtors' cash

30028964.19

management system and other operations in the ordinary course in order to ensure minimal disruption of the Debtors' business operations during the pendency of these Chapter 11 Cases.

34.     I am familiar with the substance contained in each First Day Motion, and I believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in the Debtors achieving a successful and prompt restructuring, and (c) best serves the Debtors' estates and their stakeholders' interests.  I have reviewed each of the First Day Motions, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief and are incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts.

**A.      Motion for Joint Administration**

35.     Many of the motions, applications, hearings, and orders in the Chapter 11 Cases will jointly affect all three Debtors, who I understand are "affiliates" within the meaning of the Bankruptcy Code.  Under these circumstances, the interests of the Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of the Chapter 11 Cases for procedural purposes only.  Joint administration of the Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

36.     For these reasons, the Debtors submit, and I believe, that the relief requested in the motion is in the best interest of the Debtors, their estates, and their creditors and therefore should be approved.

**B.      Application to Appoint 156(c) Claims Agent**

37.     The Debtors request entry of an order authorizing the retention and appointment of Kroll Restructuring Administration LLC ("Kroll") as their claims and noticing agent in the Chapter

11 Cases.  The Debtors selected Kroll after soliciting proposals from Kroll and two other potential claims and noticing agents.  I believe that the relief requested in Kroll's retention application will ease the administrative burden on the Clerk of the Court in connection with the Chapter 11 Cases and decrease the Debtors' costs associated with claims and noticing.  In addition, I have been advised by counsel that Kroll's retention is required by the Local Rules in light of the aggregate number of parties listed on the Debtors' creditor matrix.  Accordingly, I believe that the application should be approved on the terms proposed.

**C.      Motion to Provide Utility Companies with Adequate Assurance**

38.      In connection with the operation of their business, the Debtors obtain telephone and internet services (collectively, the "Utility Services") from a utility company (the "Utility Company" and, collectively with any other potential utility companies that provide services to the Debtors during the Chapter 11 Cases, the "Utility Companies").  Aside from the aforementioned Utility Services, the Debtors receive the majority of their utility services indirectly, through common area maintenance charges as part of lease payments and through their employees. Because the Utility Company provides essential services to the Debtors, any significant interruption in the Utility Services would be highly problematic.  In addition, to the extent any other Utility Companies assert that they are entitled to "adequate assurance" of future performance from the Debtors, it is essential for the Debtors to have procedures in place to address those requests in an orderly manner.

39.      I understand that under section 366 of the Bankruptcy Code, the Debtors' Utility Companies are entitled to a form of "adequate assurance" of future performance.  Accordingly, the Debtors have proposed to protect the rights of the Utility Companies by providing such Utility Companies with a deposit in an amount equal to approximately 50% of the Debtors' estimated

monthly cost of utility services subsequent to the Petition Date. The Debtors submit that the deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business, constitute adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code. To the extent that the Utility Companies disagree, however, the Utility Companies would be able to utilize the Debtors' proposed procedures to seek additional adequate assurance.

40.     I believe the Debtors' proposed treatment of the Utility Companies is appropriate under the circumstances, and I am advised by counsel that the proposed procedures are consistent with procedures routinely approved in this District. Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and therefore should be approved.

**D.     Motion to Honor and Continue Insurance Programs**

41.     In the ordinary course of their business, the Debtors maintain the following insurance policies: (i) business owners' policy; (ii) umbrella liability; (iii) crime liability; (iv) directors & officers; (v) errors & omissions liability ("the E&O Policy"); (vi) excess errors & omissions liability; (vii) cyber liability; (viii) workers' compensation; and (ix) automobile liability (collectively, the "Insurance Policies"). The Debtors are in the process of renewing or modifying the E&O Policy. The cost of such renewal or modification is approximately $4,000.00. To the extent the payment related to the renewal or modification of the E&O Policy is not processed prior to the Petition Date, the Debtors seek authority to pay this amount post-petition in the ordinary course, particularly given that the E&O Policy will entirely cover the post-petition period. A listing of all known Insurance Policies currently in effect, which list I have reviewed, is attached as an exhibit to the Debtors' motion.

42.     In connection with the Insurance Policies, the Debtors obtain brokerage services from Bev Cap Management, LLC and other co-brokers, as applicable (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those Insurance Policies on advantageous terms at competitive rates.

43.     The Debtors' Insurance Policies are essential to preserve the value of the Debtors' business and assets, and are, in some cases, required by various laws, regulations or contracts that govern the Debtors' business (and I am advised that certain insurance policies are also required by the Guidelines established by the Office of the United States Trustee for chapter 11 bankruptcy cases).  In addition, the officers of the Debtors require continued D&O insurance during the pendency of these Chapter 11 Cases.  It is critical that the Insurance Policies be maintained and renewed on an ongoing and uninterrupted basis.  Therefore, the Debtors request that the Court authorize them to pay all prepetition premiums, fees, and expenses arising under, or related to, the Insurance Policies, including with respect to any Broker's fees.  For these reasons, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and therefore should be approved.

**E.      Motion to Honor Prepetition Taxes**

44.     In the ordinary course of their business, the Debtors incur and/or collect certain prepetition taxes, including, but not limited to, property taxes, business privilege taxes, annual franchise taxes, miscellaneous state taxes, and various other taxes, fees, charges, and assessments, as applicable (collectively, the "Taxes and Fees"), and remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or

governmental subdivisions or agencies of those states (collectively, the "Taxing Authorities"). The Taxes and Fees are paid monthly, quarterly, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

45.     As of the Petition Date, an estimated $5,000 in Taxes and Fees has accrued and remains unpaid.  The Debtors are seeking authority to pay all prepetition Taxes and Fees in the ordinary course of business.  For the avoidance of doubt, the Debtors are not seeking authority to pay any amounts on account of past-due taxes or to prepay any taxes.

46.     The Debtors have ample business justification to pay the Taxes and Fees because it is my understanding that: (i) substantially all of the Taxes and Fees constitute priority claims; (ii) the failure to pay certain of the Taxes and Fees may impact the Debtors' ability to conduct business in certain jurisdictions and their ability to perform under their postpetition agreements; and (iii) the Debtors' directors and officers may face personal liability if certain of the Taxes and Fees are not paid.  Absent payment of these amounts, the Debtors may face serious disruptions and distractions during the administration of the Chapter 11 Cases, as well as hinder the Debtors' efforts to maximize estate value through these restructuring proceedings.  I believe that the motion should be approved because it is in the best interests of the Debtors, their estates, and creditors.

**F.     Motion to Honor and Continue Employee Obligations and Benefits**

47.     The continued and uninterrupted support of the Debtors' employees is essential to the Debtors' success, and the Debtors therefore seek authority to continue paying wages and benefits to their employees in the ordinary course of business. The skills and experience of the Debtors' employees, their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' business are essential to the preservation and maximization of the value of the Debtors' estates.  Interruptions in payment of

prepetition employee-related obligations will impose hardship on employees and is certain to jeopardize their continued performance during this critical time.

48.     To minimize the personal hardship that the employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain employee morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, their employee-related obligations, as detailed in the Debtors' motion, including with respect to the following, whether arising pre- or post-petition: (i) wages, salaries, paid time off, severance payments to non-insiders, bonus payments to non-insiders, and other compensation; (ii) employee business expenses; (iii) contributions to prepetition benefit programs provided to employees; (iv) workers' compensation obligations; (v) payments for which prepetition payroll deductions were made; (vi) processing costs and administrative expenses relating to the foregoing payments and contributions; and (vii) payments to third parties incident to the foregoing payments and contributions. A chart setting forth the proposed maximum prepetition amounts the Debtors seek to pay with respect to each category of employee wages and benefits is set forth below:

| Employee Obligations | Approximate Amount Outstanding |
|---|---|
| **Employee Wages, Other Compensation, and Employee Expenses** | |
| Unpaid Wages and Related Amounts | $30,000.00 |
| Employee Expenses | $1,750.00 |
| Deductions and Taxes | $15,000.00 |
| **Employee Benefits** | |
| Health Benefits | $11,750.00 |
| Paid Time Off | $60,000.00 |
| Unremitted 401(k) Contributions | $2,000.00 |
| Additional Employee Benefits | $2,500.00 |
| **Total:** | $123,000.00 |

49.     Through the motion, the Debtors seek authority to pay $123,000.00 on account of prepetition workforce compensation and benefits on an interim and final basis.

### G.    Motion to Continue Using Existing Cash Management System

50.    In the ordinary course of business, the Debtors maintain a centralized cash management system (the "Cash Management System") involving four bank accounts, including (i) a concentration account (the "Concentration Account") held by Debtor Arsenal Intermediate, (ii) two operating accounts (each, an "Operating Account") held by Debtors Arsenal Insurance and Arsenal Health, respectively, and (iii) an account established to hold customer funds in trust in accordance with Arsenal Health's fiduciary duties as a plan administrator under ERISA (the "Trust Account" and, collectively with the Concentration Account and the Operating Accounts, the "Bank Accounts").

51.    As set forth above, Arsenal Health administers self-funded employee benefit programs for its health plan sponsors.  To facilitate Arsenal Health's administration of these self-funded healthcare benefit plans, each of Arsenal Health's customers typically enter into an Administrative Services Agreement containing the terms on which Arsenal Health administers the customer's plan.  The Administrative Services Agreements provide that Arsenal Health is a fiduciary of the plans within the meaning of ERISA and, as a fiduciary, Arsenal Health is required to hold any assets of the plans it receives in trust.  The Trust Account was established to hold such funds.  The funds held in the Trust Account are not property of the Debtors' estates.

52.    The Concentration Account and the Operating Accounts are maintained at Bank of America N.A. ("Bank of America"), which I understand is a party to a Uniform Depository Agreement ("UDA") with the Office of the United States Trustee for the District of Delaware.  The Trust Account is maintained at FirstBank (together with Bank of America, the "Banks"), which I understand is not party to a UDA, but is FDIC-insured and a large, reputable bank.

53.     Like other businesses of their size, the Debtors designed their Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made. The Debtors believe that significant disruptions to the Debtors' business would be highly likely if the cash management procedures were altered.  As such, it is essential that the Debtors be permitted to maintain their Cash Management System in its current format. The Debtors, therefore, seek authority for the continued use of the Cash Management System and bank accounts. The Debtors further seek authority to implement ordinary course changes to their Cash Management System and to open and close bank accounts. The Debtors also request authority for the Banks to charge and the Debtors to pay or honor service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with its contractual arrangements with the Debtors.

54.     The Debtors believe that the use of the Bank Accounts substantially comply with section 345(b) of the Bankruptcy Code.  However, the Debtors seek an interim waiver of section 345(b) as it pertains to the Trust Account because FirstBank is not an authorized depository.  I believe this relief is necessary to avoid any disruption to the Debtors' business.

55.     In the ordinary course of their business, the Debtors maintain business relationships between and among themselves and their non-debtor affiliates (the "Non-Debtor Affiliates").  As part of these business relationships, the Debtors and their Non-Debtor Affiliates participate in a variety of intercompany transactions (the "Intercompany Transactions") that generate intercompany receivables and payables (the "Intercompany Claims").  The Debtors maintain strict records of the Intercompany Claims and can ascertain, trace, and account for all Intercompany Transactions, including records of all current intercompany accounts receivable and payable.

56.     The Intercompany Claims among the Debtors primarily arise from the transfer of funds throughout the Cash Management System.  When funds are transferred to or from the Operating Accounts and the Concentration Account, intercompany balances accumulate which represent the cumulative impact of those transfers.  These intercompany payables and receivables occur in the Debtors' ordinary course of operations.

57.     The Intercompany Claims among the Debtors and the Non-Debtor Affiliates will primarily arise from the Debtors' portion of certain shared services, including certain information technology and other small services and payments made on account of the license for Sage.  On a monthly basis, the Debtors' total cost of such services is approximately $1,650.00.  As of the Petition Date, no amounts are owed by the Debtors to the Non-Debtor Affiliates in connection with the shared services.

58.     The Cash Management System provides the mechanism for cash to flow through the Debtors and the Non-Debtor Affiliates so that operations may be maintained.  To lessen the disruption caused by the Chapter 11 Cases and to maximize the value of the Debtors' estates, it is essential that the Debtors be allowed to continue to use Intercompany Transactions in the ordinary course.  As stated above, the only Intercompany Transactions that will occur during the Chapter 11 Cases with the Non-Debtor Affiliates will relate to their shared services.

## <u>CONCLUSION</u>

59.     I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

*[Remainder of page intentionally left blank]*

30028964.19

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 26, 2023                    _/s/ Michael Wyse_____
                                            Michael Wyse
                                            Chief Restructuring Officer

## **Exhibit A**

### **Corporate Organizational Chart**

