1       UNITED STATES BANKRUPTCY COURT
                DISTRICT OF DELAWARE

2

3   IN RE:                    .  Chapter 11 (Subchapter V)
                              .  Case No. 23-10097 (CTG)
4   ARSENAL INTERMEDIATE      .
    HOLDINGS, LLC, *et al.*,  .  (Jointly Administered)
5                             .
                              .  Courtroom No. 7
6                             .  824 Market Street
            Debtors.          .  Wilmington, Delaware 19801
7                             .
                              .  Thursday, March 23, 2023
8   . . . . . . . . . . . . . .  9:30 a.m.

9                   TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10              UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:          Sean M. Beach, Esquire
                              Elizabeth S. Justison, Esquire
13                            YOUNG CONAWAY STARGATT & TAYLOR, LLP
                              Rodney Square
14                            1000 North King Street
                              Wilmington, Delaware 19801

15

16  For the US Trustee:       Linda J. Casey, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
17                            J. Caleb Boggs Federal Building
                              844 King Street
18                            Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801

19
    (APPEARANCES CONTINUED)
20  Audio Operator:           Theresa Mistretta, ECRO

21  Transcription Company:    Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24

25  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the United States
   Department of Labor:      Ellen W. Slights, Esquire
3                            UNITED STATES ATTORNEY'S OFFICE
                             1201 Market Street
4                            Suite 1100
                             Wilmington, Delaware 19899
5
   For BR Intermediate
6  Holdings, LLC:            David M. Feldman, Esquire
                             GIBSON, DUNN & CRUTCHER, LLP
7                            200 Park Avenue
                             New York, New York 10166
8

9  For BeneBay, Inc.:        Jeffrey R. Waxman, Esquire
                             MORRIS JAMES, LLP
10                           500 Delaware Avenue
                             Suite 1500
11                           Wilmington, Delaware 19801

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

MOTIONS:                                                              PAGE

Agenda
Item 1:    Debtors' Memorandum of Law in Support of the        4
           Use of an "Opt-Out" Form in Connection with
           the Third Party Releases Set Forth in the
           Joint Chapter 11 Plan of Liquidation of
           Arsenal Intermediate Holding, LLC and its
           Affiliated Debtors [D.I.165, 3/22/23]

           Court's Ruling:                                     88


Transcriptionist's Certificate                                 89

1       (Proceedings commenced at 10:00 a.m.)

2              THE COURT:  Be seated.

3              MR. BEACH:  Good morning, Your Honor.

4              THE COURT:  Good morning, Mr. Beach.

5              MR. BEACH:  May I please the Court?  Sean Beach

6  from Young Conaway Stargatt & Taylor on behalf of the

7  debtors.

8              Your Honor, before I start my presentation with

9  respect to the issue today, Ms. Slights would like to make

10 one statement on behalf of the Department of Labor and we

11 thought it might make sense just to have her do it at the

12 outset if that's okay with Your Honor.

13             THE COURT:  Of course.

14             MR. BEACH:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             Ms. Slights?

17             MS. SLIGHTS:  Thank you, Your Honor.  Ellen

18 Slights with the U.S. Attorney's Office on behalf of the

19 Department of Labor.

20             The Department of Labor asked me to appear this

21 morning to read a brief statement if I may?

22             THE COURT:  Certainly.

23             MS. SLIGHTS:  The attorney for the Secretary of

24 Labor is unable to attend today's hearing; however, in light

25 of the briefs recently filed, I have been asked to clarify

the Secretary's position.  She neither supports, nor opposes
the opt-out mechanism in the debtors' proposed plan.  The
Secretary does not intend that her participation in the case
means that an individual plan participants are deserving of
any less protection with respect to the operation of any
release mechanism.

Whatever decision the Secretary makes with regard
to opting in or out of the proposed plan would not be binding
on individual or recent plan participants, beneficiaries, or
plan sponsors, nor would a decision by such parties be
binding on the Secretary.  Under ERISA, each has an
independent right of action.

THE COURT:  Okay.  So, that's very helpful and I
really appreciate your being here.  I appreciate it.  I think
the Department of Labor, typically, is an independent
litigating authority in these issues and that you're here,
basically, just pinch-hitting --

MS. SLIGHTS:  That is correct.

THE COURT:  -- so, I appreciate that.

So, if I actually have a question about what you
just said, is it fair to ask you?  If the answer to that is
"No, it's not," you can tell me.

MS. SLIGHTS:  I'm afraid the answer is, no, it's
not, Your Honor.

THE COURT:  Okay.

1            MS. SLIGHTS: It's just beyond my purview.

2            THE COURT: Totally understood, Ms. Slights. I

3 appreciate your offering those observations and I appreciate

4 it.

5            MS. SLIGHTS: Thank you, Your Honor.

6            THE COURT: Thank you.

7            Okay. Mr. Beach?

8            MR. BEACH: Thank you, Your Honor.

9            Again, for the record, Sean Beach on behalf of the

10 debtors. Your Honor, to the extent that anything in the

11 debtors' brief suggested otherwise or there's an ambiguity

12 regarding the DOL's position, we certainly didn't intend

13 that. We understand their position and appreciate it.

14            THE COURT: So let me say first to everyone that I

15 know that I asked you to write these briefs in a hurry and

16 that you did and they were extremely helpful, so thanks to

17 everyone. Thank you to the Executive Office for putting up

18 with my making them move faster than they would like.

19            I'll ask you the question that I would have asked

20 Ms. Slights if I were allowed to see if -- and, obviously if

21 the U.S. Trustee has a view on this -- I confess I am not --

22            MR. BEACH: I can call a friend if I need to?

23            THE COURT: Yeah, exactly. Look, I'm not an ERISA

24 expert. I don't think anyone -- it would surprise me if

25 anyone here were. That way, if someone wants to tell me they

1  are, that would be terrific.

2          If the Department of Labor or the Secretary,

3  whoever the appropriate plaintiff is, were to bring a claim

4  under ERISA, does -- do the recoveries go to the plan as

5  opposed to the Treasury or, like, how does the -- the

6  question I have is you make the point, Look, the Department

7  of Labor is here and don't worry, because these people

8  effectively have a form of having their rights protected

9  through the way ERISA works and I want to make sure I

10 understand the extent to which that's correct.

11         If the Secretary brings an action and prevails --

12 all right, let's imagine -- all right.  I have no idea if

13 there's a claim against one of the beneficiaries of a third-

14 party release or not.  Let's assume for the purposes of today

15 that I'm not going to know the answer to that when we make

16 the decision and that we're going to have to proceed on the

17 assumption that there hypothetically could be a claim;

18 whether it's good, bad, or indifferent, we're not going to

19 decide.

20         So, if such a claim were to be brought and there

21 was to be a recovery, where do the proceeds go?

22         MR. BEACH:  Your Honor, the best way I think I can

23 answer that question, and perhaps we have a copy of it or can

24 get a copy of it for Your Honor, the Department of Labor

25 filed three proofs of claim.  I think it's abundantly clear

1  in that proof of claim the statement that is attached to the

2  proof of claim that the proceeds of any recovery of that

3  litigation would go to the plan or the plan beneficiaries.  I

4  don't recall exactly what the wording was at this point.

5       THE COURT:  Okay.  I can look at the proof of

6  claim.  I'm sure I can take that out.

7       Okay.  So, I derailed you when you were about

8  to -- I'm sure you came here planning to say something and I

9  should be a nicer person and let you make the presentation

10 you want to make.

11      MR. BEACH:  Not at all, Your Honor.

12      And I do appreciate that there was a focus in the

13 brief on the Department of Labor claim.  I will tell Your

14 Honor that is, you know, suspenders after the belt, after

15 another pair of suspenders in terms of why we think this

16 case -- well, to the extent this case is unique, that only

17 helps.  It's unique because we have this additional set of

18 security, potentially, for a recovery that would, I believe,

19 go to the beneficiaries of these health plans.

20      Your Honor, first, I'd like to start by framing

21 the issue that Your Honor put us to which was a relatively

22 narrow issue, and that was whether these cases present some

23 unique set of facts or circumstances that would make Your

24 Honor reconsider your view that an opt-out mechanism is an

25 appropriate mechanism, subject to, you know, having

1  addressing those issues at confirmation to the extent there

2  was notice or an effected party that came before the Court

3  and objected to that mechanism at confirmation.

4          Your Honor, I believe that's the issue that is

5  before Your Honor today.  The U.S. Trustee's Office's

6  position in many cases these days has been, you know, black

7  and white.  Opt-in -- opt-outs are not appropriate,

8  notwithstanding many judges in this jurisdiction who've said

9  they are an appropriate mechanism for third-party releases

10 and only opt-ins are appropriate.

11         The U.S. Trustee's Office here, I think, was

12 trying to narrow that issue and focus on two particular

13 groups of creditors.  Those would be the plan sponsors and

14 the plan participants understanding Your Honor's prior

15 rulings on this issue and arguing that those creditor groups

16 were unique or akin to *pro se* litigants.

17         Your Honor, this case, in our view, is really no

18 different than other cases that are before Your Honor and

19 other judges in this jurisdiction.  Not only is this no

20 different from any other case where the creditors who are

21 unfamiliar with the bankruptcy process, but the debtors have

22 also gone above and beyond to provide adequate disclosures

23 and notice to these parties, in particular, to furnish them

24 with an understanding of these issues.  And, Your Honor, I'll

25 get to that a little bit more, but we have been working and

1 | we do appreciate the comments that Ms. Casey has provided to

2 | us in terms of what disclosures she thought would be

3 | appropriate. I don't think we've resolved her issues, but we

4 | have done as much as I think the debtor could possibly do to

5 | get there in terms of disclosures.

6 | THE COURT: So, I do want to hear all of what you

7 | have to say, but let me just focus you in on one particular

8 | point.

9 | MR. BEACH: Uh-huh.

10 | THE COURT: All right. Your brief is terrific. I

11 | understand that in every case I've got parties of varying

12 | levels of sophistication, right; some are, you know, billion-

13 | dollar hedge funds and some are regular people and we don't

14 | engage in a retail analysis with respect to this question.

15 | That's fair.

16 | One thing. Of all the things that concern me

17 | here, the one that concerns me the most is that I've entered

18 | an order and for good reason. It was with everyone's consent

19 | and was a very, to very salutary ends. But the point that

20 | distinguishes this case from every other case is that in

21 | every other case, you don't have an order by the bankruptcy

22 | judge that might operate to prevent the people who are

23 | creditors from learning of the facts of their claim. And so,

24 | the various points you made about why this case is a lot like

25 | every other largely moved me, except I'm stuck on that point.

1    And so, I want to hear you say whatever you want

2 to say, but just so you know where my mind is right now --

3 and I haven't made my mind up on this; I'm really struggling

4 with it, but I am concerned about the fact that I entered an

5 order that might prevent people who are creditors from

6 learning that they're creditors before they've got to make a

7 decision whether to opt in or opt out.  And so if you could

8 focus on that, among the other things you want to address,

9 that would be most helpful to me.

10    MR. BEACH:  Sure.  I'll address that first, Your

11 Honor.  As you may recall, at the end of that hearing, one of

12 the issues we went back to do is to make an amendment to the

13 order at the request of the Office of the United States

14 Trustee to make it abundantly clear to the plan participants,

15 as well as the plan providers that they could reach out to

16 the healthcare providers to request information about the

17 amount of their claim and whether there is a claim.

18    I will also say, Your Honor, in connection with

19 that hearing I believe there was evidence in the

20 declaration -- if it wasn't evidence, then it was argument --

21 about the many plan participants and plan sponsors that have

22 already been contacted by healthcare providers, either from a

23 billing or collection standpoint and that information seems

24 to have been readily available to most of those parties.  In

25 addition to that, Your Honor, I think one of the arguments

1  that the Office of the United States Trustee makes is that

2  that stay applies for a four-month period of time and that

3  the bar date --

4       THE COURT:  The issue isn't the bar date, though,

5  right, because we're talking about the third-party releases.

6  As *vis-a-vis*, the debtor, that is what it is and I'm

7  satisfied that what you've done addresses that, but it

8  doesn't respond to the concern about the opt-out, right?

9       MR. BEACH:  The bar date is an ability for the

10  creditors to file a direct claim against the debtors.  I

11  agree that --

12       THE COURT:  And they'll get what they get and none

13  of us knows what that will be, right?

14       MR. BEACH:  And the releases don't apply to the

15  debtors.  I know the U.S. Trustee's brief said that they did

16  and Ms. Casey was right that someone could read it that way

17  based on how the related parties were drafted.  We have now

18  clarified that point and it's clear that it doesn't apply to

19  the debtors, *vis-a-vis*, the third parties.

20       I think, you know, to the extent that the claims

21  that they would have against the third parties that would be

22  released under the plans, Your Honor, I would submit are

23  pretty attenuated in terms of how they would --

24       THE COURT:  I understand.  We always have that

25  argument.  It cuts both ways, right?  The more ridiculous the

1  claims are, the less those parties need the releases and so I

2  hear the point.

3          Whether those third parties are fiduciaries,

4  whether they could be liable vicariously for someone else's

5  breach of fiduciary duty, that, to me, is a set of questions

6  that we've got to sort of treat as a black box for this

7  purpose.  I'm not going to adjudicate that today, right.

8          MR. BEACH:  Understood.

9          THE COURT:  So I kind of have to assume if they're

10  asking for a release, that probably means they want it.  And

11  I understand there's nuisance litigation.  I'm not saying the

12  fact that they're asking for the release means they have

13  liability, by no means, but I do think I've got to proceed on

14  the premise that this is a thing of value.

15          MR. BEACH:  Understood, Your Honor.

16          And I raise that issue because the point is

17  whether or not they know the exact amount of the cost of

18  going to a dentist or a doctor and have received a bill and

19  can pursue that claim against the debtor, query whether that

20  is the type of claim that they would even consider pursuing

21  against these parties.

22          THE COURT:  Maybe not.

23          MR. BEACH:  And in addition to that, Your Honor, I

24  think part of the struggle of this whole argument is that

25  these are issues that can be taken up at confirmation, as to

1 whether or not there was proper notice and whether --

2          THE COURT:  Do you really want me to do that?

3          I mean, you've given me an order that you want me

4 to sign and would it really be a sensible thing for me to

5 sign that order and then blow up your plan at confirmation on

6 the ground that I shouldn't have signed that order?

7          MR. BEACH:  No, Your Honor.  But we're confident

8 that we will be able to make the case that proper notice was

9 provided and the opportunity to determine whether the opt-out

10 was appropriate, was provided.  And if an affected party

11 comes in and says that that was not proper, then that's an

12 issue that we can address at that time.

13          THE COURT:  Well, see, this is the difficulty of

14 this question.  Sort of by definition, is anyone -- the whole

15 point of this is it's the case of the dog that didn't bark,

16 right.  The question is, do the people understand from the

17 processes that we're setting up that their rights are being

18 effected?

19          And so, it doesn't -- it's not wholly responsive

20 to that to say, Well, to the extent there's someone who's

21 prejudiced by that, they can come and tell you, because the

22 concern we have is about whether they appreciate the need to

23 come here.  If they know of the need to come here, they can

24 opt out, right.  So, I'm not worried about the person who

25 knows what's going on; by definition, I'm worried about the

1  person who doesn't.

2          MR. BEACH:  Understood, Your Honor.

3          And we believe that with the notices, as amended,

4  there are very clear disclosures about not only what the

5  releases say.  The full release language is in those notices.

6  The definition of the related parties and released parties is

7  in those notices.  There is additional disclosure about the

8  types of claims or the fact that the plans are underfunded,

9  the fact that it's possible that there's a delay or an

10 inability to pay their claims.  Those disclosures are as

11 clear as they possibly can be; frankly, as clear as I've seen

12 them in any case.

13         THE COURT:  My issue isn't at all with the

14 language.  I think you've done a terrific job.  I've read it,

15 too, and I'm not concerned.  Obviously, to the extent the

16 parties continue to be discussing it, I don't mean to be

17 putting a thumb on that.

18         But my concern isn't that someone will read this

19 and not -- and be misled by it.  Sometimes you're worried

20 about that because you give someone a phone book of, you

21 know, like, seven pages of all bold, all caps, and you can't

22 understand it.  It was complicated defined terms and you have

23 no idea what's going on, so I get that.

24         My general -- the general set of concerns that I

25 have about the consensual third-party release -- and look,

1 this is the point that my colleagues have made in cases in

2 which they've adopted the U.S. Trustee's position on this, is

3 that a person, an unsophisticated person gets a thing about a

4 bankruptcy case and doesn't focus on it and the argument

5 goes, *vis-a-vis*, the debtor, if you throw away a legal

6 document, you do it at your own peril, but *vis-a-vis*, a

7 nondebtor, you shouldn't be charged with reading it and

8 understanding it.

9 You know, my view is that when you've got a -- at

10 the very least when you've got a sophisticated party, you

11 know, in a world in -- in Continental says what it says, the

12 same principle applies. What I'm struggling with is how you

13 apply that to the person who might not even know of their

14 claim because of an order that I've entered.

15 And, again, I'm not -- I want to hear you because

16 I'm really leaning straight up on this issue.

17 MR. BEACH: Understood.

18 Yeah, and I know this is not going to answer your

19 question directly, but I do want to make it clear what this

20 plan is not doing. There's a two-year runway from the

21 termination of the administrative services agreement for any

22 plan participants to submit their healthcare claims --

23 THE COURT: Uh-huh.

24 MR. BEACH: -- pursuant to the ordinary course, as

25 they've done it before, against the plans themselves.

1          THE COURT:  Yeah.  So, if the debtor -- if you

2  find money that the plan should have, they're not prejudiced

3  from getting their plans, their claim paid within the two-

4  year wind-down period?

5          MR. BEACH:  Yes.  And in addition to that, if at

6  the end of that two-year period the claims have not been paid

7  in full, they are automatically deemed to be asserted against

8  the debtor, based on the revision to the plan.  And the

9  liquidating trustee can make a determination as to whether

10 they're properly asserted against the debtor.

11         THE COURT:  So, they're treated as having been

12 made by the plans against the debtor and the liquidating

13 trustee can object or not, essentially, and the question of

14 whether the debtors, outside of bankruptcy, would have

15 liability for an underfunded, as the administrator, would

16 have liability for an underfunded plan would be, essentially,

17 the question.

18         Do I have that within a stone's throw of right?

19         MR. BEACH:  That's correct, Your Honor.

20         In addition to that, for direct claims that may be

21 somewhat derivative of those healthcare claims against the

22 debtors, those individuals have six months from, I believe

23 service of the confirmation hearing notice to file those

24 direct claims --

25         THE COURT:  Because you extended the bar date to

1  address the concern that was -- that we dealt with last week?

2          MR. BEACH:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. BEACH:  With respect to the Department of

5  Labor, we talked a little bit about that; that's an

6  additional, you know, even though each party does have its

7  individual rights, I understand that and I understand that we

8  shouldn't impair either parties' individual rights, they

9  should -- there is a sophisticated party, notwithstanding

10 that --

11         THE COURT:  Uh-huh.

12         MR. BEACH:  -- that has filed proofs of claim.

13 So, all of these claims are asserted in some way by a

14 sophisticated party already against the debtors' estates.

15         I recognize that Your Honor's focus was on the

16 third-party releases and how these individual participants

17 then understand their rights against the third parties, Your

18 Honor.  I would submit that you will get this creditor-by-

19 creditor inquiry in every case.  I don't think this is unique

20 because of the stay order that Your Honor entered.  I think

21 that you can look at any retail case.  I think there have

22 been a few that Your Honor has approved opt-outs in --

23         THE COURT:  Uh-huh.

24         MR. BEACH:  -- and, you know, probably customers

25 who don't realize that they have, you know, a card in their

drawer that's been there for two years and --

THE COURT:  No, I get that and you persuaded me of that.

And the one distinguishing feature is that in those cases it's not the judge's fault that a creditor didn't know of its claim; it was just life.  And if it's just life, it may be, you know, in a world in which I think the right answer is, generally opt-outs are okay, then that's just life.

Here, I've entered an order and, look, for good and sound reason.  I'm not picking anyone, least of all myself for entering the order that everyone agreed I should enter, but it does have the consequence.

Your point that you negotiated language, good and helpful language in which they have the ability to get information, that's a lot better than if we didn't have it. I agree with that.

But, look, if I'm living in a different planet from the actual facts, you should enlighten me, but the concern that I have -- and if this is imaginary, like, tell me -- is that there could be someone out there who had a procedure and, you know, the provider sent a bill to the debtor now that this is a plan.  They haven't been paid.

The provider hasn't yet done anything to let the person, the participant know of this and now they can't.  And

1  four months from now they're going to get a bill for $10,000

2  and they're going to look at it and say, Yikes, and they will

3  first learn that they would have gotten the notice of the

4  bankruptcy and they would have been served with the plan,

5  let's say, but wouldn't have reason to care because they went

6  to the doctor and no one's told them they owe any money.

7        And so they got this thing and they paid no

8  attention, because they wouldn't have had reason to pay

9  attention, and they, now, because of my order, won't have

10  reason to pay attention until -- they can still, once they

11  learn of it, file a proof of claim because of the good things

12  that you've done, but *vis-a-vis*, their rights against the

13  third parties, they've disappeared and if only I hadn't

14  entered that order, they would have gotten the bill in time

15  to come in and opt out.

16        MR. BEACH:  Your Honor, every one of these plan

17  participants has gotten numerous notices in this case.  They

18  got the notice of commencement.  They got -- which included a

19  bar date, which we're now extending.  They will also get this

20  notice that we're providing; it's a notice that is particular

21  to them and their issue telling them that these plans are

22  underfunded.

23        THE COURT:  Right.

24        MR. BEACH:  So, regardless of whether they know

25  the exact amount of the claim, they know that they're at risk

1  for having a claim that may not be paid.  The notice and the

2  opt-out form itself are as conspicuous as they could be on

3  that point.

4           THE COURT:  Uh-huh.

5           MR. BEACH:  There is often the case where parties

6  have unliquidated claims or no claims at all and they have to

7  make a determination as to whether or not they think they

8  would want to opt out because they think they might have a

9  claim in the future.  They would have known that they went to

10  the doctor.  They will get a notice saying, This claim might

11  not be paid.

12           THE COURT:  Yeah, I'm not disputing that they have

13  sufficient notice that they have a claim under 1015 that

14  would be discharged.  This isn't like the future-rising claim

15  problem where it's not a claim because they're not

16  sufficiently on notice of it.  I get that it's a claim,

17  that's sort of the problem, and where I'm stuck.

18           And look, your points are very helpful.  That

19  you've sent them a bunch of pieces of paper is helpful.  The

20  concern is that a piece of paper that comes with a caption

21  might be something they pay no attention to if they don't

22  have a real world problem of getting the bill from the

23  provider.  And I have no idea if that actually has happened

24  or hasn't happened, but that's the source of my concern is

25  someone who's gotten a bunch of legal papers, they've looked

1   at them, and it's like, yeah, this is like these class action

2   notices -- whatever -- I'm not paying attention to this.  And

3   they don't have a bill from their doctor who says, You owe me

4   $10,000, and that if only they had gotten that, they would

5   have woken up.

6          MR. BEACH:  Yeah, my point, Your Honor, is not

7   that they will just be getting a legal notice.  These will be

8   notices very specific to the issues of these plan

9   participants and the underfunded nature of their claims.

10         And, Your Honor, I understand the unique nature of

11  this *pro se* order.  I don't -- notwithstanding our

12  conversation today, I think it was the right thing to do for

13  the plan participants.

14         THE COURT:  Oh, I do, too.

15         MR. BEACH:  And that, to me, does not change the

16  view that someone going to the doctor will not often see the

17  amount of that claim, if ever.  Really, what they typically

18  see is what the insurance paid, what the insurance didn't

19  pay, and if there's a small amount left that they are to pay.

20         That information wouldn't be available to them

21  right now anyway and it is often the case that creditors in

22  cases -- we mentioned retail cases, certainly in mass torts

23  cases, Your Honor, they don't have that information.  Some

24  people may not even know that they're exposed to something or

25  that they have an injury at that point and opt-out mechanisms

1  have routinely been used in those contexts:  <u>Mallinckrodt</u>,

2  <u>Boy Scouts</u>, and a number of other cases.

3              I don't --

4              THE COURT:  Yeah, we have future claimants

5  representatives in those cases and other procedural

6  protections that we don't have here.

7              MR. BEACH:  Understood, Your Honor.

8              But there are also claimants that have presented

9  themselves and are --

10              THE COURT:  Yeah, look, I hear you.  This is why

11  this question is always hard.  And, this is a question of

12  degree, not of kind, right, because there are things in

13  common that it has in common with other cases.  I agree.

14              MR. BEACH:  That's true.  It is a question of

15  degree.  And, Your Honor, I would say that the distinction in

16  degree is very narrow and this will be an issue that Your

17  Honor will likely have to address.

18              And, you know, how do determine what an

19  unsophisticated group is or a group that didn't get exact,

20  precise information about what their claim?  You could go on

21  forever to figure out how to -- you know, what are those

22  groups, how do you determine those groups --

23              THE COURT:  Yeah, look, you've persuaded me.  I'm

24  not doing this on a retail basis, right, and we're not doing

25  it creditor by creditor.  We're not engaged in an individual

1  inquiry, person by person.

2          If I'm moved by the points that the U.S. Trustee

3  has made, it would be limited to -- and this is actually a

4  question for you -- it would presume to be limited to not the

5  sponsors, but the participants, because the sponsors are

6  going to have notice of whatever claims are unpaid, it seems

7  to me.

8          The sponsors haven't been barred by my order from

9  learning of things.

10          MR. BEACH:  Correct.

11          THE COURT:  It's only the participants.  And so my

12  question for you is, if I were to conclude that the opt-out

13  was inappropriate as to the participants, and I'm still

14  puzzling, would you want a mechanism by which there was an

15  opt-in only as to participants, but that the opt-out

16  mechanism applied to all other creditors, including the

17  sponsors, or is that more complicated than helpful?

18          MR. BEACH:  Your Honor, I'd want to take a break

19  and talk to my client about that.

20          THE COURT:  Okay.  And I haven't made up my mind,

21  so I'm just mulling.

22          MR. BEACH:  Yeah, I'd like to talk to my client

23  about that, if need be.

24          But, Your Honor, if there was an issue that Your

25  Honor was concerned about in terms of the participants

1  getting precise information about the fact that they have a

2  claim, we certainly can put an additional notice in those

3  notices.  We think the disclosure is sufficient enough --

4          THE COURT:  No, the problem -- my issue isn't that

5  you haven't done what you can do as well as you can do it;

6  it's that whatever you send them is still addressing a

7  problem that they don't know they have and won't know they

8  have until they get a bill from their doctor.

9          MR. BEACH:  Okay.  Your Honor, we could consider

10  the notice that is going out, or soon to go out -- I'm not

11  sure there was 10 days from the last order, if it's gone out

12  yet, but there were, you know, pretty detailed notices going

13  out to plan providers.  If there was something that we could

14  put in that notice if it's not too late, we can try and get

15  the information from those individuals and put them on the

16  notices.  That, Your Honor, would be -- it would probably be

17  administrative costly for the estate.

18          THE COURT:  Right.  No, I understand that.

19          My goal is not to make this, you know,

20  exceptionally burdensome for the estate.  That doesn't seem

21  to be in anybody's interests here.

22          Okay.  Let me let you continue.  I hope my

23  questions are at least making a little bit of sense.

24          MR. BEACH:  Yes, Your Honor, they certainly are

25  and I appreciate your focus on that particular issue.

1    I am just looking at my notes to see if we've

2 covered most of the issues in any event.  Your Honor, I'm not

3 sure what -- to the point I was trying to make before, I'm

4 not sure what guidelines -- I know Your Honor is considering

5 whether you'd make a potentially narrower ruling on the facts

6 and circumstances in this case.  I would submit, Your Honor,

7 that whatever guidelines are here are going to be used in

8 other cases.  And I know that's not your primary concern;

9 it's the concern about whether the rights of these parties

10 are affected in a negative way.

11    THE COURT:  Yeah, look, I'm focused on this case.

12    Let me say, to the extent anyone is thinking about

13 paying attention to the one-off circumstances here to guide

14 other cases, I'm -- my goal is to get this right in this case

15 and then what anyone makes of that thereafter is up to them.

16 I'm not trying to influence others; I'm trying to get this

17 right.

18    MR. BEACH:  Okay, Your Honor, then I'll try to

19 skip through some things.  But the U.S. Trustee had indicated

20 that she had concerns about, or her office had concerns about

21 four issues at the last hearing.

22    THE COURT:  Uh-huh.

23    MR. BEACH:  I'll just touch on them because my

24 understanding is that most, if not all of them, continue to

25 be outstanding.  One is the bar date, and the second is the

1  solicitation order, the third is the adequacy of disclosures
2  in the plan, and the fourth is the releases.

3      I know Your Honor wasn't focused on the bar date,
4  but Ms. Casey indicated that she's going to object to our
5  ability to notice out the bar date or the extension of the
6  bar date and that notice is today, so I'd like to make sure
7  that Your Honor understands what we have done in that regard.
8  And, you know, the bar date, the adequacy of disclosure, the
9  solicitation order kind of all go to noticing and those
10 related issues.

11     THE COURT:  Can I ask you one related question?
12 This is a timing question, as I'm puzzling through this,
13 which is confirmation is set, the hearing on confirmation is
14 set for some time at the end of April; is that right?

15     MR. BEACH:  May 3rd, assuming we get the relief
16 today, yes.

17     THE COURT:  Okay.  So that's actually my question,
18 which is if I get this resolved by, say, Monday, do I mess up
19 your schedule?  I looked at it briefly and I thought the
20 answer was no, but if I'm wrong about that, I'd like to know.
21     (Pause)

22     MR. BEACH:  Let us do the math, Your Honor.  I
23 don't think it would change it materially if Your Honor had
24 availability a day or two after that, that we can determine.

25     THE COURT:  Okay.  We can -- Ms. Justison, if you

1  don't mind, actually, while you're here, puzzling through the

2  calendar and seeing if I've got it.  It looked, to me, like

3  all the required notice periods would work if it got this

4  resolved.

5          If I got this resolved on Monday and you were able

6  to do a mailing, say, on Tuesday, it seems to me there were

7  still, I thought maybe there was still adequate notice, but

8  that was very back-of-the-envelope.

9          MS. JUSTISON:  Good morning, Your Honor.  I think

10  that's right.  If you made a ruling on Monday and we could

11  complete service by Wednesday, that gives us 35 days until

12  the May 3rd hearing.

13          THE COURT:  Okay.  That was my back-of-the-

14  envelope math.  Okay.  I'm not -- well, I said I wanted to be

15  sensitive to both, getting this right and not botching things

16  for everybody while I try to get it right, so that's very

17  helpful, okay.

18          MR. BEACH:  So, Your Honor, let me just talk a

19  little bit about the bar date and --

20          THE COURT:  Uh-huh.

21          MR. BEACH:  -- and some of which may have been in

22  the prior versions, but much of which has changed based on

23  discussions with the Office of the United States Trustee.

24          THE COURT:  Okay.

25          MR. BEACH:  The U.S. Trustee requested that the

1  bar date for the plan sponsors to be extended for 90 days and

2  the debtors have agreed to that.  My understanding from

3  talking with Ms. Casey prior to the hearing is that she

4  believes the disclosures that were made in connection with

5  the notice related to the plan sponsors was what she wanted

6  to see, so I'm hoping that narrow issue is resolved.

7      The plan participants, as I indicated before,

8  would have an extended bar date for six months to file claims

9  if they feel like they have direct claims against the debtors

10  and, again, the debtors are not released parties.  In

11  addition, as I indicated earlier, the plan participants have

12  the ability under the administrative services agreements,

13  which we've made clear here that they have a two-year run-out

14  period to submit healthcare claims under their health benefit

15  plans and that those would -- that would continue to be the

16  case with the caveat that those claims, if not paid after the

17  two-year period, would be considered against the debtors'

18  estates, subject to the liquidating trustee's objection.

19      I think what you may hear from the U.S. Trustee's

20  Office is that that's an empty provision because if the bar

21  date is six months, then they can't -- then those claims

22  would automatically somehow be prevented from being

23  submitted.  Your Honor, I don't think that is a fair reading

24  of how the provision works.  I think those healthcare claims

25  are claims under the plan and if they are considered to be

1  claims against the debtor, subject to objection, the

2  objections would be whether those claims that are asserted

3  under the plan can fairly be asserted against the debtor.

4        We're not saying -- I don't think the liquidating

5  trustee would be fairly able to come before Your Honor and

6  say that any of those individual claims where they didn't

7  file a proof of claim for a direct claim against the debtor

8  would then be barred from kind of reverting to the estate.

9        THE COURT:  So, hold on.  I'm sorry.  I'm sure

10 what you said made sense, it's just --

11       MR. BEACH:  Probably not.

12       THE COURT:  -- quicker if -- so, I just need some

13 remedial help.

14       So there's a person whose bill was not paid.  He

15 discovers this when the provider bills him after the four-

16 month stay that I've entered expires.  He looks at it, he

17 says, Oh, no, I'm on the hook for $5,000 for this procedure

18 that I had.  Oh, look, I've got the ability to assert a claim

19 because the bar date still runs for another two months, so he

20 files a proof of claim.  Okay.  So, I get that's a claim

21 against the estate.

22       And then you're saying the plans would also have

23 claims against the estate for any unfunded amounts, subject

24 to the trustee's right to object and at some level, we're now

25 creating a form of double-counting; is that what we're

1  concerned about?

2        MR. BEACH:  Triple-counting if you count the

3  Department of Labor.

4        THE COURT:  And the Department of Labor.

5        And so, and these are all claims for the same

6  injury and now we've got three claims, but everyone outside

7  of bankruptcy is entitled to recover on these claims, so we

8  now have this complicated problem.  We have a 502(e) problem;

9  is that what we have?

10        MR. BEACH:  In terms of duplicate, yeah.  I mean,

11  the liquidating trustee would have to make sure that

12  duplicate claims weren't being paid, but I think that that

13  would be apparent.  And it would only be claims that

14  weren't -- well, let me step back.

15        I think often times the way it works is that the

16  healthcare provider will bill the insurance company.  The

17  third-party administrator will get those claims.  Plan

18  participants can also submit those claims.  But these are the

19  claims that would be submitted under the plan over that two-

20  year period on behalf of those plan participants and those

21  are the ones that after the two-year period, if there are any

22  amounts left over --

23        THE COURT:  Oh, I see, it's after the two-year

24  period.  If it's still underfunded after two years, then the

25  plan asserts a claim against the estate.

1          MR. BEACH:  That's exactly right.

2          THE COURT:  And is the vision -- I confess I

3 haven't worked my way through the plan with enough care to

4 know the answer to this question -- does the plan contemplate

5 that the liquidating trustee is going to reserve for that

6 claim coming in two years later?

7          MR. BEACH:  That would be up to the liquidating

8 trustee, Your Honor, in terms of how they dealt with that

9 issue.

10          THE COURT:  Okay.

11          MR. BEACH:  But there, again, that's something

12 they would need to consider, but, Your Honor, I would submit

13 that having the Department of Labor claim already there and

14 the bar date for direct claims --

15          THE COURT:  Yeah, I hear ya.  This is a

16 complicated problem that we're setting up.  I understand.

17          MR. BEACH:  Yeah.

18          THE COURT:  I mean, look, problems like this arise

19 in bankruptcy, I get it.

20          MR. BEACH:  Yes.  And, Your Honor, frankly, we

21 don't think this provision is necessary.  This was a request

22 from the Office of the United States Trustee.

23          THE COURT:  Okay.

24          MR. BEACH:  We're trying to -- this is the belts-

25 and-suspenders and the other belts-and-suspenders that --

1          THE COURT:  I understand.  We should not live in a

2    world in which no good deed goes unpunished, so I understand

3    why you included it.  I understand it gives rise to a

4    complication, but we're not going to make life more

5    complicated because you decided to include that.  So, okay, I

6    hear you.

7          MR. BEACH:  And then, finally, Your Honor, we

8    talked multiple times about this, in addition to those bar

9    dates, we've got the Department of Labor claims that were

10   filed, which I understand are distinct rights that these

11   parties have.

12         THE COURT:  Uh-huh.  So, just so I understand, and

13   I'll obviously hear from the U.S. Trustee, but is there an

14   issue that I should be deciding today about the bar date

15   that's disputed between the parties?

16         MR. BEACH:  Your Honor, I believe there is because

17   we would like to serve the extended bar date for the plan

18   sponsors and for the plan participants out with the

19   confirmation hearing notice --

20         THE COURT:  Uh-huh.

21         MR. BEACH:  -- that's built into that so that we

22   don't have to spend more money on a separate noticing, with

23   respect to the bar date.

24         I will say that there's one issue that Ms. Casey

25   and I discussed prior to the hearing.  Apparently, the claims

1   agent's website had TBD on the bar date that's already out

2   there that we're seeking to extend up until yesterday when we

3   learned about the issue and now it's changed and it includes

4   the bar date.

5          Your Honor, the debtors are not relying on what

6   the claims agent's website says in terms of the bar date;

7   we're relying on the direct notice that went to those

8   claimants.  So, since you may hear --

9          THE COURT:  The notice that the claimants have

10  gotten was of your motion to set the bar date, right?

11         MR. BEACH:  No, Your Honor.  It's a little unique,

12  I think, in Subchapter V and I may need to defer to Ms.

13  Justison for the specifics of it, but my understanding is

14  that's built into the fabric of the statute.

15         THE COURT:  Oh, that is built into the statute;

16  you're right.  And so, in terms of extending it, right,

17  there's a bar date that's set by statute, presumably, if I

18  remember, some provision of 11 whatever it is.  Actually,

19  rather than my guessing, why doesn't Ms. Justison just

20  explain this to me.

21         MS. JUSTISON:  Good morning, Your Honor.

22  Elizabeth Justison of Young Conaway, on behalf of the

23  debtors.

24         Your Honor, in Subchapter V cases, there's a

25  general order that sets the bar date as 60 days after the

1  petition date --

2         THE COURT:  Right.

3         MS. JUSTISON:  -- so, that's not in the Code; it's

4  in the general order.

5         THE COURT:  Got it.

6         MS. JUSTISON:  And so, the notice of commencement

7  that was sent to all potential creditors in this case did

8  list that bar date.  And the bar date issue that we're

9  discussing today, Your Honor, is a voluntary extension that

10 the debtors are doing to assist parties in this case.

11        THE COURT:  Okay.  And tell me about notice of the

12 extension.  So, what has happened or do you propose to

13 happen?

14        MS. JUSTISON:  So once Your Honor approves

15 whatever extension that is agreed upon, all parties who are

16 affected by the extension will receive an additional notice.

17        THE COURT:  Okay.

18        MS. JUSTISON:  And our hope, Your Honor, was to

19 include that in the confirmation hearing notice --

20        THE COURT:  Okay.

21        MS. JUSTISON:  -- to reduce service costs in the

22 cases.

23        THE COURT:  Okay.  And that's the point of

24 contention between the debtor and the Office of the United

25 States Trustee?

1          MS. JUSTISON:  Yes, Your Honor.

2          THE COURT:  Okay.  I will give Ms. Casey a chance

3     to be heard on that.

4          MS. JUSTISON:  Thank you.

5          THE COURT:  Okay.

6          MR. BEACH:  Your Honor, I don't want to retread

7     what we've gone through before.  There were additional points

8     on disclosures that I think we've talked generally about

9     those.  We have massively increased the disclosures, specific

10    disclosures with respect to plan sponsors and plan

11    participants in the order, in the notice, in the opt-out.

12    So, unless Your Honor wants me to go specifically through

13    them, I don't intend to.

14         THE COURT:  No, I think I understand.  Your briefs

15    were very good and I think I understood what they said in

16    that regard.

17         MR. BEACH:  Okay.  So, unless Your Honor has

18    further questions for me at this point?

19         THE COURT:  I don't.  This is very, very helpful,

20    so I appreciate it, Mr. Beach.  And, obviously, you'll have a

21    chance to come back after we hear from others, if there are

22    points to be made.

23         So Mr. Waxman has his hand up.

24         Let me -- Ms. Casey, obviously, I'm very

25    interested in your perspective, but Mr. Waxman, I see you'd

1  like the chance to be heard, so let me give you that

2  opportunity.  But you're muted.  Mr. Waxman, I'm sure you're

3  being extremely eloquent, but you're on mute.

4          MR. WAXMAN:  Sorry about that, Your Honor, and I

5  apologize for busting in before.  There is a very time-

6  sensitive issue as Your Honor may recall.

7          First, I'm Jeff Waxman with Morris James, on

8  behalf of BeneBay, the third-party administrator.

9          As Your Honor may recall, we were tasked with

10  performing the mailing that Mr. Beach discussed a few moments

11  ago and we had 10 days to do it.  I heard something.  I was

12  not signing into the hearing to discuss this, but I heard Mr.

13  Beach mention that there may need to be some changes made to

14  mailing, and I can tell you when I exchange emails with my

15  client during this conference call or, excuse me, during this

16  hearing, the envelopes were all stuffed yesterday and they're

17  on the way to the mailhouse.  I think they were actually

18  delivered today.

19          So, if there's going to be a change to whatever

20  mailing there is before the envelopes actually go under

21  the -- before the stamps go onto the envelopes, I think it

22  would be helpful to know now; otherwise, it may be too late.

23          MR. BEACH:  Your Honor, I was throwing that out as

24  a possible solution here.  I would not hold out that mailing

25  at this point --

1          THE COURT:  Okay.

2          MR. BEACH:  -- certainly, given where Mr. Waxman

3    is saying things are.

4          THE COURT:  Okay.  All right.

5          So no one should change what you're -- no one

6    needs my approval to send something in the mail, and so if

7    that's already happening without an order, you should do what

8    you're going to do.

9          MR. BEACH:  Well, we had the order.  This is for

10   the *ex parte* --

11         THE COURT:  Yes, yes, yes.  Oh, with that, yes,

12   yes.

13         No, look, I don't think what we do now ought to

14   undo what we've done before.  So, if we directed that to

15   occur in the previous order, frankly, I had assumed it would

16   have already happened.  If it's happening now, that's totally

17   fine.  That should just proceed in the ordinary course and

18   we'll deal with the consequences of it.

19         MR. BEACH:  Yeah.  And I appreciate Mr. Waxman

20   bringing it up.  I wasn't trying to add confusion to that

21   process.

22         THE COURT:  Got it.  Look, to the extent anyone

23   has introduced confusion today, I plead guilty to being that

24   person, so no concerns there.  I appreciate that that should

25   proceed consistent with the prior order.  Nothing I'm

1  intending to say was intended to revisit anything that was

2  already decided.  So that should proceed and we'll deal with

3  this as best we can.

4          MR. BEACH:  Okay.

5          MR. WAXMAN:  Okay.  Thank you, Your Honor.

6          I just wanted to make sure that we didn't do

7  anything inadvertently which costs the estate more money by

8  having (indiscernible).

9          THE COURT:  No, a totally fair point to raise.  I

10 appreciate your chiming in, Mr. Waxman.

11         MR. WAXMAN:  Thank you.  I will let my client

12 know, no reason that -- that there's no reason to stop the

13 mailing now.  Thank you.

14         THE COURT:  Thank you, Mr. Waxman.

15         Okay.  Ms. Casey, let me give you a chance.  I

16 think you probably have a -- look, I don't know where I am,

17 but I think I've identified the concerns that I have.  So you

18 can say whatever you'd like, but to the extent that you

19 address those, that would be great.

20         MS. CASEY:  Thank you, Your Honor.  Good morning.

21 Linda Casey, on behalf of the United States Trustee.

22         I am going to try to convince Your Honor that this

23 is a unique case, that these parties should be protected.

24 Coming second, I did want to first address some of the issues

25 that were discussed and then go into my presentation.

1            THE COURT:  Sorry, I always do this.

2            MS. CASEY:  That's okay.

3            THE COURT:  So, I bullied you into writing a brief

4 that was focused on the circumstances of this case and I

5 appreciate that that's what you addressed and that is

6 maximally helpful.  I take it by doing that, your office's

7 position is still the position it has always been that you

8 believe that I'm wrong and that's okay -- many people think

9 that -- and that Judges Walrath and Owens are right and that

10 opt-ins should always be required.

11            MS. CASEY:  Of course, Your Honor --

12            THE COURT:  Okay.

13            MS. CASEY:  -- there are cases where, as a

14 litigant, we choose not to press that issue because we know

15 we've lost it in front of the judge, and so we took your

16 direction and we understood that we already pre-lost the

17 issue.

18            And I am saying, you know, I understand if I was

19 standing up here today and saying there are some

20 unsophisticated creditors in this case, that that would be a

21 losing argument, that you've already issued that.  We

22 understand that there's cases.

23            Now, I don't think -- you know, the citation to

24 Boy Scouts is a little iffy.  In that case, the opt-out was

25 only if you vote, do you have to opt out.  Silence was not

1    included in that.  And the tort claimants were completely

2    separate from that.  The tort claimants were a nonconsensual

3    release where the Court found that there was overwhelming

4    support, evidence that it was a 100 percent plan, et cetera.

5    Others of those cases talked about national media attention,

6    et cetera.  But we understand that we would lose that point

7    if I was just here talking about the unsophisticated nature

8    of these individuals and that's not what we're talking about.

9            What we are saying is that saying that because in

10   other cases there may be similarly unsophisticated parties or

11   there may be people who don't know yet that they have a

12   claim, even though the actions that result in the claim have

13   already occurred, that you're not going to do an analysis of

14   each creditor as to whether the creditors can or cannot is

15   not what we're asking.

16           We're saying here we have a claim with such unique

17   facts, with the majority of the creditors falling within this

18   camp of people, both the plan sponsors and the plan

19   beneficiaries and you have other unique facts like no

20   committee, the released parties are the debtors' equity

21   holder and the debtor and the equity holder themselves have

22   negotiated the plan.  But then some of the unique facts that

23   we have, such as Your Honor's order, such as the allegations

24   made by the released parties that the debtors did things that

25   would specifically hide the fact to these creditors and then

1  imposed upon that healthcare system.

2          So, we are proceeding today, understanding that in

3  Your Honor's courtroom, we have already lost the issue of, is

4  an opt-out process okay even if somewhere in the claims pool

5  there are unsophisticated creditors, and saying --

6          THE COURT:  Uh-huh.

7          MS. CASEY:  -- please take a look at this case and

8  these facts and see why, in this particular instance, it's

9  not appropriate.

10          I do want to circle first to the claims bar date.

11 So, the issue we have here, I think, is slicing the onion too

12 thin.  We had requested that because of the way that the

13 healthcare system is, that the claims can be processed

14 through the run-out period and that whatever unpaid claims at

15 the end of it are automatically asserted against the debtors.

16          THE COURT:  Uh-huh.

17          MS. CASEY:  And they're saying, Yes, that's

18 happening, but not really.

19          So, the only claims these plan beneficiaries will

20 have against the debtors, whatever legal theory, the quantum

21 of damages is whatever the unpaid healthcare claims are.

22 What they're saying is the claim against the plan will be

23 considered filed against the debtor, but the debtors' rights

24 to say, We don't have any contractual liabilities there.  But

25 any direct claims, like a direct ERISA claim, where the

1   function is the damages, has to be filed within six months.

2             THE COURT: Uh-huh.

3             MS. CASEY: And our position is that, A, you

4   shouldn't decide it today because there has been no motion to

5   extend this. It was just filed yesterday as part of their

6   brief with their proposed stuff. I've only had less than 24

7   hours to look at it. I haven't been able to talk to my

8   client about it.

9             But if you were to approve it today, we would say

10  that that piece, that six-month piece --

11            THE COURT: Uh-huh.

12            MS. CASEY: -- isn't appropriate in this case.

13            And to take a step back, the plan is providing a

14  $200,000 litigation funding, proceeds of the sales of the

15  debtors' assets, which the debtors have stated in their plan

16  they don't think Arsenal Health has any assets they're going

17  to sell in litigation claims, so we're not talking about any

18  prejudice to the debtors or to their estates because there's

19  no voting --

20            THE COURT: So -- I'm sorry, Ms. Casey -- what's

21  your alternative? How would you have it proceed?

22            MS. CASEY: I would have it proceed that at the

23  end of the two-year process, whatever the unpaid healthcare

24  claims are, are asserted against the debtors under any theory

25  and the liquidating trustee can file an objection. When they

1   file that objection, the healthcare creditors will know, this

2   is the exact amount that I haven't been paid and they're

3   saying that there's no liability on behalf of the debtors.  I

4   need to go in and assert my claim.

5           And we're saying that because of the unique facts

6   here and the circumstances here, and --

7           THE COURT:  I see.  So, you want the creditors'

8   ability -- the participants' --

9           MS. CASEY:  Right.

10          THE COURT:  -- ability to assert a claim against

11  the estate to be extended, not by six months, but by two

12  years?

13          MS. CASEY:  And in many ways it would actually

14  help the debtors, because if they did it within six months,

15  they're going to have more of these claims that will

16  ultimately get paid through this run-out process, whereas, if

17  we wait for the 24 months, then we know which claims actually

18  were paid and which claims were not paid.

19          THE COURT:  I'm sorry, and I apologize.

20          MS. CASEY:  That's okay.

21          THE COURT:  I trying to understand why this

22  matters.

23          If the plan recovers on the claim, the plan is

24  going to pay the doctor and reduce the exposure of the

25  underlying claimant, right?

1              MS. CASEY:  Right.

2              THE COURT:  And if the claimant recovers on the

3    claim, the claimant will be compensated because it has

4    liability to the same doctor?

5              MS. CASEY:  Correct.

6              THE COURT:  So the estate will have in it what it

7    has and all of what -- either route -- all of the money will

8    ultimately go to pay unpaid doctors.

9              So, why is this a big deal?

10             MS. CASEY:  The plans are controlled by the

11   debtors and the individual participants have their own claims

12   and they should be able to have their own claims to go

13   against it.

14             Now, I want to take a step back here --

15             THE COURT:  Wait, Ms. Casey.  Again, I do want to

16   give you a chance to be heard, but I'm just stuck, so I can't

17   help myself.

18             MS. CASEY:  That's okay.

19             THE COURT:  Under Subchapter V --

20             MS. CASEY:  Uh-huh.

21             THE COURT:  -- the Local Rules and the orders and

22   the like, there's a 60-day bar date, right?

23             MS. CASEY:  Right.

24             THE COURT:  And so, unless the debtor does

25   something, that's what we have.  The debtor is saying, we are

1  voluntarily going to not assert the time bar against someone

2  who files it within six months.

3        MS. CASEY:  Right.

4        THE COURT:  They don't have to do that, right.

5  There's nothing, as a matter of law, that would require them

6  to do that --

7        MS. CASEY:  Correct.

8        THE COURT:  -- but they're doing it.  And so, what

9  would be the legal basis to require them to extend it longer

10  than that, when, as a matter of law, it's 60 days?

11        MS. CASEY:  So, again, this is why we're asking it

12  not to be heard today because I've only had 24 hours to look

13  at this --

14        THE COURT:  Listen, I hear you, but as a practical

15  matter, they're going to send something in the mail --

16        MS. CASEY:  Right.

17        THE COURT:  -- and they shouldn't have to mail it

18  twice, right?

19        MS. CASEY:  Right.

20        THE COURT:  So, I get that you're freewheeling,

21  and I'm sorry for putting you on the spot --

22        MS. CASEY:  Right.

23        THE COURT:  -- but we are where we are.

24        MS. CASEY:  Right.  So, it goes to the same issue

25  with these releases that these creditors likely don't know

1  what their quantum of their damages is currently. They don't

2  know if it's a hundred dollars, if it's $3030, if it's

3  $300,000.

4          THE COURT: No, I understand that.

5          MS. CASEY: The debtors haven't even cashed the

6  premiums for the post-petition period, so nobody knows what

7  that is.

8          THE COURT: No, I get it.

9          MS. CASEY: And then to also say that they then

10 have to know whether they have a claim against Arsenal Health

11 or Arsenal Insurance or whether it's under Cigna or whether

12 it's BeneBay, whether they have ERISA claims or not-ERISA

13 claims, direct claims, or not claims, especially when four

14 months of that six-month period, their providers are not

15 providing them notice of this, it just seems like it's not

16 noticed reasonably calculated to get these parties to

17 understand what their claims are.

18          Now six months is certainly better than none, but

19 we don't see a harm to this estate where there's no money

20 going into the liquidating trust that's going to be disbursed

21 out immediately to let the claims run-out period go, have

22 these people know what the quantum of their claims are, and

23 then assert their claims.

24          THE COURT: So, here's where I tentatively am --

25          MS. CASEY: Okay.

1        THE COURT:  -- just for what it's worth.  It seems

2   to me that what they've proposed to do is, at least at first

3   blush, rational.  I understand your concern.

4        Let me just say if someone learns of their claim

5   for the first time --

6        MS. CASEY:  Uh-huh.

7        THE COURT:  -- more than six months afterwards and

8   comes in and wants to assert that claim and says, I've got

9   excusable neglect because I didn't learn of my claim, the

10  liquidating trustee is going to have a hard time persuading

11  me otherwise and that seems to me, to be a rational way to

12  strike the balance here.

13       MS. CASEY:  I do want to ask Your Honor to take

14  judicial notice of the claims right now.  The bar date is

15  March 27th and the claims that have been filed have been the

16  Department of Labor's claims, a law firm claim, a tax claim,

17  and then two underlying medical providers, not plan

18  participants, not plan sponsors.

19       THE COURT:  Right.

20       MS. CASEY:  I think that shows that there's some

21  significant confusion as to who owes who what in this case.

22       And so I'm up here saying, Hey, this is an

23  extremely unique case and, of course, the debtors are going

24  to object to the medical providers' claims because there's no

25  privity, there's no fiduciary duty, they're going to be

1  disallowed, but the plan participants and the plan sponsors

2  haven't filed those claims.  There's clear confusion.  So,

3  that's what we're trying to do.

4         And I understand if Your Honor -- you know, the

5  issue here is, in my mind, the confusion of not only what the

6  dollar amounts of their claims are, but who owes that claims

7  and what the legal theories are.  And so, it is our position,

8  you know, that -- I will say that the plan sponsors, to the

9  debtors' credit, what we asked for the plan sponsors is a

10  notice that very specifically said, Even if currently today,

11  all of your debtors', all of your plan participants' benefits

12  have been paid in full, when we do a forensic analysis and we

13  find out that a different plan sponsor paid you --

14         THE COURT:  Right.

15         MS. CASEY:  -- and we come after you, you need to

16  file an unliquidated claim if you want to protect that right.

17         THE COURT:  Uh-huh.

18         MS. CASEY:  An unliquidated -- you may have a

19  claim.  You may not know that you have a claim and if you

20  want to file the claim -- and I was actually very impressed

21  that the debtors did that because I thought for sure that

22  they'd say, Why would we invite them to file claims against

23  us and specifically say, Hey, you may have claims you don't

24  know about, file an unliquidated claim.

25         So, I think that's very helpful.  And if Your

1  Honor -- you know, I hear Your Honor, that you're saying if

2  some plan participant comes in and says, Yes, I've had that

3  claim.  The claim existed in the six months, but I didn't

4  know about it, you know, then the six-month -- again, that

5  sounds like it's a perfectly reasonable explanation, because

6  I do think there's not going to be much harm having claims

7  being filed after the six-month period in this particular

8  case where we don't have assets.

9          THE COURT:  Great.  And if there's no prejudice,

10  that's obviously a factor in the excusable neglect analysis,

11  so that seems, to me, the right lens in which to deal with

12  this problem.

13          MS. CASEY:  So, you know, if that's Your Honor's

14  ruling, that's Your Honor's ruling.

15          THE COURT:  Okay.

16          MS. CASEY:  You know, again, we would have

17  preferred for us to have some time to take a look at it, and

18  we did just find out yesterday.

19          THE COURT:  I get it.  And I don't love that I'm

20  putting you here to respond to something that you saw 24

21  hours ago.  I am, under the circumstances, attributing this

22  all to people's good faith efforts and not to try and sandbag

23  you.  If I thought for a moment that was what was happening,

24  I'd have a different reaction.

25          MS. CASEY:  Right.

1          THE COURT:  But I feel like this issue is also a

2    sufficiently common sensical point that I don't think, you

3    know, someone who's dealt with these problems for as long and

4    as well as you have, are terribly hamstrung.

5          MS. CASEY:  So the specific question that you

6    asked regarding the *ex parte* order, that *ex parte* order is

7    not being served on plan participants; it's being served on

8    plan providers.

9          THE COURT:  No, I understand, but the consequence

10   of it being served on the providers are that the plan

11   participants won't get a bill.

12         MS. CASEY:  Right.  But the debtors' response was,

13   well, we specifically put in there that the plan participants

14   can reach out to the providers and the providers respond.

15         THE COURT:  No, I understand that.

16         MS. CASEY:  Well, the plan participants aren't

17   getting that, so the response of, It's okay, because they can

18   call, doesn't really answer the question because they don't

19   know that they need to call.

20         THE COURT:  So --

21         MS. CASEY:  They're being told that they're not

22   going to be heard.

23         THE COURT:  So, the point that Mr. Beach made

24   that -- I guess I'm very interested in your response, too --

25         MS. CASEY:  Uh-huh.

1          THE COURT:  -- is he said, Judge, I get it, but

2    there have been so many communications and so many notices

3    about the status of these plans in light of the bankruptcy

4    that we've gone to the underlying participants that we've

5    really done all that can be done and, therefore, there really

6    isn't reason to worry that there's likely someone out there

7    who's a participant who is just going to be shocked to

8    discover that there's a problem with their plan.

9          MS. CASEY:  Well, so I would disagree with that.

10          THE COURT:  Okay.

11          MS. CASEY:  I would disagree with that.

12          The notices -- as Your Honor has said, you get a

13    notice in the mail, you don't recognize who it is, you don't

14    have a claim, you don't have a real-life problem, you don't

15    necessarily look at it.  And, again, as I said, you can take

16    a look at they got a bar date notice.  The bar date is in

17    four days and only medical providers, so far, have filed

18    claims.  I don't believe, I think under the facts and

19    circumstances, these creditors are not aware of it.

20          And I want to give an example.  So we have a plan

21    sponsor whose claims are underfunded, but as has been alleged

22    in this case, in the first day affidavit and the plan and the

23    complaint filed by Beyond Risk, there's allegations that to

24    perpetuate the fraud that these were level-funded, instead of

25    self-funded, other plan sponsors' monies were used to pay

those providers, those plan participants' claims.

    We also know that there are current customers whose premiums are not being cashed and whose plans are not being administered, and so they don't know if that nut is getting larger. So, it is possible a plan sponsor received this notice says, All of my plan participants' claims have been paid in full. None of them have received any notices. It's okay. A forensic accounting is done. It is determined that those plan participants were paid through another plan sponsor's money and the healthcare administrator goes after the underfunded plan to get the monies back into the estate for the benefit of the plan whose money was used improperly and now all of a sudden, this plan sponsor who is currently underfunded, but nobody knows that they're currently underfunded, and they don't know from their providers -- nobody's pressuring them because the providers have been paid -- are now being told, Oh, well, you have released the claims against third parties because you didn't know it --

    THE COURT: Right. So --

    MS. CASEY: -- during the 29-day period that you could vote on the plan.

    THE COURT: So, I get that and that's a thing.

    But that -- the notion of the contingent claim is, I agree that is quite present here, but that isn't the kind of thing that is categorically different from lots of other

1   cases where you've got contingent claims where the

2   contingency can occur sometime after the bar date.

3          And, look, the sponsors, I understand they're

4   small businesses and the like, and they may not have in-house

5   lawyers and all the things you said in your briefs, but --

6   and, look, I understand and respect that you think that your

7   office's position is that we should never do these things on

8   an opt-out basis, but in a world in which I view that as a

9   road that I've mentally crossed, I'm trying to see what

10  distinguishes.

11         I mean, it's different in a slight degree, right;

12  there are probably more contingent claims here than there are

13  in your typical case, but it's often the case that you've got

14  contingent claims.

15         MS. CASEY:  Right.  It is often the case that you

16  have contingent claims.  It's also the case -- so, all of the

17  factors together, so, you have contingent claims that are

18  contingent because of the bad acts of the debtors.

19         THE COURT:  Uh-huh.

20         MS. CASEY:  You have the healthcare system where

21  the plan sponsors can only hear if the plan beneficiaries

22  tell them, who can only hear if the providers tell them, who

23  now have an order saying that they can't tell them.  So, you

24  have all these reasons to think that these people are getting

25  these notices, and they're getting a lot of notices, but

1  their notices aren't telling them what to do.

2          And another fact -- again, one of the problems

3  that I'm so deep into the weeds of this, the debtors are not

4  proposing to serve the plan on anyone.  They're only going to

5  get the confirmation notice.  So all those wonderful

6  disclosures of, these are self-funded plans and you might be

7  liable and you might be all of that are in the plan, and the

8  confirmation notice is this dense legal document that has

9  these related parties terms, which, quite frankly, until

10  yesterday, the debtors who drafted it, thought that it

11  excluded the debtors and it didn't, they're difficult to read

12  the information.

13          So, you have no committee.  You have no

14  solicitation on these plans.  You have an assumed rejecting

15  class who do not have the support of the creditors, which is

16  often one of the things that are going on to this.  You have

17  the debtors' equity negotiating with the debtor with no

18  committee behind them.  You have the healthcare system where

19  people don't know what you have.  You have Your Honor's order

20  that doesn't allow the providers to go after them.  You have

21  participants and plan sponsors who are not aware that they

22  have claims against the debtors, let alone to know that they

23  have claims against the Beyond Risk and its affiliates.  You

24  have notice of confirmation, without the plan being

25  sponsored.

1          All of the checks and balances that are typically

2 involved in the cases, you do have a creditor body that is

3 mostly contingent.  You don't have a futures representative.

4 All those things that, you know, the Boy Scouts had all that

5 protection.  The Committee of Unsecured Creditors was onboard

6 with the opt-out process and, again, it wasn't silence is

7 consent; it was an opt-out if you provided a ballot.

8          THE COURT:  But that case had nonconsensual third-

9 party releases, right?

10          MS. CASEY:  It did have the -- the general

11 unsecured trade creditors had the opt-out.

12          THE COURT:  I see.

13          MS. CASEY:  So, they were not -- the channeling

14 injunction was nonconsensual releases.  The regular unsecured

15 creditors was an opt-out, but the opt-out only applied to

16 people who voted in favor.

17          THE COURT:  Right.

18          MS. CASEY:  And, again, that was your standard,

19 typical general unsecured creditors.  It was not, you know --

20 so, we do take a look at this case and say you have a one-

21 month period to determine to opt-out, one month from mailing

22 the packages, so less than a month.  During that month, the

23 *ex parte* order is in place and so the --

24          THE COURT:  Wait.  Can I ask this question?

25          Is there a practical solution to some of the

1    concerns you've raised that it's still resolvable, like, for

2    example, I'm not, myself, generally a believer in the

3    proposition that serving an actual, complicated legal

4    document on a regular person makes the world better, rather

5    than worse.

6              MS. CASEY:  Right.

7              THE COURT:  So, the notion that they're going to

8    get something that is an order that presumably gives them

9    instructions on how to find the document if they care to is,

10   I think, nearly as good.  And when you consider the cost

11   associated with mailing a phone book to everybody --

12             MS. CASEY:  Right.

13             THE COURT:  -- it doesn't seem to me like weighing

14   the, you know, consideration that it makes sense to direct

15   them to do that.

16             If there's particular language that you want that

17   they aren't giving you, I'm happy to try to be helpful.  It

18   seems to me that they're being generally responsive and are

19   not trying to play hide-the-ball with people.

20             MS. CASEY:  Right.

21             THE COURT:  But I suspect he would take your call

22   if you said, Look, I want you to use the following words.

23             MS. CASEY:  Right.  Well, again, I think one of

24   the issues that we have here is the confusion.  They get

25   something from Arsenal -- I mean, Your Honor, I would like to

1  take the time right now.  I don't know if you have the --
2  it's attached to both, my brief and the debtors' brief --
3          THE COURT:  Okay.
4          MS. CASEY:  -- but the letter that was sent to the
5  plan participants.  I have a copy here.  It was Exhibit B, I
6  think, to ours.
7          THE COURT:  Okay.  So, I've got your brief.  I
8  have your brief open and it's Exhibit A -- no, it's
9  Exhibit --
10         MS. CASEY:  B.
11         THE COURT:  -- B.
12         MS. CASEY:  Your Honor, this is one of those, we
13 provided as much notice as we possibly can.
14             In the first paragraph, the debtors stated that
15 they intend to use the process to do the orderly transition
16 of its customers and customer agreements to reliable third
17 parties.  In the third paragraph they say, We hope to
18 coordinate the processing of any outstanding claims incurred
19 and filed with your plan.  And the last sentence of that, We
20 are working to try to restore service and ensure that
21 contractual obligations are fulfilled as to claims
22 administration of your plan through the effective date of the
23 suspension of those services; however, please be aware that
24 claims may not be processed promptly and you may be required
25 to pay your providers or your providers may send your bills

1  to collections.

2           We think this is the exact opposite of letting

3  these plan participants know that they may have claims in

4  these cases.  I think it is reasonable to think that, you

5  know, prior to me becoming the U.S. Trustee and dealing with

6  these self-funded plans, I wouldn't have been able to tell

7  you the difference between processing outstanding claims and

8  fulfilling claims administration as being somehow separate

9  and apart from paying them.  And if I read that last

10 sentence, it said they may not be processed promptly, I would

11 think this is just a timing issue.

12          THE COURT:  So, look, I understand your point.  I

13 also understand the perspective of, look, we're busy doing

14 our best to recover these funds --

15          MS. CASEY:  Right.

16          THE COURT:  -- and instilling panic in a whole

17 bunch of real people probably doesn't make the world much

18 better.

19          MS. CASEY:  Understood.

20          THE COURT:  So, people are doing their best to try

21 to do what makes sense.

22          MS. CASEY:  Right.

23          THE COURT:  And I understand if our only concern

24 was notice, you could have written this differently.

25          MS. CASEY:  Right.

1          THE COURT:  I also think there are competing tugs,
2    right, and people are doing their best to deal with it.
3          MS. CASEY:  So obviously I think --  you know, the
4    U.S. Trustee's practical solution with this should be an opt-
5    in.  In short of an opt-in, and I don't really have authority
6    to say this, but there is exacting standards that needs to be
7    proved for a nonconsensual release.  They could pivot to
8    nonconsensual releases and have to prove that.
9          THE COURT:  Yeah, I understand that.
10         MS. CASEY:  And part of the issue that we're
11   fighting for here is if these -- if they do not reach the
12   standards for nonconsensual releases and these parties do not
13   understand what's going on, to trap them into an opt-out
14   seems inappropriate.
15         THE COURT:  Let me ask you this question.
16         MS. CASEY:  Uh-huh.
17         THE COURT:  Do you think, in light of -- do you
18   think the opt-out should also -- the opt-in should also apply
19   to -- and, look, we don't -- they don't normally parse it --
20         MS. CASEY:  Right.
21         THE COURT:  -- but I'm just trying to be
22   pragmatic.  The providers, they should be on sufficient
23   notice that they need to be paying attention here, right?
24         MS. CASEY:  The medical providers?
25         THE COURT:  No, no, I'm sorry, the sponsors.  I

1  apologize.

2          MS. CASEY:  The sponsors.

3          Again, the concern we have with the sponsors --

4          THE COURT:  Is the contingency; they may be

5  subject to a clawback later.

6          MS. CASEY:  -- is the contingency.  And so, it is

7  our position that both, the plan sponsors and the plan

8  providers.

9          We understand we've already lost in front of Your

10 Honor on any other unsecured creditors.  Certainly, the

11 plan -- and I can see it cutting both ways.  I can see the

12 plan sponsors, you know, they were the ones who elected to

13 hire Arsenal, they should certainly be aware they have a

14 contractual arrangement with Arsenal.  I can also see it

15 saying they are farther removed from the medical providers

16 and the insurance claims administrators -- administration,

17 therefore, less likely to know whether their plan was

18 underfunded or overfunded and whether they have a claim or

19 not.

20         THE COURT:  Okay.  So, I'm going to take advantage

21 of the fact that you're deeper in the weeds than I am.

22         MS. CASEY:  Yes.

23         THE COURT:  So, the participant goes to the

24 doctor.  The plan sponsor, right, the sponsor of the plan,

25 their employee, the participant --

1          MS. CASEY:  Uh-huh.

2          THE COURT:  -- doesn't have their bill paid and

3   they get -- they -- the liability to the provider is with the

4   participant, not the sponsor, right?

5          MS. CASEY:  That's the contractual relationship,

6   correct.  So the patient and the provider, the patient owes

7   the provider.

8          THE COURT:  Right.

9          MS. CASEY:  The provider does not have any right

10  to go after the employer.

11         THE COURT:  So explain to me the nature of the

12  claim that -- first of all, what's the claim that's made

13  against the plan sponsor?  I'm a small business, I hire the

14  debtor to administer a health plan.  I've got employees,

15  they're really unhappy --

16         MS. CASEY:  Right.

17         THE COURT:  -- because their bills aren't paid and

18  they're yelling at me.

19         MS. CASEY:  Right.

20         THE COURT:  But what's my legal liability to

21  anybody?

22         MS. CASEY:  The plan sponsor, the employer?

23         THE COURT:  Yeah.

24         MS. CASEY:  The plan sponsor's legal liability

25  would be, first, to the plan to pay any claims that -- so,

1  since this is a self-funded plan, the plan sponsor is

2  obligated to pay to the plan --

3          THE COURT:  Got it.

4          MS. CASEY:  -- all of the claims that are valid

5  against that plan.  And, theoretically, if that doesn't

6  happen, the employees themselves can then go against the

7  employers --

8          THE COURT:  Okay.

9          MS. CASEY:  -- but it's through the plan.

10          THE COURT:  Got it.  That's helpful.

11          MS. CASEY:  So, the plan can come after -- and

12  that's where the issue here is so much more complicated than

13  in other cases because we also have plan funds commingled.

14          THE COURT:  Right.  So, there's the clawback

15  problem.

16          MS. CASEY:  So, there's that issue and then you

17  have the intentionally underfunded issue.  So you have all of

18  these issues here and then you have the fact that the claim

19  is -- you have three steps away:  the provider to either, to

20  the insurance company or to the employee; the plan sponsor,

21  if they have not been told, that they get all of these.  I

22  mean, it is very easy to imagine a customer who stopped

23  prepetition as part of the wave of customers who left, who,

24  at that time, all of their employees' claims have been paid,

25  they see Arsenal and they go, Thank God I'm out of that case,

1  and they don't even look at it.  They don't even read it.

2  Their plans have been paid in full and they're not going to

3  find out until later.

4         You have plan participants who, you know, today go

5  to the doctor and it's not getting paid and the doctor is not

6  allowed to tell them that you haven't gotten paid.  And they

7  don't know that they have claims against -- they don't even

8  know that they have claims against their insurance company

9  because the providers aren't allowed to tell them, let alone

10  the ability to say, Oh, do I have claims against my plan?  Do

11  I have claims against my employer?  Do I have claims against

12  Arsenal?  Do I have claims against third parties?  When they

13  don't even know that they have a claim and their provider is

14  not coming to them.

15         And remember this *ex parte* orders, in one of

16  the -- I think at the previous hearing, we were told that we

17  haven't been paying claims for so long, those providers have

18  probably already gone out to them.  Well, they're also not

19  paying claims as they come in since January, so it's not that

20  long of a time and these employees may not be aware that

21  their claims are not getting paid.

22         And that is why, you know, we are saying that,

23  yes, the U.S. Trustee disagrees and thinks that it should be

24  an opt-in, that they should either meet that exacting

25  standards or they should have to opt-in as consensual.

1          But in this case, we are particularly concerned

2    that these creditors will not know that they have claims,

3    will not read it, any of the disclosure.  And, again, because

4    it's not a disclosure statement and a plan, it is a

5    complicated legal document, but all of the disclosures about

6    the self-funded natures and the underfunding and there's not

7    going to be money there is all part of the plan not included

8    in the statements.

9          And absent, you know, an express statement that

10   says, You may have claims that you're not aware of and if you

11   do not opt out, you immediately -- and I don't even know if

12   that works because it becomes after In re Arsenal.  Well, I

13   don't know who Arsenal is.  I don't know why I'm getting it.

14   Yeah, I got this letter, but it says that Arsenal is going to

15   take care of me.  I don't need to read it.  And then they're

16   not getting phone calls from their providers and they're not

17   getting it, and I just think this case is so unique from the

18   other cases before Your Honor.

19         And I don't think -- I think we should look -- I'm

20   going to look at my notes -- at the -- I mean you have a lot

21   of issues.  And the Subchapter V nature of this case should

22   also be looked at, the fact that we don't have a committee,

23   the fact that we're not having voting, the fact that we can't

24   find comfort in the fact that a significant number of

25   creditors support this plan, the fact that we --

1            THE COURT:  Are those considerations really

2    relevant to a consensual -- obviously, in a nonconsensual,

3    you would need that.

4            MS. CASEY:  Right.

5            THE COURT:  But does that really bear on a

6    consensual release?

7            MS. CASEY:  I -- well --

8            THE COURT:  I understand your position that I

9    shouldn't infer consent from silence -- I get that -- but

10   imagine we've crossed that bridge.  Once we've done that, why

11   are the other considerations still relevant?

12           MS. CASEY:  Well, in Mallinckrodt, one of the

13   reasons that the nonconsensual releases were appropriate was

14   2200 people had actually opted out, and so I think that

15   seeing how many people can understand or not understand to

16   waive their rights, and, again, I go back to the proof of

17   claim --

18           THE COURT:  Of course you make the decision before

19   you -- typically, you make the decision before you know who's

20   going to do what, right?

21           MS. CASEY:  Well, I will say that more often than

22   not, the debtors have taken -- debtors in cases -- not this

23   debtor -- have taken the position that it's a confirmation

24   objection and we are ending up at the confirmation arguing

25   it.  I think the case that we cited before Your Honor, it

1  actually was decided at the confirmation.  And, Your Honor,

2  the one that we had cited -- I can't remember the name -- had

3  cited to the fact that the debtors allowed late opt-outs --

4          THE COURT:  Right.

5          MS. CASEY:  -- as supportive of the opt-out

6  process.  So, I do think it happens more often than not at

7  the end.

8          THE COURT:  Fair enough.  But that does strike me

9  as odd to -- I mean, I know we're not approving solicitation

10  materials here, but if I'm approving a form of ballot that

11  says, you know, You have to check this box to opt out --

12          MS. CASEY:  Right.

13          THE COURT:  -- wouldn't it be weird for me to

14  approve that and then say, Because you did what I approved,

15  your plan is unconfirmable?

16          MS. CASEY:  Right.  Although, it has --

17          THE COURT:  I understand.

18          MS. CASEY:  -- happened.

19          So, I do think the -- so, you know, again, we do

20  have the majority of the debtors' creditors here fall within

21  this group.  We have that we're not asking you to find the

22  three or four needles in the haystack of a case; we're asking

23  you to see that this is a unique case.  We are asking it in

24  the context of this, including the context that this *ex parte*

25  order has been signed.

1          And, Your Honor, I would like to talk about the

2    Department of Labor.  The Department of Labor's submission

3    specifically says:

4          Each court recognized that the Secretary's

5    national public interests in bringing an ERISA enforcement

6    action are wholly distinct and separate from those of private

7    litigants who seek to address individual grievances or recoup

8    plan losses for their personal benefit as plan beneficiaries.

9          And you've heard --

10          THE COURT:  So, when the Department of Labor

11    recovers, where does the money go?

12          MS. CASEY:  It does go to the -- well --

13          THE COURT:  It goes to the plan; is that right?

14          MS. CASEY:  If the Department of Labor recovers

15    damages in the litigation for the benefits, then yes, it goes

16    to the plan.

17          My understanding is that the money could go

18    towards claims administration.  So the Department of Labor

19    could take the position that there's no money here to

20    administer the claims and they could be seeking to have the

21    claims be administered and say, Beyond Risk, you need to put

22    a fund of money in here to administer the claims, in which

23    case it would go to the healthcare trustee and not the plan

24    beneficiaries.

25          And that one of the -- and I would assume --

1          THE COURT:  Because every plan has an

2   administrative cost, right?

3          MS. CASEY:  Correct.

4          THE COURT:  You can't get money to people without

5   paying someone to do it --

6          MS. CASEY:  Correct.

7          THE COURT:  -- and so some of the money has got to

8   go to do that.

9          MS. CASEY:  And sort of thinking on my own,

10  knowing that I'm not the Secretary of Labor, I was like,

11  Okay, what does it mean?  What could the national interests

12  be distinct?

13          And I thought, well, here, we have the commingling

14  of funds and the Secretary of Labor might say, Well, the most

15  important thing is administering these claims, knowing what

16  claims are valid, what the dollar amounts are, and the monies

17  should go towards administering the claims.

18          And then the individual plan sponsors might say,

19  Well, wait a second.  My funds were used to pay somebody

20  else's claims.  That was breaching a fiduciary duty, I want

21  to go after you for my particular fund's claims.  I don't

22  care about the national interest of having all the claims

23  administered.

24          They might also say to themselves, You know what

25  the most important thing here is just getting as much money

1  to the providers on behalf of the plan beneficiaries and the

2  plan sponsors might say, No, my interest is finding out how

3  much that somebody else owed me or what it is.  And the same

4  thing with the plan beneficiaries, they might say, Hey, yes,

5  you settled your case.  You agreed to the opt-out in or you

6  settled your litigation because it hit your national

7  interests, but it didn't resolve my pocketbook.

8          And the Department of Labor's statements have said

9  they are separate cases.  They are separate and distinct.

10  This is not a case where the Government is standing in the

11  shoes of the claimant like what happens under some other

12  areas of law.  They are separate and distinct, and the

13  underlying, applicable law says that the Department of

14  Labor's action do not affect the plaintiffs' claims and vice-

15  versa.

16          And I think the debtors' own statement, it says,

17  Hey, the Department of Labor cannot opt out, even though

18  that's not an opt-out for these people, and yet they protect

19  them.  And I understand what they're saying is they can

20  pursue damages and have those damages flow through, but we

21  don't know that that's what's going to happen.  We don't know

22  what the concerns of the Secretary are.

23          And I do think, Your Honor, your order, while it

24  was beneficial, is a complicating factor.

25          THE COURT:  I understand.

1          MS. CASEY:  And this plan is being served out

2     currently on March 27 with an, I think, April 26th opt-out

3     deadline which does technically comply with the rules.  But

4     also, again, comes down to, is that enough?  You know, is the

5     notice sufficient?

6          So, if we go to the opt-outs are okay, which we

7     don't want to say they are okay --

8          THE COURT:  Uh-huh.

9          MS. CASEY:  -- is a 28-, 29-, 30-day period where

10     an order preventing providers from reaching out is in place

11     where it's complicated and difficult and it's not

12     understanding where they're not getting the plan, they're

13     just getting the confirmation notice, and the confirmation

14     notice is, itself, a dense legal document.  I would actually

15     say that the plan is more story-telling and the confirmation

16     notice is more of a legal document that people might not

17     understand.

18          And I do want to -- all of our confirmation

19     objections are reserved.

20          THE COURT:  Can I ask you this question?

21          MS. CASEY:  Yes.

22          THE COURT:  I know your position, your office's

23     position is that opt-out, you know, is incorrect.  In

24     concept, is there a reason why the opt-out deadline has to be

25     before confirmation?  What if there were an opt-out

1  deadline -- I know you also considered the six months --

2            MS. CASEY:  Uh-huh.

3            THE COURT:  -- but assume that I'm persuaded that

4  if the problem is my order --

5            MS. CASEY:  Right.

6            THE COURT:  -- giving time after my order expires

7  solves the problem.

8            MS. CASEY:  To be quite frank, I think that's a

9  Beyond Risk -- do they want to have their settlement approved

10 and paid and agree to all of their releases without knowing

11 who has all opted out.

12           THE COURT:  Well, if we have --

13           MS. CASEY:  I think one of the reasons the opt-out

14 occurs before is that if there's too many opt-outs, that it

15 might change the -- the debtor might have to withdraw the

16 plan.  But that's just a guess.

17           THE COURT:  Right.

18           MS. CASEY:  You know, I don't think that there is

19 any -- opt-out, quite frankly, a creature of the courts.

20 It's not anything in any of the statutes or anything, so

21 there's no reason that it has to be limited to any particular

22 time.

23           And I will say, to be frank, my understanding, and

24 I deal with self-funded healthcare claims, typically, where

25 the debtor itself is the employee plan sponsor --

1          THE COURT:  Uh-huh.

2          MS. CASEY:  -- to be frank, I have been told

3     numerous times that by 90 days out of a particular patient

4     going into the doctor, something like 98 percent of the

5     claims have been asserted against the plan.

6          That doesn't mean administered.  We can see here

7     where we've had claims asserted against the plan that haven't

8     been administered for a quite lengthy period of time, but as

9     far as the knowing the amount of claims that are asserted in

10    general.

11         THE COURT:  And here, we have the order that

12    prevents the claimant from learning of it.

13         MS. CASEY:  Right, we have the order of the

14    claimant preventing it.  So, I don't think that there is

15    anything legally that would prevent the Court from saying the

16    opt-out for the plan participants is the 60 days or the plan

17    sponsors is the 90 days or whatever the right amount is,

18    unless, frankly, the recipient of those releases says, Well,

19    we wouldn't go towards confirmation unless we knew who was

20    opting in and who was opting out.

21         THE COURT:  Okay.  It sounds like I've got

22    questions for Mr. Beach then.

23         MS. CASEY:  Yes.

24         THE COURT:  Okay.  Anything else that I should

25    understand?

1          MS. CASEY:  So just as one of the reasons that we

2     are here today is the U.S. Trustee is likely going to object

3     to the plan in general in the sense that the settlement is

4     providing these third-party releases to an entity who is

5     really only waiving the DIP claims that were necessary to get

6     to the point where they got the third-party releases and

7     there really isn't any consideration flowing to these

8     creditors.

9          So, in addition --

10         THE COURT:  We'll get to that at confirmation.

11         MS. CASEY:  Yes.

12         THE COURT:  I understand that.  But, again, if

13    they're consensual, then -- but the issue we have today is

14    are they consensual?

15         MS. CASEY:  Right.  And that goes to would a --

16    and, Your Honor, I'm sure, is aware that personal

17    bankruptcies are often caused by unpaid healthcare claims.

18    Would an individual who's getting absolutely nothing from the

19    released parties and being exposed to unknown healthcare

20    claims knowingly consent to a consensual release of that

21    party, if they fully understood that there was a claim, how

22    much their claim was and that they were actually releasing

23    somebody?

24         And I think that -- I know that veers more into

25    the U.S. Trustee always thinks it should be an affirmative

1  opt-in --

2          THE COURT:  No, I get it.

3          MS. CASEY:  -- but here, where you have that

4  specific lack of knowledge, it makes it even problematic.

5          THE COURT:  Okay.  I understand.

6          MS. CASEY:  Thank you.

7          THE COURT:  Thank you, Ms. Casey.  That's very

8  helpful.  I really appreciate it.

9          MR. BEACH:  For the record, Your Honor, Sean Beach

10 on behalf of the debtors.

11         Your Honor, I'm not going to respond point by

12 point.  I think one of the problems is that the competitions

13 created here are the scattershot of whether or not there was

14 adequate notice to these parties and disclosures to these

15 parties.  We have gone above and beyond.

16         Ms. Casey showed a letter that was sent.  Whatever

17 letter we would have sent, she would have criticized what was

18 in that letter.  This is a Subchapter V case which is

19 supposed to build efficiencies into the process so that we

20 can get from Point A to Point B and do the best we can to

21 help out a group of creditors.

22         Beyond Risk has supported that process and

23 shouldn't be punished for putting in millions of dollars to

24 support that process.  Ms. Casey mischaracterizes the

25 settlement, which I understand is not a today issue, but

1 they're also waiving millions of dollars of prepetition

2 claims that they supported the company and so it didn't

3 crater immediately and then leave these people in a much more

4 position than they were in.

5          Third-party releases are important to the

6 settlement, Your Honor, and the fact that there may be

7 imperfect notice is not a fact unique to this case.  It's a

8 fact in every case that there's not going to be perfect

9 notice to every party and not everyone will perfectly

10 understand it.

11          So, Your Honor, Continental and Millennium Labs

12 permits third-party releases.  This is a situation where we

13 are trying not be overly aggressive and do nonconsensual

14 third-party releases to allow an efficient process for

15 objection, which is to opt out of these releases.

16          We are also, in addition to what you often have is

17 checking a box on a form, they can be uploaded into the

18 creditors' site.  There are step-by-step instructions on

19 exactly how to do this in the notices that were provided.

20          So, Your Honor, we would --

21          THE COURT:  Can I ask a question?

22          MR. BEACH:  Sure.

23          THE COURT:  So, I take it the settlement agreement

24 itself -- so, look, I get that you're contractually obligated

25 to make your best efforts to get this form of release.  Let

1  me say, without adjudicating anything, it seems that you're

2  discharging that obligation.

3          In terms of the conditions that would permit the

4  parent to walk away from the deal, there isn't a public

5  document that answers that question for me yet, is there?

6          MR. BEACH:  The settlement was built into the --

7          THE COURT:  The plan.

8          MR. BEACH:  -- plan.  So that --

9          THE COURT:  Does the plan tell me -- Ms. Casey

10  made the point that unless Beyond Risk gets, you know, X

11  fraction of opt-ins by such date, the plan falls apart.

12          And, look, I'm going to do my best to call balls

13  and strikes, so I would like to understand the consequences

14  of whatever I decide.  If I look more carefully at the plan,

15  will I understand the answer to that question?

16          MR. BEACH:  Your Honor, may I have a moment?  That

17  is new to me.

18          THE COURT:  Certainly.

19          MS. CASEY:  And, Your Honor, may I clarify?

20          I didn't say that is their -- I said that may be

21  their position.  There's nothing in the plan that says that.

22          THE COURT:  Okay.  Because I didn't see anything

23  and I wanted to make sure there was nothing that I was

24  missing.

25          MR. BEACH:  Your Honor, this is the problem with

1  these types of arguments.  They are just throwing stuff

2  against the wall to see what sticks and it's problematic.

3         I will tell you, Your Honor, you know, we can look

4  at the plan and look at what the outs are with the

5  settlement, but this case has been a lot more costly and this

6  we previously anticipated.  We may not have enough money to

7  get to the end of the game and, you know, Beyond Risk may not

8  stand by it and then we are left with a case that is

9  liquidated with secured debt, maybe not the full 2.25

10 million, but something less than that, and these people can't

11 possibly be better off in that scenario.

12        THE COURT:  No, I understand that causing -- look,

13 I want to be pragmatic.  It does seem to me that causing the

14 case to convert seems to me not to be -- look, that's not in

15 front of me today.  I'll address those issues when we get

16 there.

17        MR. BEACH:  Understood.

18        MS. CASEY:  Your Honor, may I say something real

19 quickly, because, you know, saying that I was throwing

20 arguments at the wall to see what sticks, I, quite frankly,

21 was recognizing that if Your Honor wanted to give them six

22 months, that would certainly be much more preferable to one

23 month.

24        THE COURT:  Right.

25        MS. CASEY:  I would have supported six months.

1          I was just trying to say, in all candor, Beyond

2   Risk might say that that's not appropriate.

3          THE COURT:  Fair enough.  Okay.  Understood and we

4   are where we are.

5          MR. BEACH:  Your Honor, may I just say one other

6   thing?

7          THE COURT:  Certainly.

8          MR. BEACH:  The Subchapter V Trustee,

9   unfortunately, is not here today, but he was satisfied with

10  our prior disclosures.  I believe he's satisfied with these

11  disclosures.  We've been talking to him about being the

12  liquidating trustee under this case.  He is interested in

13  doing that.  I mean, we are working towards a solution here.

14         THE COURT:  I understand.  Let me ask you this

15  very pragmatic question, and if you need to consult with your

16  client and can't answer it now, I understand that.

17         As between a world, and I'm not saying this is my

18  decision, I'm just trying to puzzle through how I figure this

19  out -- I will figure it out quickly, I get that --

20         MR. BEACH:  Uh-huh.

21         THE COURT:  -- as between giving folks until the

22  bar date to opt out and a world of opt-in, does the debtor

23  have a preference?

24         MR. BEACH:  I can probably get an answer to that

25  question, but I would like a few minutes, Your Honor.

1          THE COURT:  Certainly.  Should we take a break?

2          MR. BEACH:  That would be helpful.

3          THE COURT:  Okay.  Certainly.  Why don't we recess

4   for five minutes.  We'll come back.  If you need longer, let

5   me know.

6          MR. BEACH:  Yeah, I mean, one thing, just to put

7   the bug in your ear before you leave.

8          THE COURT:  Certainly.

9          MR. BEACH:  We are amenable to whatever

10  disclosures need to be made.  We can say if you went to, you

11  know, in front of the opt-out for plan participants, if you

12  went to the doctor between X date and Y date, you may have a

13  claim and you can reach out to your healthcare provider.

14  And, you know, there's other disclosures, perhaps, that might

15  help.

16          THE COURT:  Okay.  So, where my head is, just so

17  we're all rowing together here, and look, I'm not saying

18  where my head is, is the right place to be, but the concern

19  that I have is that the argument is, the argument against

20  opt-in -- the argument for opt-in is that there are

21  circumstances in which it is unrealistic to expect or to

22  require people to read a document or else lose their rights.

23  And you don't solve that problem by adding more words to the

24  document.

25          So, that's -- so, I hear you and I appreciate

1 you're saying, Tell me what it needs to say, but I don't

2 think you can solve the problem that we're grappling with by

3 wordsmithing.

4 MR. BEACH: Yeah, and the other way is, Your

5 Honor, and I don't think it's a good, right way, is that we

6 don't go the consent or forfeiture route and we go to -- for

7 approval of nonconsensual releases.

8 THE COURT: Well, that's the debtors' option and

9 it's a high standard.

10 MR. BEACH: It's a high standard, I understand

11 that, and if the standard is not met, then we --

12 THE COURT: And it can be very hard to do that in

13 a plan that doesn't involve voting.

14 MR. BEACH: Understood, Your Honor.

15 And then we have a situation where it puts the

16 settlement at further risk.

17 THE COURT: Right. And so, why don't I give you

18 your five minutes.

19 MR. BEACH: Thank you.

20 THE COURT: Is there anything else that you want

21 to say? I don't want to cut you off. Anything else?

22 MR. BEACH: Not right now, Your Honor.

23 THE COURT: Okay. Let me give you a few minutes.

24 So, it is now 11:35. I'll come back at 11:42.

25 MR. BEACH: Thank you, Your Honor.

1          THE COURT:  So, with that, we're in recess.

2      (Recess taken at 11:37 a.m.)

3      (Proceedings resumed at 11:43 a.m.)

4          MR. BEACH:  Your Honor, for the record, Sean

5  Beach, on behalf of the debtors.

6          You asked a question of me as to whether my client

7  would prefer if the choice became this, an opt-in, I think

8  this was your question, with respect to plan participants or

9  an extended opt-out period of time, I assume, to run past the

10  four months of the --

11          THE COURT:  To be (indiscernible) with the bar

12  date, just for rough justice purposes.

13          MR. BEACH:  Okay.  Your Honor --

14          THE COURT:  And I appreciate this is without

15  prejudice to all of your arguments as to why I'm wrong in

16  requiring either of those things.

17          MR. BEACH:  Yeah, and I won't repeat those, and

18  that is obviously our preference is to do what we are

19  proposing, but I tried to reach my client in the break.  I

20  was not able to do that.

21          I will tell you, Your Honor, my view is that an

22  opt-in is not -- would not be something that I think is

23  useful, frankly, for anybody and I don't think the debtor is

24  interested in that approach.  I think we'd have to decide if

25  another approach, like nonconsensual third-party releases

1 might be something we'd have to decide whether we move

2 towards; however, in terms of a longer opt-out period, that

3 seems more palatable than an opt-in period.

4         THE COURT: Okay.

5         MR. BEACH: We'd have to decide whether that's

6 more palatable than the nonconsensual --

7         THE COURT: Right. Look, it's ultimately your

8 decision on how you want to move forward in light of what I

9 decide is appropriate --

10         MR. BEACH: Right.

11         THE COURT: -- but that reaction is very helpful.

12         MR. BEACH: Thank you, Your Honor.

13         MR. FELDMAN: Your Honor, David Feldman with

14 Gibson Dunn. I represent Beyond Risk.

15         THE COURT: Okay. Mr. Feldman?

16         MR. FELDMAN: Good morning, Your Honor.

17         Thank you for hearing me. I'm going to hope to be

18 brief. And I just want to clarify a couple of things. I

19 know that some of these things like the central fabric of our

20 settlement is not before you today, but some things were said

21 which I just think are inaccurate and I want to -- I do want

22 to touch on the question you ask of what happens if the

23 third-party releases that we had built into our settlement

24 aren't approved.

25         First, the whole thesis from my client's

1  perspective of this case was to kind of do the right thing

2  by, with respect to the plan participants, and that's the

3  whole reason why we basically funneled money into this

4  business prepetition when it looked pretty clearly months

5  into this transaction that we had bought -- I don't want to

6  call it a lemon -- but not what we thought we acquired.  We

7  haven't owned this business for very long.  There's

8  complaints outstanding against the founder for a variety of

9  things that we think were done wrong and sold us a bill of

10 goods.

11         But we continue to kind of stand behind it because

12 we wanted there to be kind of a smooth exit, you know, as

13 smooth an exit as possible, while preserving other litigation

14 rights against the party that we think wronged us, which is

15 the party that sold us the business.

16         So, we put a significant amount of money in

17 prepetition that was essentially funding operations of the

18 business because the business wasn't throwing off the kind of

19 cash that we were told that it would because of the way the

20 businesses were operating.

21         So, the deal that we struck with the debtor here

22 isn't simply, you know, we're going to waive our litigation

23 fees that are being run up to get the plan confirmed; it's a

24 whole host of things.  It's a million eight in prepetition

25 amounts.  It's all of the fees that are being incurred on a

1  post-petition basis up to this $1.5 million and, frankly, a

2  big chunk of what we're spending day-to-day here isn't just

3  dealing with Mr. Beach and his firm and the U.S. Trustee on

4  the core bankruptcy stuff; it's dealing with, you know, our

5  special -- the company's special counsel, dealing with the

6  Department of Labor.  They're literally having, like, daily

7  meetings to figure out how to navigate the situation, and all

8  of that is being funded by the DIP.

9          I mean, my guess at the end of the day when you

10 look at the total cost, there'll be more money spent on that

11 part of the process than there will in the core bankruptcy

12 pieces.

13         So, all of that has been baked into this, you

14 know, settlement, where the idea is we're going to try to

15 leave something for the creditors here.  We don't know at the

16 end of the day whether anybody is going to be able to make

17 the argument that any underfunding, whether there will be

18 underfunding, and if there is underfunding, whether the

19 debtor should be liable for that underfunding.  But what we

20 do know is --

21         THE COURT:  Let alone, the recipients of the

22 third-party releases were a step further removed.

23         MR. FELDMAN:  Right.  Exactly, right.

24         So, you know, so that's what we're talking about

25 here.  And there were some major concessions made by my

1  client, which I, frankly, was surprised by the whole notion

2  here, as Mr. Beach alluded to, was this will be a cost-

3  efficient process, Subchapter V.  Obviously, we've gone off

4  the rails on that subject.  You know, Ms. Casey was always a

5  fierce advocate for, you know, the issues that she believes

6  in strongly, but, you know, there is a cost to litigating

7  those issues and that cost is very significant in a case of

8  this size.

9          THE COURT:  I understand.  But your client

10  understood that that was the price of bankruptcy protection

11  when it made the decision to go here.

12          MR. FELDMAN:  No, I understand that, but I do want

13  to -- it's kind of the point that Mr. Beach raised is, you

14  know, given where things are at this point, there is kind of

15  a -- you know, I had a conversation just this past week.  The

16  client basically said, We've got -- at some point, we have to

17  reassess where we are.  Are we going to be able to fund to

18  the end because this thing is like -- it's much -- it's more

19  expensive than even you told us that it would be.

20          But I'm not standing up here saying that we're

21  pulling the plug or anything like that today.  We're trying

22  to get to the finish line.

23          On the question that you asked, we do have a

24  settlement as between us.  The settlement is to be

25  implemented in the plan itself.  We didn't do this in two

1  stages where there was a settlement and then the 9019.

2           THE COURT:  Okay.

3           MR. FELDMAN:  So, is it possible that based on

4  what happens here today that the client, my client reassesses

5  and says, We're not willing to go forward.  I think it's

6  possible, but I would say this, as between -- and you maybe

7  my opinion doesn't matter because I'm the recipient of it --

8  but as between the two options that have been offered here,

9  the opt-in versus the extended opt-out, certainly, I can

10 envision the call with my client after.  You know, if your

11 decision is the latter, it's an easier conversation to have

12 than the former.

13          THE COURT:  Okay.  That's very helpful.

14          MR. FELDMAN:  That's all I have to say.  Thank

15 you, Your Honor.

16          THE COURT:  Okay.  I appreciate that.

17          So, this has been very helpful.  Is there -- are

18 there other -- I will get you a decision no later than

19 Monday.  I do want to think about everything that you've

20 said.

21          Is there any other point that anyone else wants to

22 make?

23          Mr. Beach?

24          MR. BEACH:  I was just going to stand and say, No,

25 Your Honor, I think that (indiscernible).

1          THE COURT:  Okay.  So, let me -- so thanks to

2    counsel all around for -- this was extremely helpful to me.

3    I'm still not as smart about these issues as I would like to

4    be, but I'm less dumb now thanks to all of your help, so I

5    really appreciate that.

6          Let me also, while we're here, thank the

7    Department of Labor and Ms. Slights for your comments.  I

8    asked the Department of Labor to come in.  They didn't need

9    to do that, but I asked for their help and they provided it

10   and I just wanted to express my appreciation for that.

11         So, I will do my best to get you something as

12   promptly as I can, and with that, we're adjourned.  Thank

13   you.

14         MR. BEACH:  Thank you, Your Honor.

15      (Proceedings concluded at 11:52 a.m.)

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7     /s/ William J. Garling                    March 25, 2023

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25