## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ARSENAL INTERMEDIATE<br>HOLDINGS, LLC, *et al.*,<br><br>        Debtors. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10097 (CTG)<br>(Jointly Administered)<br><br>**Related Docket No. 165** |

## <u>MEMORANDUM OPINION</u>

Debtors ask the Court to enter an order authorizing an "opt out" form that would inform creditors that unless they opt out of the plan's third-party release by April 26, 2023 – one week before the scheduled confirmation hearing – they will be deemed to consent to the release of any direct claims they may have against the debtors' corporate parent and the parents' directors and officers.[1] The U.S. Trustee opposes that relief. The U.S. Trustee's institutional position is that consensual third-party releases always require a creditor affirmatively to "opt in" to the release. Alternatively, the U.S. Trustee argues that even if the Court rejects that position and concludes that an opt-out procedure is appropriate in the typical case, the unusual circumstances of this case counsel in favor of requiring an opt-in mechanism.[2]

This Court concludes that in the typical case, so long as the disclosure is prominent and conspicuous, and impaired creditors are given the ability to opt out simply by marking their ballot or by some other comparable device, it is appropriate

---

[1] D.I. 165.

[2] D.I. 164.

to infer consent from a creditor's failure to opt out. Releases contained in a plan that permit creditors to opt out may be deemed consensual as to those who do not exercise that option.

The Court is persuaded, however, by the U.S. Trustee's argument that in this case, a prior order entered by this Court, that was intended to protect certain potential creditors from adverse collection activity, requires further protection. The order at issue prevents healthcare providers, who were entitled to be, but may not have been, paid by health plans the debtors administer from seeking to collect against the participants in those plans until July 15, 2023.[3] An unintended consequence of that order, however, is that it may operate to prevent those plan participants from, in the meantime, learning of the potential claims they may hold against either the debtors or the beneficiaries of the third-party release.

In view of that order, the debtors have agreed to extend the bar date to file proofs of claim, which under this Court's general order applicable to subchapter V cases (as this one is) would have been March 27, 2023, by six months to September 27, 2023. For the same reasons that the debtors agreed to extend the bar date, the Court concludes that it would be inappropriate to infer consent from a creditor's failure to opt out by April 26, 2023. The Court accordingly will not enter the order authorizing the form of notice in the manner proposed by the debtors. The Court would, however, authorize a notice of the confirmation hearing that *either* (a) relied on an opt-in mechanism for the third party-release, while maintaining the existing

---

[3] *See* D.I. 146.

deadline, or (b) provided for opt out, so long as the opt-out deadline, like the bar date, were extended past confirmation through September 27, 2023.

The Court appreciates that the analysis herein does not articulate a simple rule that will dictate the outcome of every case. But that is because this question is more a matter of art than of science. This Court is generally comfortable describing third-party releases as consensual so long as there is conspicuous disclosure and a simple mechanism for impaired creditors to exercise the opt-out right. The only factor that leads to a different conclusion in this case, of the several urged by the U.S. Trustee, is the order the Court entered that might keep creditors from learning of their claims. Other judges draw that line in different places. Because this issue presents a question about how judges exercise their discretion, rather than a pure question of law, the fact that different judges have reached somewhat different judgments should be seen as neither surprising nor problematic.

## Factual Background

The debtors in these cases operate captive insurance and alternative risk management companies. The companies were founded in 2006 and were acquired in 2011 by BR Intermediate Holdings, which is part of a larger risk-management business known as Beyond Risk.[4] While there are three debtor entities in these jointly administered cases, the debtor that is most relevant to the present dispute is Arsenal Health, whose business is administering self-funded health plans.[5]

---

[4] *See* D.I. 2 at 7. BR Intermediate Holdings, LLC is referred to as "BR Intermediate Holdings."

[5] *See* D.I. 2 at 6. Debtor Arsenal Health, LLC is referred to as "Arsenal Health."

3

The debtors filed these cases under subchapter V of chapter 11 after BR Intermediate Holdings allegedly discovered that the debtors' prior owners had committed fraud in connection with the sale of the business.[6]  Litigation over those allegations of fraud is proceeding in the Delaware Chancery Court.[7]  As relevant to the current motion, the debtors contend that various of the health plans administered by Arsenal Health are underfunded, which they say is contrary to the representations made to them in connection with the acquisition.

Debtors propose to sell their assets in these chapter 11 cases.[8]  To that end, this Court entered an order establishing bid procedures that provide for an auction to take place beginning on April 7, 2023 and that sets a sale hearing for April 13, 2023.[9]  The debtors have also filed a liquidating plan under which they propose to distribute proceeds of that sale to creditors.[10]

Section 5.2 of the proposed plan contains a consensual third-party release under which creditors release claims against Beyond Risk and its "Related Parties," which include its directors and officers.[11]  That release is an integral part of a settlement, negotiated between the debtors and Beyond Risk, under which Beyond Risk agreed to forego certain claims against the debtors' estates, to finance the

---

[6] D.I. 2 at 10-11.

[7] *Id.* at 8-9.

[8] *See* D.I. 62 (motion to approve bid procedures).

[9] D.I. 133 (bid procedures order).

[10] D.I. 131 (proposed plan).

[11] *Id.* §§ 5.2, 10.89, 10.91.

bankruptcy case, and provide other consideration. Approval of that settlement is a confirmation issue that is not before the Court at this time.

The typical practice in this Court has been for creditors' consent (or not) to a third-party release to be determined in connection with the vote on the plan. In subchapter V cases, however, § 1191(b) of the Bankruptcy Code eliminates § 1129(10)'s requirement of an impaired accepting class.[12] As a result, so long as the plan is nondiscriminatory and satisfies absolute priority, there is no requirement that creditor votes be solicited in a case under subchapter V.

The debtors accordingly do not intend to solicit votes on their plan. They do, however, ask this Court to approve procedures under which creditors will be deemed to consent to the third-party release unless they affirmatively opt out.[13] The U.S. Trustee opposes that request. The U.S. Trustee's institutional position is that a consensual third-party release requires creditors to opt in. This Court, however, has rejected that argument in rulings made from the bench in several prior cases.[14] In deference to this Court's previously stated views (and as the Court suggested), the U.S. Trustee focused its argument in this case on the reasons why, even if an opt-out procedure is appropriate in a typical case, the U.S. Trustee

---

[12] 11 U.S.C. § 1191(b) ("Notwithstanding section 510(a) of this title, if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

[13] *See* D.I. 165.

[14] This Court's bench rulings (even if less than artfully stated) are set forth in the debtors' submission. *See* D.I. 165 at 10-11.

contends that the unusual circumstances of this case provide reason to require an opt-in procedure.[15]

## Analysis

**I.    In the typical case, the Court is satisfied that a creditor that fails to opt out of a third-party release, following prominent and conspicuous disclosure, may be deemed to consent to it.**

At the outset, it should be made clear that this Memorandum Opinion does not speak to the authority of a bankruptcy court, in connection with confirmation of a plan of reorganization, to grant a *non-consensual* third-party release.    That question is a matter of ongoing controversy, being the subject of an appeal awaiting decision in the Second Circuit and a pending petition for certiorari from a decision of the Fifth Circuit.[16]    And it is a topic that, at least in this jurisdiction, bankruptcy courts have the benefit of meaningful guidance from the Third Circuit, whose rulings are of course controlling.[17]

To that end, the Third Circuit suggested in *Continental* that a "non-consensual release[]" may be permissible where the key "hallmarks" of an

---

[15] *See* D.I. 164.

[16] *See In re Purdue Pharma, L.P., et al.*, No. 22-110 (2d Cir. argued Apr. 29, 2022); *Highland Capital, L.P. v. NexPoint Advisors, L.P.*, petition for certiorari pending, No. 22-631 (filed Jan. 5, 2023).

[17] *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000); *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000); *United Artists Theatre Co. v. Walton*, 315 F.3d 217 (3d Cir. 2003); *In re Global Industrial Technologies, Inc.*, 645 F.3d 201 (3d Cir. 2011) (en banc); *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir 2019).

appropriate release – "fairness, necessity to the reorganization, and specific factual findings to support these conclusions," are present.[18]

The obvious implication of the Third Circuit's suggestion that non-consensual releases may be authorized in exceptional cases is that *consensual* third-party releases ought to be noncontroversial.  To the extent a creditor voluntary agrees that it will not assert a claim against a third party, the creditor is free to make that decision.  Neither *Continental* nor any of the other Third Circuit decisions, however, articulates what it means for a release to be "consensual."  In particular, when a plan of reorganization contains a third-party release, is it sufficient to treat it as "consensual" if creditors had the opportunity to opt out of the release and did not exercise it?  Or is it necessary for the creditor to provide some affirmative expression of consent, such as voting in favor of the plan or checking a box on a form?  Absent a statutory definition of the term or appellate authority directed to these questions, bankruptcy judges have taken divergent approaches.

This Court sees this issue not as one as to which there is a "right" or "wrong" answer as a matter of legal doctrine.  Rather, it is similar to the question that a court faces when a motion seeking some particular relief is unopposed, but the court

---

[18] *Continental*, 203 F.3d at 214.  While a district court from outside this circuit has raised questions about this reading of Third Circuit law, *see In re Purdue Pharma, L.P.*, 635 B.R. 26, 104 (S.D.N.Y. 2021) (on "those occasions when the Third Circuit did address a bankruptcy court's statutory authority to impose non-debtor releases, it overturned bankruptcy court orders granting them"), every judge of this Court to consider the matter has treated the Third Circuit's statements in *Continental* as controlling.  *See generally In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022) (relying on *Continental* as authorizing non-consensual third-party release when supported by extensive factual findings with respect to fairness and necessity); *In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504 (Bankr. D. Del. 2022) (same).

7

nevertheless has qualms about entering the relief, either because it is dubious about the claim on the merits, or because it is concerned about the sophistication of the party against which the relief is sought.  There would be nothing at all wrong with a court's decision to grant the relief on the ground that in an adversary system, it is incumbent on parties who have been properly served with pleadings to protect their own rights.  But nor is there anything wrong – particularly if the court has doubts about the movant's entitlement to the relief – with the court requiring the moving party to address the merits or perhaps provide evidence that the parties against which the relief is sought have affirmatively consented to it.  The question of the consensual third-party release presents a variant on this theme.

At one end of this spectrum, some cases view the model for finding a third-party release to be consensual as being based in principles of contract law, in which case some affirmative expression of consent is required before one would find that an offer has been accepted and a binding contract thus formed.  The argument is that "consent" to grant a third-party release should be treated the same way as consent to relinquish any other legal entitlement.

That is the position set forth by Judge Bernstein of the Bankruptcy Court for the Southern District of New York in *In re Sun Edison, Inc.*[19]  After noting that third-party releases are noncontroversial when the creditors who are bound to the release have affirmatively expressed their consent, the court noted that "[c]onsent

_____

[19] 576 B.R. 453 (Bankr. S.D.N.Y. 2017).

through silence or inaction – 'deemed consent' – raises a more difficult question."[20] The court explained that in the absence of "a duty to speak, silence does not constitute consent. An offeror has no power to transform an offeree's silence into acceptance when the offeree does not intend to accept the offer."[21] Accordingly, a party seeking to enter into a contract with another "cannot ordinarily force the other party into a contract by saying, 'If I do not hear from you by next Tuesday, I shall assume you accept.'"[22] Judges on this Court have expressed similar views. As Judge Walrath put the point in *In re Washington Mutual*, consent to a release can be manifest either "by contract or the mechanism of voting in favor of the plan."[23]

This approach finds support in the Supreme Court's caselaw. The Court spoke in *Espinosa* of a bankruptcy court's obligation to make an "independent determination" that the orders the court is asked to enter comport with the Bankruptcy Code.[24] An argument can be made that it is therefore appropriate, in a case in which the proponent of the plan does not purport to make an evidentiary showing sufficient to persuade the court that the third-party release satisfies the

---

[20] *Id.* at 458.

[21] *Id.* (internal quotation and citation omitted).

[22] *Id.*

[23] *In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011. *See also In re Emerge Energy Services, L.P.*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (finding "basic contract principles" to be applicable and concluding that "while the Debtors included on the ballot and Opt-Out Form notice to the recipients of the implications of a failure to opt-out, the Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations.").

[24] *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 278 (2010).

very high standard necessary to approve such a release on a non-consensual basis, for the court to ensure itself that the release will bind only those creditors who have affirmatively agreed to be bound by it.

At the other end of the spectrum, there are cases – particularly in a jurisdiction like this one in which even non-consensual third-party releases may be appropriate based on the facts and circumstances of the case – that view a third-party release just like any other plan provision.  Under *Continental Airlines*, the permissibility of a third-party release (even without consent) depends on the facts and circumstances as they are established at the confirmation hearing.[25]

As with any other plan provision whose compliance with the Bankruptcy Code (or other applicable law) is disputable, if an affected party objects to the inclusion of that plan provision, the debtor (or other proponent of the plan) is faced with a choice.  The proponent may seek to meet its burden, at the confirmation hearing, of demonstrating that the plan is confirmable under the demanding standard applicable to non-consensual third-party releases.  Alternatively, the plan proponent may carve the objecting party out of the release, leaving the plan, including the third-party release, as "consensual" as to all other parties.

Some may find it unseemly for a party to seek relief to which it might not be entitled on the merits, exempt those parties who are sufficiently alert to object to it,

---

[25] *In re Continental Airlines*, 203 F.3d at 217 ("we find, based on the record before us, that the Bankruptcy Court and District Court lacked a sufficient evidentiary and legal basis to authorize the release and permanent injunction of Plaintiffs' claims under any of the standards adopted by courts that have evaluated non-debtor releases and permanent injunctions").  *See also Global Indus. Tech.*, 645 F.3d at 206 (third-party release could be granted upon a "showing with specificity that the [release] is both necessary to the reorganization and fair").

and claim that the relief is "consensual" as to everyone else. The bankruptcy process, however, operates in our adversarial system of justice in which the judge's primary role is to resolve disputes presented by the parties. As the Supreme Court explained, what "makes a system adversarial rather than inquisitorial is … the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."[26]

As a practical matter, the functioning of the bankruptcy system generally depends on requiring parties that object to the relief proposed in a plan to come into court to raise their objection. Consider a complex business that seeks to sell its assets on a going concern basis and moves for approval to assume and assign hundreds of contracts to the buyer. Section 365(b)(1)(A) requires the debtor-in-possession to cure any defaults as a condition to assumption and assignment. May a debtor serve the hundreds of counterparties with a schedule of cure amounts taken from its own books and records, and ask the court to presume (after the passage of the objection period) that those who have not filed objections have consented to the cure amounts listed in the schedules? What if the debtor's books and records (as is sometimes the case) are known to contain errors?

There is, at the very least, a serious argument that it is not the role of the judge to raise objections to the listed cure amounts based on the court's own skepticism about the accuracy of the numbers. In our adversarial system, that is

---

[26] *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991).

the role of the contract counterparty.[27]  If and when such a party raises an objection, the court will hold a hearing and the debtor will be held to its burden of proof.  But a party that is validly served and does not raise an objection will be deemed to have consented to the scheduled cure amount.  That happens in bankruptcy court every day and there is nothing controversial about it.

The same is true of other plan provisions as to might give rise to confirmation issues.  To be sure, a court would likely be well within its discretion to require a more elaborate process or an evidentiary presentation, particularly if the court had concerns about the propriety of the relief sought or the sophistication of the affected creditors.  A court would be equally within its discretion, however, to leave the onus on the affected parties to raise whatever objections they have.

The opt-out model of third-party releases proceeds from this basis.  A court could treat the third-party release as consensual as to those creditors who did not object to confirmation of a plan that includes such a release.  As to those creditors who do object, the debtor could seek to meet its burden under the *Continental* standard.  Alternatively, just as the debtor could settle with the contractual counterparty who takes issue with the proposed cure amount on any mutually agreeable terms, the debtor could agree to carve the objectors out of the third-party release and therefore obviate their objections.  On this view, the kinds of procedures

---

[27] Amanda Frost, *The Limits of Advocacy*, 59 Duke L. J. 447 (2009) ("American judges are strongly discouraged from engaging in so-called 'issue creation' - that is, raising legal claims and arguments that the parties have overlooked or ignored - on the ground that doing so is antithetical to a legal culture that values litigant autonomy and prohibits agenda setting by judges.")

that have become standard in this Court for consensual third-party releases, such as the requirement that the terms of the release be set forth clearly and conspicuously, and that impaired creditors have the option of opting out by checking a box on their ballot, rather than filing a formal objection to confirmation, are discretionary measures employed by the court in order to guard against a creditor's inadvertently consenting to a release to which it in fact objects.[28]

Courts that view the question of consensual third-party releases in this manner do not take issue with the contention that this form of "consent" would be inadequate to form an enforceable contract. There is no serious way to disagree with the point made in the cases described above that a party's failure to respond to an offer is an insufficient basis on which to find that the offer was accepted.

At the same time, the "duty to speak" in this context arises from the fact that the provision in question is contained in a plan of reorganization that has been validly served on the creditor in accordance with the requirements of due process. As Judge Dorsey explained in the *Mallinckrodt* case, parties that fail to act in response to a judicial process are regularly bound by the result of that process, whether in the context of default judgments, bar dates, and or consent to the entry of final orders by bankruptcy courts.[29]

---

[28] Bankruptcy Rule 3016(c) also requires the conspicuous disclosure of injunction against "conduct not otherwise enjoined under the Code." Fed. R. Bankr. P. 3016(c). *See also* Fed. R. Bankr. P. 2002(c)(3) (requiring similar disclosure in notice of confirmation hearing). In *In re Lower Bucks Hosp.*, 571 F. App'x 139 (3d Cir. 2014), the Third Circuit affirmed a decision of bankruptcy court that declined to enforce a third-party release on the ground that the disclosure was insufficiently conspicuous.

[29] *In re Mallinckrodt*, 639 B.R. at 879. *See also Boy Scouts*, 642 B.R. at 675 (agreeing with decision in *Mallinckrodt* that "the issue … is one of notice"). Needless to say, a creditor that

Just as a party that fails to respond to a validly served summons can be defaulted, it is incumbent on a creditor that has an objection to a provision of a plan of reorganization to raise its objection in the bankruptcy court. Federal Rule of Civil Procedure 55 provides that a judgment may be entered by default against a party that fails to respond to a pleading seeking affirmative relief.[30] That rule is expressly made applicable to contested matters, such as plan confirmation proceedings, under Bankruptcy Rule 9014.[31]

In this respect, the word "consensual," when used to describe a third-party release, does not necessarily mean that every creditor who will be bound by the release has affirmatively agreed to it. As a descriptive matter, it may be just as likely that the creditor was careless, inattentive, or mistaken.[32] Rather, the term "consensual" is used in the sense that a confirmation hearing in which no party-in-

---

did not receive constitutionally adequate notice would remain free to challenge whatever order or judgment followed thereafter. *See In re Motors Liquidation Co.*, 829 F.3d 135, 158-159 (2d Cir. 2016) (holding that creditors that did not receive constitutionally adequate notice of free and clear sale would not be bound by the order granting buyer free and clear title). Commentators have emphasized the due process concerns. *See, e.g.,* Dorothy Coco, *Third-Party Bankruptcy Releases: An Analysis of Consent Through the Lenses of Due Process and Contract Law*, 99 Fordham L. J. 231 (2019). No one contends, however, that a creditor that does not receive constitutionally adequate notice of the plan can be bound by a third-party release (or any other plan provision). *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). The analysis described herein therefore applies only to those creditors that *do* receive constitutionally adequate notice and *may*, consistent with due process, be bound by the terms of the plan, including any third-party releases.

[30] Fed. R. Civ. P. 55 ("a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default").

[31] Fed. R. Bankr. P. 9014 (making Bankruptcy Rule 7055 applicable to contested matters); Fed. R. Bankr. P. 7055 (adopting Civil Rule 55 in its entirety).

[32] *Emerge Energy Services*, 2019 WL 7634308, at *18; *In re Chassix Holdings, Inc.*, 553 B.R. 64, 79 (Bankr. S.D.N.Y. 2015).

interest raises an objection is described as a "consensual" hearing.  Can one be confident that every affected party has knowingly and voluntarily agreed to each provision in the plan?  Of course not.  But each affected party received notice and had an opportunity to be heard.  No party availed itself of its procedural right to raise an objection.  And in the absence of any objection, the Court entered a confirmation order that, in conjunction with § 1141(a) of the Bankruptcy Code, renders the plan binding on all creditors.[33]  Perhaps, as a technical matter, it would be more accurate to say that any objections to the third-party release were "forfeited," rather than to say that the releases are "consensual."  The basic import, however, is the same.

This reasoning is at least implicit in Judge Gerber's decision in *In re DBSD North America, Inc.*[34]  As that opinion explains, "both the Plan and Disclosure Statement have the third party release provision set off in bold font, and the ballots set forth in both capitalized and bold text the effect of consenting to the Plan or abstaining without opting out of the release.  Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual."[35]  On this Court, Judge Shannon's decision in *In re Indianapolis Downs*

---

[33] 11 U.S.C. § 1141(a) provides that, subject to certain specified exceptions, "the provisions of a confirmed plan bind … any creditor … whether or not the claim … of such creditor … is impaired under the plan and whether or not such creditor … has accepted the plan."  *See also In re Residential Capital, LLC*, 508 B.R. 838, 846-847 (Bankr. S.D.N.Y. 2014) (finding creditor to be bound to terms of discharge injunction under § 1141(a)).

[34] 419 B.R. 179 (Bankr. S.D.N.Y. 2009).

[35] *Id.* at 218.

is to the same effect.[36]  "As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."[37]

This form of analysis does not particularly take issue with the argument that, as a descriptive matter, notwithstanding the bold print and the opportunity to opt out by checking a box on the ballot, the creditor's failure to opt out may well be (or perhaps is more likely to be) attributed to carelessness, inattention, or mistake than to actual subjective consent.  Under the rationale of *Indianapolis Downs* and *DBSD*, it would make no difference if the creditor received the plan and disclosure statement in the mail and decided to recycle them without subjectively learning of the third-party release.  The point of these cases is that when one decides to toss a formal legal pleading into the trash can, one does so at one's own risk.  Just as a creditor that discarded the plan and disclosure statement cannot be heard to argue, after the plan has become effective, that the plan did not satisfy the best-interests test of § 1129(a)(7), provided unequal treatment to creditors in the same class in violation of § 1123(a)(4), or provided an incorrect cure amount for an assumed executory contract, the creditor who throws away the plan unopened is barred from arguing that the third-party release failed to meet the *Continental* standard.

---

[36] *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013).

[37] *Id.* at 306.  *See also Mallinckrodt*, 639 B.R. at 877-881; *Boy Scouts*, 642 B.R. at 674-678.

Even if a creditor that chooses to discard the plan and disclosure statement generally does so at the creditor's own risk, there remains a fair argument that third-party release provisions should be treated differently. The argument is that bankruptcy is about the restructuring of the debtor-creditor relationship. So a creditor that is validly served with a plan and disclosure statement ought to understand that ignoring the plan risks sacrificing the creditor's rights to complain about the recovery it will receive from the debtor's estate. Losing the right to pursue a valid cause of action against a third party, the argument would go, is another matter entirely. Judge Wiles made exactly this point in *Chassix*. "[M]any creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to their dealings with the Debtors and would not affect their claims against other parties. Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point."[38]

While that argument is a fair one, a response to it is that in view of *Continental* and the other Third Circuit authority, a third-party release cannot be said to be fundamentally different from other plan provisions. Otherwise put, in this jurisdiction, a creditor may not safely assume that a plan relates only to its dealings with the debtor and not third parties. The creditor that discards the plan

---

[38] *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80-81 (Bankr. S.D.N.Y. 2015).

and disclosure statement accordingly does run the risk that its rights against third parties – though only with respect to claims related to the debtor – may be prejudiced.

This discussion ends essentially where it began. A plan provision that grants a third-party release is (as *Continental* explains) an extraordinary exercise of bankruptcy authority. Courts may well harbor serious doubts about the debtor's ability to meet the *Continental* standard at confirmation. Bankruptcy courts are therefore left to strike a balance between the requirement of *Espinosa* that the court make an independent determination that the relief it is asked to enter comports with the Bankruptcy Code (which would presumably be satisfied if creditors affirmatively consented to the relief) with the competing imperative to honor the operation of an adversarial system in which it is to the parties, not the court, to raise objections to the relief sought by an opposing litigant.

That is a matter of judgment rather than a question of law. As described above, many bankruptcy judges have struck this balance in favor of categorically requiring creditors to opt in before binding the creditor to a third-party release. And others have struck that balance a few inches further down the scale, concluding that conspicuous disclosure coupled by a simple means of opting out was sufficient to protect the interests of creditors opposed to granting a third-party release. Neither camp is either right or wrong. This Court, however, is generally more in the latter camp than the former, finding the reasoning of *Indianapolis Downs* and *DBSD* to be persuasive. That, however, does not rule out the possibility that

unusual circumstances may tip the scale in the other direction.  And for the reasons described below, the facts of this case do require a measure of further judicial solicitude.

## II.    On the facts of this case, the Court concludes that additional protections are required.

The particular challenge in this case stems from the potential underfunding of the health benefit plans that Arsenal Health administers.  As the debtors described it, Arsenal Health's clients were generally small and medium-sized businesses, who were referred to as plan sponsors.[39]  These sponsors made monthly payments to Arsenal Health for coverage for the sponsors' employees and their families (who are the plan participants) under these plans.  Under ERISA,[40] Arsenal Health held these funds in trust for the benefit of the plan participants.

Arsenal Health would pay medical claims up to a threshold that was generally $10,000 per participant.  While the plan sponsors would obtain separate coverage for claims in excess of $10,000 per participant, the health plan that Arsenal Health administered was responsible for the first $10,000.

As a result of the debtors' operational issues and financial distress, however, Arsenal Health has failed to make payments to various healthcare providers for medical services provided to individuals covered under these health plans.[41]  The problem is exacerbated by the fact that (as counsel has explained) plan funds were comingled, such amounts that ought to have been held in trust for the benefit of one

---

[39] *See* D.I. 99.

[40] The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

[41] D.I. 99 at 7-8.

plan may have been used to pay claims asserted against another.[42]    The debtors state, however, that they are cooperating with the Department of Labor with respect to this issue, and are working to establish segregated benefit plan trust fund accounts for each benefit plan that Arsenal Health administers.

In the meantime, however, the healthcare providers have not been paid for services they have provided to those plan participants covered under these plans. These individuals may (or may not) have been billed directly by the healthcare providers.  The plan participants may also be at risk of collection actions and credit impairment.[43]

For the good and sound reason of trying to prevent plan participants from suffering injury while the debtors undertake to sort out the financial status of the plans they are administering, the debtors moved this Court for an order that would operate to bar, for a four-month period, the healthcare providers from engaging in collection activity against the underlying plan participants.[44]   The Department of Labor supported this relief.[45]   After a hearing during which all the objections to the proposed relief were consensually resolved, this Court entered such an order.[46]

The result of that order, however, is that the underlying plan participants, who may end up owing healthcare providers for medical services they received but for which the plan failed to pay, will not be billed by the healthcare providers for

---

[42] *See* D.I. 164 at 4.

[43] *Id.* at 8.

[44] *Id.* at 20.

[45] D.I. 126.

[46] D.I. 146.

those services until July 2023.  Perhaps, in the meantime, the debtors will locate the funds and the healthcare providers will be paid, relieving the plan participants of liability to the healthcare providers.  But if not, and this scenario certainly cannot be ruled out, some plan participants may receive bills from their providers in July 2023 that inform them, for the first time, that they owe very substantial sums to their healthcare providers for past medical services.

If that happens, those plan participants will presumably have claims against the various plans.  But will they have claims against Arsenal Health, Beyond Risk, or its directors and officers, when it would not appear that the plan participants are in contractual privity with any of those parties?  At this point in the bankruptcy case, this Court is not in a position to resolve those questions.  Rather, the question the Court must address is whether – assuming that the plan participants would have claims – it is appropriate to conclude that the plan participants have voluntarily relinquished those potential claims based on the plan participants' failure to opt out of the releases by the proposed deadline of April 26, 2023. Answering that question is confounded by the fact that, by virtue of this Court's order, plan participants may not even learn of the potential claims they would be forgoing under the "consensual" third-party release until July 2023.

In addition to pointing to this Court's order that may prevent certain claimants from learning of their claims, the U.S. Trustee also points to a variety of other factors that, it argues, counsel against an opt-out procedure.  For example, the U.S. Trustee argues that the complex way in which healthcare is generally financed

in the United States operates to prevent beneficiaries from knowing the invoiced cost of services they receive.[47]  The U.S. Trustee further contends that (a) because of the work that still needs to be done to unwind the results of the commingling of funds, some creditors may end up holding claims that the creditor would have no reason to know about today; (b) the debtors sent letters to beneficiaries that might lead those beneficiaries to believe that their claims are merely delayed, not at risk of being unpaid; (c) plan sponsors in this case are generally smaller business that tend not to have access to in house lawyers to assist in sorting out the complexities of this situation; and (d) the language of the releases is itself complex.[48]

In response, the debtors point out that the concerns about the creditors' relative unsophistication in light of the complex issues presented is mitigated by the fact that the Department of Labor has statutory authority under ERISA to take action for the benefit of health plans, has already filed a proof of claim in this case, and will presumably opt out of the third-party release.[49]  In a helpful pleading filed at the Court's invitation, the Department of Labor, however, emphasizes that while it does have statutory authority to act for the benefit of health plans, the actions of the Secretary of Labor do not bind individual beneficiaries any more than the actions of individual beneficiaries would prejudice the rights of the Secretary of Labor.[50]

---

[47] *Id.* at 9.

[48] *See id.* at 8-9.

[49] D.I. 165 at 2.

[50] D.I. 163.  The Court appreciates the assistance provided by the Department of Labor in response to its invitation to file a brief on these issues.

All of the points set out above are fair ones.  In the end, on the whole record before it, this Court will not require an opt-in procedure simply because some of the creditors may be unsophisticated or because some of the creditors hold claims that may be contingent on the occurrence of future events.  That much is often true in bankruptcy cases, and a principle that required a case-by-case assessment of those considerations in each case in order to approve solicitation procedures would risk becoming unworkable.

This case does, however, present a circumstance that is not present in every case, and that gives the Court pause.  Here, the Court's own order might operate to prevent creditors from learning of their claims, and therefore prejudice their interests.  As Justice Souter observed, in a comment that was correct even if made in a dissenting opinion, "it certainly seems reasonable to rely on an order from a federal judge."[51] And he added (in a footnote) that he "would also rest better knowing that my innocent errors will not jeopardize anyone's rights unless absolutely necessary."[52]

That same sentiment underlies this Court's concern with the effect of its prior order.  To be clear, the Court is confident that the order, which was unopposed, was properly entered and serves a salutary purpose.  But an unintended consequence of it is that potential creditors may be lulled into failing to realize that they hold claims against Arsenal Health or third parties until some time in July, when the stay provided in that order expires.  By that time, however, if this Court were to

---

[51] *Bowles v. Russell*, 561 U.S. 205, 220 (2007) (Souter, J., dissenting).

[52] *Id.* at 220 n.7.

enter the order proposed by the debtors, those creditors' rights to opt out of the plan's third-party release would have long expired.

The Court accordingly will not enter an order authorizing the debtors to tell their creditors that if they do not opt out of the third-party release by April 26, 2023 they will be deemed to consent to it, when creditors may not even learn of their potential claims until after the stay expires on July 15, 2023. The debtors properly addressed that concern vis-à-vis the creditors' claims against the estate by voluntarily extending the bar date to September 27, 2023. To the extent the debtors (or Beyond Risk) require knowledge, before the plan becomes effective, of which parties will be bound by the third-party release, this can only be accomplished by way of an opt-in mechanism. Alternatively, the debtors may address the effect of this Court's order, as applied to claims against third parties, in the same way they have against the debtors – by extending the date to opt out of the third-party release to September 27, 2023.

The parties are directed to settle an order providing notice of the confirmation hearing in a form that is consistent with this Memorandum Opinion.

Dated: March 27, 2023

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE