UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 (Subchapter V) |
|  | . |  |
|  | . | Case No. 23-10097(CTG) |
| ARSENAL INTERMEDIATE | . |  |
| HOLDINGS, LLC, et al | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . | . | Tuesday, May 23, 2023 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:              Sean M. Beach, Esq.
                             Elizabeth S. Justison, Esq.
                             S. Alexander Faris, Esq.
                             Shella Borovinskaya, Esq.
                             Kevin Guerke, Esq.
                             YOUNG, CONAWAY, STARGATT
                              & TAYLOR, LLP

For the U.S. Trustee:        Linda Casey, Esq.
                             OFFICE OF THE U.S. TRUSTEE
                             844 King Street, Suite 2207
                             Wilmington, Delaware 19801

Subchapter V Trustee:        William A. Homony, Esq.
                             MILLER COFFEY TATE LLP
                             1628 John F. Kennedy Boulevard
                             Suite 950
                             Philadelphia, Pennsylvania 19103


(Appearances Continued)

Audio Operator:              Electronically Recorded
                             by Donna Capell, ECRO

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For the U.S. Department
of Labor:                       Leonard H. Gerson, Esq.
                                U.S. DEPARTMENT OF LABOR - PLAN
                                 BENEFITS SECURITY DIVISION
                                200 Constitution Avenue, N-4611
                                Washington, D.C. 2021

For Beyond Risk:                John H. Knight, Esq.
                                RICHARDS, LAYTON & FINGER, PA
                                One Rodney Square
                                920 North King Street
                                Wilmington, Delaware 19801

                                David M. Feldman, Esq.
                                Matthew Breen, Esq.
                                Marshall R. King, Esq.
                                GIBSON, DUNN & CRUTCHER, LLP
                                200 Park Avenue
                                New York, New York 10166

For Normal Chandler and
Justin Law:                     Matthew G. Summers, Esq.
                                Margaret A. Vesper, Esq.
                                BALLARD SPAHR, LLP
                                919 North Market Street
                                11th Floor
                                Wilmington, Delaware 1980

For the Fringe Benefit
Coordinators and Peco
Foods:                          Jeffrey R. Waxman, Esq.
                                MORRIS JAMES, LLP
                                500 Delaware Avenue, Suite 1500
                                Wilmington, Delaware 19801

APPEARANCES VIA ZOOM:

For Iron Reinsurance
Company, Inc.:                  Daniel Hogan, Esq.
                                HOGAN MCDANIEL

For the U.S. Department
of Labor:                       James Goldstein, Esq.
                                U.S. DEPARTMENT OF LABOR

(Appearances Continued)

Also Appearing:                Cole Celenza
                               WYSE ADVISORS, LLC

                               Brandon Wood, *Pro Se*

                               Michael Franciosa, Interested
                                Party on behalf of the Debtors

                               Huiqi (Vicky) Liu, Interested
                                Party on behalf of Beyond Risk

                               Demi Yeager
                               U.S. BANKRUPTCY COURT

<u>INDEX</u>

PAGE

<u>MOTION TO REJECT THE ADMINISTRATIVE SERVICES AGREEMENT</u>   5
<u>WITH FRINGE BENEFIT COORDINATORS</u>

<u>MOTION TO SHORTEN NOTICE PERIOD RE:  APPROVAL OF</u>   8
<u>SETTLEMENT WITH FRINGE BENEFIT COORDINATORS</u>

<u>CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF</u>   14
<u>LIQUIDATION</u>
    <u>Argument by Mr. Summers</u>   87
    <u>Argument by Ms. Casey</u>   97
    <u>Argument by Mr. Beach</u>   112
    <u>Argument by Mr. Feldman</u>   129
    <u>Comments by Mr. Gerson</u>   133
    <u>Court Decision</u>   134

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>FOR THE DEBTORS</u> | | | | |
| MICHAEL WYSE | 28 | 60 | 81 | |

| <u>EXHIBIT</u> | <u>EVID.</u> |
|---|---|
| Wyse Declaration | 27 |
| Debtors' Exhibits 1 through 20 | 57 |
| Chandler/Law Exhibits 5-7 | 79 |

1          (Proceedings commence at 10:00 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Be seated.

4                Good morning.  We are on the record in In Re

5    Arsenal Intermediate Holdings, LLC, which is Case Number 23-

6    10097.  Good morning to all.

7                And Counsel, you can proceed.

8                MR. FARIS:  Good morning, Your Honor.  Alex Faris

9    of Young, Conaway, Stargatt & Taylor, here for the Arsenal

10   Intermediate Holdings Debtors.  With me at counsel table are

11   my colleagues Sean Beach and Kevin Guerke and Liz Justison

12   and Shella Borovinskaya, as well.  I'm going to let Mr. Beach

13   handle the rest of the introductions when he stands up.

14               But I am going to be addressing the first two

15   matters -- well, the first matter on our agenda, and then the

16   last matter, as well, if that's acceptable with Your Honor.

17               THE COURT:  Certainly.

18               MR. FARIS:  So the first matter on today's agenda

19   is the motion to reject the debtors' contract with Benebay.

20   This contract was a pre-petition services agreement, pursuant

21   to which Benebay provided third-party claims administration

22   services to the debtors, and we sought to reject that.

23               We did receive a couple of objections from Mr.

24   Waxman's clients.  And Mr. Waxman is in the courtroom today.

25   And we -- I'm pleased to report that we have reached a

1   resolution of those objections.  They were mostly notice-

2   based.  The resolution of those items are that we will serve

3   the order on all of the customers of Arsenal Health that were

4   listed on the debtors' schedule, Schedule G, that are still -

5   - that were still in effect as of the petition date.

6           Your Honor, I believe that resolves Mr. Waxman's

7   objection and I will defer to him to confirm.  But in light

8   of that, we would respectfully request entry of the order.

9           THE COURT:  Okay.  Mr. Waxman.

10          MR. WAXMAN:  Good morning, Your Honor.  Jeff Waxman

11  of Morris James on behalf of two clients, Fringe Benefits

12  Coordinated and Peco Foods.  They both filed limited

13  objections.  There was no issue with respect to the

14  underlying ability of the debtor to reject, it was simply a

15  question of notice.  And the resolution proposed by the

16  debtors resolves all of the issues that we had raised.

17          THE COURT:  Got it.

18          MR. WAXMAN:  Thank you.

19          THE COURT:  Okay.  And so this is separate from the

20  settlement that I've -- that I saw today with your -- with

21  one of your clients.  Is that right, Mr. Waxman?

22          MR. WAXMAN:  That's correct, Your Honor.

23          THE COURT:  Got it.

24          MR. WAXMAN:  And I believe Mr. Faris is going to

25  address that --

1          THE COURT:  That at --

2          MR. WAXMAN:  -- one next.

3          THE COURT:  -- the end.

4          MR. WAXMAN:  Yeah.

5          THE COURT:  Got it.  Okay.

6          MR. FARIS:  That's correct, Your Honor.  They do go

7      somewhat hand in hand.  The rejection is to stop the

8      administrative burn, and then the settlement that we're --

9          THE COURT:  Kind of --

10         MR. FARIS:  -- we've teed up --

11         THE COURT:  -- ties up the other issues.

12         MR. FARIS:  Exactly.

13         THE COURT:  Got it.

14         MR. FARIS:  Yes, Your Honor.

15         THE COURT:  Okay.  Let me ask this:  Is there -- is

16     there more you want to say or should I see if anyone --

17         MR. FARIS:  Not about --

18         THE COURT:  -- else wants --

19         MR. FARIS:  -- the rejection motion, Your Honor.

20         THE COURT:  Okay.

21         MR. FARIS:  Thank you.

22         THE COURT:  With respect to the motion to reject,

23     which is the first item on the agenda and is the motion

24     that's at DI 193, is there any other party-in-interest that

25     would like the opportunity to be heard?

1          (No verbal response)

2                    THE COURT:  Okay.  Seeing no one.

3               I've reviewed the motion and I'm satisfied the

4     relief sought is appropriate, certainly with the resolution

5     of the objections that have been recited, and we will enter

6     that order.

7                    MR. FARIS:  Great.  Thank you, Your Honor.

8               I'd like to take the second matter a little bit out

9     of turn, it's the last matter on the agenda, which is the

10    debtors' motion to shorten for the 9019 motion.  And we'd

11    like to do that just to get these two preliminary items -- or

12    get these two important items out of the way and then proceed

13    with the main show today, if that's acceptable.

14                   THE COURT:  That is.

15                   MR. FARIS:  Great.

16                   THE COURT:  You can present them.

17                   MR. FARIS:  Great.  Thank you --

18                   THE COURT:  In the absence --

19                   MR. FARIS:  -- Your Honor.

20                   THE COURT:  -- of any party-in-interest objecting

21    to proceeding that way.  So, seeing none, that's fine.

22                   MR. FARIS:  Great.  Thank you, Your Honor.

23              Last night, we filed a motion to approve a

24    settlement with Mr. Waxman's client Fringe Benefit

25    Coordinators, who we've also called "Benebay" sometimes in

1     this case.  Fringe Benefit Coordinators is a subsidiary of

2     Benebay.

3          That resolution, we felt that that needed to go out

4     on notice to parties-in-interest under Rule 9019.  And we

5     have sought to shorten notice on that motion to provide a

6     seven-day objection period and then a hearing at the Court's

7     earliest convenience.  There are a couple of reasons for

8     that:

9          Number one, the resolution and prompt approval of

10    the resolution will give some clarity as to how certain funds

11    that are currently held by Benebay will be treated.  Those

12    funds are customer trust funds and the settlement will

13    coordinate a transition of those funds to the liquidating

14    trust or to the debtors, to the liquidating trust upon

15    approval of the plan.

16         And then it will also -- we currently have a

17    thirty-day window to pay Benebay its allowed administrative

18    expense under that settlement, and so prompt approval will

19    give us enough time to get that payment processed.

20         And so, in light of that, you would respect [sic]

21    entry of an order shorting the notice on the 9019 motion.

22         THE COURT:  Okay.  Is there any party-in-interest,

23    while we're here, that objects to shortening notice, such

24    that the response would be a week from today and hearing the

25    first available date thereafter?  Any objection to proceeding

1    in that manner?

2         MR. FARIS:  Your Honor, we -- I will note that we

3    did consult with the U.S. Trustee before filing the motion

4    and, in this case, he advised that there was no objection.

5         We also consulted with the Department of Labor, and

6    they have also voiced no objection.

7         I did check with Mr. Homony this morning and he

8    confirmed no objection, as well.

9         THE COURT:  Okay.  We'll -- based on those

10   representations and the absence of any party telling me

11   otherwise, I'm happy to grant the motion to proceed on

12   shortened notice.

13        So I guess that leaves us the question of what's

14   the first date --

15        MR. FARIS:  A hearing date.

16        THE COURT:  -- after May 31st -- or May 30th, when

17   we are available for a hearing.  What if we did this at three

18   o'clock on June 1st?

19        (Court and court personnel confer)

20        THE COURT:  Okay.  Hold that thought.  Let's

21   address the technical issue.  And we are briefly in recess.

22        MR. FARIS:  Understood, Your Honor.  Thank you.

23        (Recess taken at 10:06 a.m.)

24        (Proceedings resume at 10:15 a.m.)

25        (Call to order of the Court)

1      THE COURT:  Be seated.

2      So, before we kick off, let me just say one thing.

3  I understand that the Zoom isn't working and we're not sure

4  how long it would take to fix.  So my view is that, in light

5  -- I've got a very busy calendar today and no one is entitled

6  to participate over Zoom, so we're going to go forward and

7  anyone who is proceeding over Zoom took their chances.

8      So, just so everyone understands, when you -- we --

9  we're happy to allow people to listen in to proceedings over

10  Zoom, to the extent permitted, but we're not going to hold up

11  the train over that, and so we're going to proceed.  And

12  apologies to those who aren't able to hear.

13      So, with that, I'm -- I guess where we were, if I'm

14  right, Mr. Farris, is we were looking at dates.  Is that

15  right?

16      MR. FARIS:  That's correct, Your Honor.

17      THE COURT:  Okay.  So, Ms. Barksdale, going back to

18  the calendar, I guess I was suggesting three o'clock on June

19  1st.  Does that look like that works for our calendar?

20      (Court and court personnel confer)

21      THE COURT:  And from the parties, perspective, any

22  objection to having the hearing at three o'clock on June 1st?

23      MR. FARIS:  That is fine, Your Honor.

24      MR. WAXMAN:  That --

25      THE COURT:  Mr. Waxman?

1      MR. WAXMAN:  That's fine, Your Honor.

2      MR. FARIS:  And would it be acceptable, if there

3  are no objections, to submit a -- to submit the order under

4  CNO?

5      THE COURT:  If we get -- you set an objection

6  deadline --

7      MR. FARIS:  Yep.

8      THE COURT:  -- and the rules otherwise apply, so,

9  in the event there's no objection, you can submit an order

10  under certification, certainly.

11      MR. FARIS:  Great.  Thank you, Your Honor.

12      THE COURT:  Okay.

13      MR. FARIS:  That wraps up the two agenda items on

14  my plate, and so I will turn things over to Mr. Beach.

15      MR. WAXMAN:  Actually, before you do ...

16      Your Honor, Jeff Waxman of Morris James on behalf

17  of Fringe Benefit Coordinators.

18      THE COURT:  Okay.

19      MR. WAXMAN:  We have filed an objection to the

20  confirmation.  With the objection that -- with the settlement

21  agreement that is resolved, if I may be excused?

22      THE COURT:  You certainly may.

23      MR. WAXMAN:  Thank you, Your Honor.

24      THE COURT:  So I take it, Mr. Waxman, you are --

25  even before your settlement is approved, you are formally

1    withdrawing your objection.

2          MR. WAXMAN:  I believe that that is appropriate,

3    yes.  All of the other rights, in the event that the

4    settlement is not approved, will go forward.  We have the

5    right to void the settlement.  And obviously, there's a big

6    difference between the settlement amount and the underlying

7    claim.

8          THE COURT:  I understand.

9          And I -- just so that folks are aware, I now

10   understand the Zoom is fixed, so ...

11       (Laughter)

12         THE COURT:  So, for those of you who are on Zoom,

13   just so you all know what happened before, Zoom didn't work.

14   We decided to proceed because of the calendar.  I made clear

15   that, when one chooses participate via Zoom, they do that at

16   their own peril.  But we want to do what we can to be

17   accommodating, so it is fixed, so welcome to everyone on

18   Zoom.

19         Okay.  With that, Mr. Waxman, so what your rights

20   are in the event the settlement isn't approved is an issue we

21   can worry about later.  All I need to know for today is that

22   you have agreed to withdraw your objection to confirmation.

23         MR. WAXMAN:  That --

24         THE COURT:  That's correct?

25         MR. WAXMAN:  That's correct.

1    I would just point out it is, obviously, without

2  prejudice, to the extent that the admin claim is larger, the

3  plan can go effective.  All of Fringe Benefit Coordinators'

4  rights are reserved.

5          THE COURT:  All right.  We can --

6          MR. WAXMAN:  But for today --

7          THE COURT:  We can cross that bridge, if and when

8  we get there.

9          MR. WAXMAN:  Exactly.

10          THE COURT:  Okay.

11          MR. WAXMAN:  Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you, Mr. Waxman.

13          MR. WAXMAN:  Thank you.

14          THE COURT:  Mr. Faris, you -- oh, I see.  We now

15  have Mr. Beach.  Okay.  You're -- we're -- you're also

16  allowed to proceed.

17      (Laughter)

18          MR. BEACH:  Thank you, Your Honor.  For the record,

19  Your Honor, Sean Beach from Young, Conaway, Stargatt & Taylor

20  on behalf of the debtors.

21          Your Honor, Mr. Faris introduced my colleagues, but

22  I'd like to also introduce Mr. Michael Wyse, who is the

23  debtors' Chief Restructuring Officer and the declarant, as

24  well as supplemental witness today -- well, he'll be

25  supplementing his declaration, I should say.

1              THE COURT:  Okay.

2              MR. BEACH:  We also have with us today

3    representatives of Beyond Risk:  David Feldman, Matt Breen,

4    and Marshall King from Gibson Dunn, as well as Devin Taylor,

5    who is the Beyond Risk General Counsel, and John Knight from

6    Richards, Layton & Finger.

7              Your Honor, we also have Mr. William Homony who is

8    the Subchapter V Trustee and the proposed liquidating trust

9    under the plan, as well as Leonard Gerson from the Department

10   of Labor.  And I understand that James Goldstein from the

11   Department of Labor is on Zoom and now can hear the

12   proceedings.

13             THE COURT:  Terrific.  Well, welcome to everyone.

14             MR. BEACH:  Your Honor, what we'd like to do today

15   is obviously seek confirmation of the debtors' plan and with

16   respect to these Subchapter V proceedings.

17             What I'd to do first is just very briefly highlight

18   the live objections, which are only two, and then walk

19   through, again briefly, how we got here, the pre-petition

20   issues that resulted in the bankruptcy filing, which were

21   significant, and what we accomplished during the bankruptcy

22   case.  Again, I know Your Honor's time line is tight and we

23   would like to get through the proceeding by your drop-dead

24   time line, so I will be quick, but I think that context is

25   important for the Court to have in connection with

considering the plan confirmation.

So, Your Honor, as I said, have two objections that are live:  One is from the United States Trustee, the other one is -- which is at Docket Number 263 -- and the other one is from Norman Chandler and Justin Law, and that is at Docket Number 226.

Your Honor, as you may recall, Mr. Chandler and Mr. Law are -- well, Mr. Chandler is the founder of the two operating debtors, Arsenal Health and Arsenal Insurance. Both were officers of the debtors prior to their termination for cause in October.  And as Your Honor will hear throughout these proceedings and have heard throughout these bankruptcy cases, much of what the debtors were dealing with leading up to the bankruptcy were issues that were put into place by Mr. Chandler and Mr. Law.

Your Honor, the Department of Labor also filed a reservation of rights, that's at Docket Number 267.  And we have now resolved all of the comments to the various different plan documents, working very closely with them. And we do appreciate the help in getting those issues resolved.  And my understanding is that the Department of Labor has no objection to the plan at this point.

With that, Your Honor, I'd like to start with a bit of an overview of how we got here.

Your Honor, the two operating companies are Arsenal

1   Health and Arsenal Insurance.  Arsenal Health administered

2   self-funded health plans, heath benefit plans, and Arsenal

3   Insurance managed captive insurance companies.  The third

4   debtor, Your Honor, is Arsenal Intermediate Holdings, which

5   is a holding company.

6           Arsenal Health and Arsenal Insurance were acquired

7   by Beyond Risk in December of 2021 for approximately $43

8   million.  Once Beyond Risk acquired the debtors, it pretty

9   quickly discovered that there were irregularities with --

10  that allegedly concealed -- were concealed by Chandler and

11  Law, and they began to slowly come to light.

12          In February of 2022, the debtors stopped collecting

13  administrative fees, which added to the issues the company

14  was having, in terms of cash flow.

15          In April of 2022, a lead salesman from the debtors

16  and alleged mis-marketing of the healthcare plans as level-

17  funded instead of self-funded plans.  Chandler and Law

18  immediately attempted to discredit that allegation.

19          July through August of 2022, the accounting

20  irregularities, which, after Beyond Risk sent an employee

21  down there to understand the accounting issues, described

22  those described those accounting issues as a "black hole" and

23  discovered, after months of requesting an accounting, that

24  there were significant issues and, frankly, not much of an

25  accounting at all.

1           At or around that same time, it became apparent

2    that Chandler and Law knew of the marketing issues, despite

3    prior attempts to discredit the allegation.  After a

4    deposition of Mr. Chandler in the Viva litigation (phonetic),

5    it was pretty clear that he was aware of those issues even

6    prior to the acquisition by Beyond Risk.

7           At that point, the debtors immediately stopped

8    marketing the plans and -- altogether, not just as level-

9    funded plans, but stopped marketing the plans right away,

10    once they determined that those allegations were credible.

11           Your Honor, in October of 2022, a law firm that was

12    working for the debtors, Tuggle Duggins, revealed that there

13    were regulatory issues, and Chandler and Law were terminated

14    for cause in October of 2022.

15           In November 2022, Polsinelli was hired to replace

16    Tuggle Duggins, to review such issues and the regulatory and

17    accounting irregularities that were there.

18           Throughout that period described above, Your Honor,

19    prior to the bankruptcy cases, the debtors continued to lose

20    customers and revenue.  Beyond Risk funded over $1.8 million

21    to keep the operations going.  But due to the alleged

22    mismanagement and misrepresentation of former management

23    discussed above, the debtors have steadily -- had steadily

24    lost customers and revenue.

25           Since January of 2022, the debtors' monthly revenue

1    declined from approximately 474,000 in January to

2    approximately 77,000 in December.  And over the past year,

3    the debtors lost approximately 95 percent -- over that past

4    year prior to the bankruptcy, lost approximately 95 percent

5    of their customers.  It became pretty apparent that the

6    company needed to file for bankruptcy.

7              The realities started to come to light that the

8    funds in the healthcare plans were commingled.  Those funds

9    were not just commingled, Your Honor, they were -- Chandler

10   and Law set up a bank account at Iron Reinsurance, which is a

11   nondebtor, and those funds were placed in a nondebtor

12   account.

13             So, in terms of trying to figure out which funds

14   applied to which plan participants and which plan sponsors,

15   it was almost impossible to do at that point, which created

16   another issue.

17             And because Iron Reinsurance was terminated, we

18   could not get documents from them.  We still, even though we

19   have tried throughout the course of this bankruptcy case, to

20   get documents, simple bank statements weren't even provided

21   to the debtors during the case.  As Your Honor is aware, we

22   now have an adversary proceeding against Iron Reinsurance,

23   and that proceeding is proposed to be taken over by the

24   Department of Labor, who will address these information gaps.

25             But because of those information gaps, because of

the accounting irregularities, because of the commingling of

the funds, it was a pyramid that had to fall at some point.

And with the lowering of the revenue, the payments to the --

on account of the employee healthcare claims could not be

made anymore because the revenue wasn't coming in because the

plans weren't being marketed because they had been mis-

marketed before.

With that, Your Honor, I'd like to turn to what we

have accomplished during these bankruptcy cases, which I

think is significant.

This is a Subchapter V case, it's supposed to be a

small, efficient process.  It has been a very complicated and

difficult process, but I do believe we've been able to

accomplish the goals that we articulated to Your Honor at the

first-day hearing, and those were:

To maximize the value for the debtors'

stakeholders;

Provide a soft landing for the plan sponsor,

customers, so that they could transition as smoothly as

possible to other insurance administrators;

And to diligence and establish an orderly mechanism

for addressing complicated issues surrounding the

administration of the health benefit claims.

We believe, Your Honor, that the amended plan

before Your Honor today accomplishes those goals.

1    But in the few short months since the petition

2  date, Your Honor, as Your Honor is aware, we've been able to

3  keep employees employed.  And those employees had a difficult

4  job during the course of this bankruptcy case to address

5  many, many questions that were raised once all of these

6  issues came to light.

7    So they were dealing with plan sponsors.

8    They were working on an accounting of the funds

9  that came in from the various different insurance plans.

10    As we've talked before with Your Honor, that

11  accounting was not perfect because of the difficulties in

12  getting the information from the various third parties to be

13  able to provide an accurate accounting and, frankly, because

14  there was commingling.  I'm not sure there will ever be, you

15  know, complete accuracy.  But what that accounting did

16  provide, it provided an ability to give an order of magnitude

17  on the under-funding of the healthcare plans.

18    Your Honor, we also did address the customers who

19  were transitioned to other insurance administrators.

20    We addressed the significant impact on the health

21  plan participants and the plan sponsors by staying the

22  collection against them in connection with the *ex parte*

23  order.

24    We filed a complaint, as I mentioned, against Iron

25  Reinsurance.

1    We conducted an exhaustive sale process, which,

2    unfortunately, did not yield any value.  But that's not

3    surprising given the problems created by the mismanagement of

4    the companies prior to the bankruptcy case.

5    We addressed numerous inquiries, both Wyse

6    Advisors, Young Conaway, the client, the employees, addressed

7    numerous inquiries from thousands of different parties over

8    the course of the bankruptcy case.  And Your Honor, we think

9    that's a significant value.  Prior to that, these parties

10   were not getting the information to understand the situation

11   the best they could.  So providing that information and

12   notice on a number of bankruptcy issues, I think was vital to

13   the process.

14   In addition to that, Your Honor, as Mr. Faris

15   indicated, we've negotiated a settlement with Fringe Benefits

16   Coordinators, which will provide an additional 205,000 of

17   customer trust funds into accounts to, hopefully at some

18   point in the near future, start to be used to pay healthcare

19   claims.

20   We've rejected contracts and leases.

21   We've conducted constant discussions with the

22   Department of Labor throughout the course of the case to

23   figure out the best course forward.

24   We conducted an investigation of Beyond Risk, as

25   Your Honor is aware of, as well as the current officers of

1    the debtors, and negotiated the settlement that's before Your

2    Honor today.

3            So, with that, Your Honor, unless you have any

4    questions for me, I would cede the podium to my colleague

5    Kevin Guerke, who will seek to admit the declaration of Mr.

6    Wyse and his additional direct testimony.

7            THE COURT:  Okay.  I may have some questions along

8    the way, but I don't think it makes sense at this point for

9    me to annoy you with them.  So I'm happy to give you a chance

10   to put in the evidence and then address whatever questions I

11   have after the evidence is in.

12           MR. BEACH:  Thank you, Your Honor.

13           THE COURT:  Thank you.

14           Mr. Guerke.

15           MR. GUERKE:  Good morning, Your Honor.  Kevin

16   Guerke from Young Conaway on behalf of the debtors.

17           Your Honor, we plan to offer supplemental testimony

18   from our declarant, and I have prepared and we sent over a

19   binder of exhibits that we will use with the witness today.

20   There are several documents that have been marked as

21   confidential and we're trying to figure out the best way to

22   deal with that today and not bog down the proceedings.

23           So what we have proposed and I believe is

24   acceptable to the objectors is we use the exhibits and we

25   treat the witness exhibit and Your Honor's exhibit as chamber

1      copies and then deal with any sealing that is necessary or

2      required after the hearing.  I know the Court has a very

3      tight time frame today.  If that's acceptable, that's how

4      we'll proceed.

5              THE COURT:  Is there any objection to proceeding in

6      that manner?

7              MR. SUMMERS:  (Not identified) There is no

8      objection from Norman Chandler and Justin Law.

9              THE COURT:  Okay.  Okay.  Very well.  That's a

10     sensible procedure, so we can proceed that way and address

11     what becomes publicly available at an appropriate time.

12             MR. GUERKE:  Thank you, Your Honor.

13             With that, the debtors move to admit the

14     declaration of Michael Wyse into evidence as part of his

15     direct testimony.  The witness is in the courtroom and is

16     available for cross-examination.

17             We also plan to put him on the stand and supplement

18     that declaration with testimony.

19             THE COURT:  Okay.  So let's take this in pieces.

20     First, is there any objection to the admission into evidence

21     of the Wyse declaration?

22             MR. SUMMERS:  Your Honor, Matthew Summers on behalf

23     of Norman Chandler and Justin Law.

24             We do have objections to a handful of statements in

25     the declaration which we believe are improper legal

conclusions relating to the settlement with Beyond Risk.

THE COURT: Okay. Hold on. Let me pull the declaration up. What docket number is that again?

MR. SUMMERS: It's Docket Number 268.

THE COURT: 268. Okay. So tell me which paragraphs concern you.

MR. SUMMERS: Sure. So, Your Honor, the first paragraph is Paragraph 6(x) on Page 3, the second sentence.

THE COURT: The "as discussed" sentence?

MR. SUMMERS: Yes, the "as discussed" sentence, Your Honor. It says that the settlement is:

"-- an integral component of the negotiations and compromises underlying" the cases and the plan.

I believe that that is a legal conclusion and a legal standard.

And then in the next sentence, Your Honor, it discusses the arm's length negotiations and at the end, the fair, reason -- it says the settlement is fair, reasonable, and necessary, which I also believe are the ultimate legal issues.

Similar language appears in a handful of other paragraphs. I don't know if you want me to go through them.

THE COURT: Well, why don't we talk about this as a matter of principle --

MR. SUMMERS: Sure.

1          THE COURT:  -- and see if that can resolve thing.

2          MR. SUMMERS:  Okay.

3          THE COURT:  So, to conclude -- Mr. Guerke, legal

4    conclusions like, you know, necessary and reasonable, right?

5    Which are really left for the Court to resolve.  Is there any

6    objection to sort of striking from the declaration those

7    conclusions on the ground that they are legal conclusions?

8          MR. GUERKE:  Your Honor, we didn't offer the

9    declaration as an expert opinion on the law.  And we know

10   you'll give it the weight that it deserves.  And it was

11   really structured as an outline.

12         THE COURT:  I understand.  But I -- it's a

13   declaration that you've moved into evidence and I've got to

14   apply the Rules of Evidence to it, so I understand that.

15         So what I -- what I'm trying to do is, if we can't

16   get to an understanding of what is in evidence and what isn't

17   at a conceptual level, that night -- look -- because I don't

18   think, at the end of the day, the outcome of this

19   confirmation hearing is going to turn on whether his

20   statement that he thinks the plan is fair and equitable does

21   or doesn't come into the evidence, nevertheless, I've got to

22   calls balls and strikes.

23         MR. GUERKE:  Understood, Your Honor.

24         Yes, so, to the extent that you determine that

25   something is a legal conclusion, we're not offering --

1          THE COURT:  So, look, here's how I -- just going

2     through what you described to me, the statement that the

3     negotiation took place at arm's length seems to me to be a

4     factual assertion, not a legal conclusion.  The rest of it

5     strikes me as a legal conclusion.

6          So, to the extent the declaration repeats these

7     types of formulations, if I treat as stricken from evidence

8     the statements about this was integral and that it was fair

9     and reasonable and the like, but leave in that the

10    negotiations took place at arm's length, on the ground that

11    that's describing what happened in negotiations, is reading

12    it -- is reading the declaration in light of those principles

13    sufficient to resolve those objections?

14          MR. SUMMERS:  It is, Your Honor, yes.

15          THE COURT:  Okay.  Are there any other objections

16    to the admissibility of the declaration?

17          MR. SUMMERS:  There are not, Your Honor.

18          THE COURT:  Okay.  Any other party-in-interest who

19    would like to be heard with respect to the admissibility of

20    the declaration?

21    (No verbal response)

22          THE COURT:  Okay.  So, subject to those

23    qualifications, the declaration will be admitted.

24    (Wyse Declaration received in evidence)

25          MR. GUERKE:  Thank you, Your Honor.

1    THE COURT:  And so I take it -- okay.  That was

2    step one.

3    Now you want to call the witness for some

4    supplemental direct testimony.

5    MR. GUERKE:  That's correct, Your Honor.  And with

6    your permission, we'd call Michael Wyse to the stand.

7    THE COURT:  Okay.  Mr. Wyse, you can take the

8    stand.

9    If you can swear the witness.

10    THE ECRO:  Raise your right hand.

11    MICHAEL WYSE, WITNESS FOR THE DEBTORS, AFFIRMED

12    THE ECRO:  Please state your full name and spell

13    your last name for the record.

14    THE WITNESS:  Yes.  Michael Wyse, last name is

15    spelled W-y-s-e.

16    THE ECRO:  Thank you.  You may have a seat.

17    THE WITNESS:  Thank you.

18                        DIRECT EXAMINATION

19    BY MR. GUERKE:

20    Q    Good morning, Mr. Wyse.

21    A    Good morning.

22    Q    Could you please briefly give the Court your educational

23    background?

24    A    Yes.  I have a BBA/MBA in Accounting and Financing from

25    Saint Bonaventure University.

1    Q    And could you tell us about your -- briefly about your

2    work experience?

3    A    I have spent my entire career, outside of one year in

4    public accounting, in the distressed/restructuring arena.

5    Q    What CRO experience do you have?

6    A    Over the past -- as I've -- so the last eight or so

7    years of my career, I've been the Managing Member of Wyse

8    Advisors, which is a turnaround/restructuring boutique.  I've

9    served in well over a dozen CRO roles.

10   Q    What were your specific roles and responsibilities in

11   this case?

12   A    Specific roles and responsibilities were typical with

13   regards to managing the day-to-day restructuring efforts,

14   cash forecasting, reporting, marketing the assets.  That's

15   basically most of it.  Standard.

16   Q    When approximately were you appointed?

17   A    I was appointed at the end of December 2022.

18   Q    Mr. Wyse, could you open the binder of exhibits in front

19   of you and turn to Exhibit 1, please?

20   A    I've just got to move some stuff around here.  Sorry.

21        Exhibit 1?

22   Q    Yes.  What is Exhibit 1?

23   A    Exhibit 1 is minutes of the meeting of the board of

24   managers of the General Partner of Beyond Risk Topical

25   Holdings, held on December 21st, 2022.

1    Q    Does this describe your appointment and the authority

2    that you were given?

3    A    It does.

4    Q    Could you flip to the second page, please?

5         Do you see the numbered paragraphs in the middle there?

6    A    I do.

7    Q    Does that part of this exhibit describe your general

8    duties?

9    A    Yes.

10   Q    Were you also granted independent authority?

11   A    I was.

12   Q    Is that reflected in this document?

13   A    It is, in the next set of numbered paragraphs.

14   Q    Briefly describe the independent authority that you have

15   been granted.

16   A    Sure.  It was primarily to arrange for debtor-in-

17   possession financing to finance the process, as well as

18   negotiate any other terms or agreements with Beyond Risk.

19   Q    Let's talk about the plan for a minute.

20        Can you briefly walk us through what has been

21   accomplished in this case in your view, from the time you

22   were appointed up through the plan?

23   A    Sure.  I think the best way to describe it is there was

24   -- it was chaos.  And what this process brought was structure

25   to this chaos.

1    Beyond Risk funded -- provided additional financing to

2    the process to fund the process.  Even after, you know, just

3    over a year they bought this company for $43 million, they

4    were willing to put in an additional $3 million -- now it's

5    almost three and a half million dollars -- to fund through

6    this process to bring some structure to the chaos.  And I

7    think there was a lot accomplished in a short time frame.

8    Q    Can you walk us through the structure of the plan as you

9    understand it?

10   A    Sure.  The plan provides for, you know, a pathway for --

11   for any potential recoveries to general unsecured creditors.

12       There will be the -- at the -- hopefully, at the

13   confirmation and the conclusion here, there will be a trust

14   set up, which will be led by a trustee, Mr. Homony.

15       There will also be an independent fiduciary put in place

16   to oversee the health side of things, the health plan side of

17   things.

18       And that was funded by Beyond Risk, as well, $200,000.

19   So the -- the trust will be funded.  There's seed money in

20   there to -- to initiate those and pursue any potential causes

21   of action that will have at the remaining assets that are

22   left over.  So I think it accomplishes a lot.

23   Q    Do you believe the debtors have sufficient funding to

24   pay off administrative and priority claims?

25   A    I do.

1 Q Do you believe that the liquidating trust will be

2 adequately funded?

3 A I do.

4 Q Did you prepare a budget?

5 A I did.

6 Q You've touched on some of this.  But what's included in

7 your budget?

8 A The budget accounts for all administrative claims to be

9 satisfied.  You know, we just got an additional increase to

10 the -- to the funding, I think it was filed last night.  So

11 there is sufficient funds available to cover the amounts

12 covered in the budget, which are amounts that cover the --

13 the administrative costs of the case.

14 Q Was there a settlement with Beyond Risk that provided

15 the funding that you've described?

16 A There was.

17 Q Did the debtors negotiate the terms of that settlement

18 that's embodied in the plan?

19 A We did.

20 Q Were those negotiations arm's length?

21 A They were.

22 Q Briefly describe the negotiation of the settlement.

23 A So the negotiation of the settlement was a result of, yo

24 know, my ongoing investigation of any potential claims.  At

25 the conclusion of that, we had these arm lengths -- arm's

1  length negotiations with Beyond Risk and -- and raised some

2  of the issues that came about.  There was really only issue

3  we identified, which was recharacterization of some

4  intercompany debt.

5      But you know, then we sort of went through and what

6  would make the plan feasible and what would really provide

7  more of a pathway for recoveries for the general unsecured

8  creditors.

9  Q    Two general questions about the settlement.  First, I

10  want to ask you about the basic terms, and then I want to ask

11  you, in your view, what it accomplishes.

12      So the first question:  What were the basic terms of the

13  settlement?  And it's not a memory test, but to the best of

14  your --

15  A    Appreciate it.

16  Q    -- your understanding.  Of course, the plan provides all

17  the detail.

18  A    Right.  So, yeah, the -- all the details are in the

19  plan.

20      But I mean, the -- the biggest part was they provided

21  secured financing to get us through this process, to bring

22  structure to the chaos.  And -- and they've agreed to -- to

23  waive that amount and include only a one-and-a-half million

24  dollars -- or the way -- up to one-and-a-half million dollars

25  of that.  And then, any remainder over the DIP financing was

1    a general unsecured claim.

2        They have also agreed to recharacterize the $1.8 million

3    of intercompany that we -- or intercompany contributions they

4    identified -- that we identified and recharacterize those to

5    more of an equity contribution;

6        And also agreed to fund a trust, which I think is

7    sufficiently funded, compared to what I've seen in other

8    situations.

9    Q    What did that settlement accomplish, the key points, the

10   critical things?

11   A    I mean, the critical point is it got us to where we are

12   today.  It really brought that structure, allowed them -- it

13   -- it provided the path to a recovery, potential recovery,

14   for the general unsecured creditors.

15   Q    Did the settlement provide releases to Beyond Risk?

16   A    Yes, it did.

17   Q    Why did the debtors provide releases to Beyond Risk as

18   part of this settlement?

19   A    The releases -- the releases were -- you know, which are

20   pretty standard, but there was significant consideration

21   given.  And you know, it was highly likely -- highly unlikely

22   for them to move forward without being, you know, released.

23   They're not going to fund a process for people to sue them --

24   to sue them.

25   Q    Generally, who were the released parties?

1    A    They are outline -- outlined in the plan, of course.

2    But generally, it's Beyond Risk, certain affiliates,

3    directors and officers of the debtors.

4    Q    Did you consider whether the releases were appropriate?

5    A    I did.

6    Q    And do you deem those releases appropriate?

7    A    I do.

8    Q    Primarily for the consideration that was given.  You

9    know, also, you know, based on the investigation, based on,

10   you know, my understanding of the situation.  And you know,

11   we continued to review it throughout the process of, you

12   know, whether it was reasonable.  And for the consideration

13   they gave, we deemed it to be very reasonable.

14   Q    Let's back up a bit to the period before you started

15   negotiating the terms of the settlement.

16        What did you do after you were appointed?

17   A    After we were appointed -- and when I say "we," I mean

18   Wyse Advisors.  I have a team of two that was assisting me

19   and primarily boots on the ground at all times.

20        But the first things we do is primarily get a handle on

21   the cash situation, understand what our runway is and how

22   long we have until we have to make some difficult decisions.

23        During that time, you know, we're discussing the

24   situation, trying to get smart about the situation,

25   understanding why we got -- how we got here, why we're here,

1   and what we're going to do.  So that involved conversations

2   with Arsenal employees.  You know, I think there were town

3   halls.  We had conversations throughout those -- that period

4   before we filed with the Arsenal employees.  We spoke to

5   numerous Beyond Risk employees just to get some art on the

6   situation, all the while building out that cash flow,

7   understanding what the -- what our real runway was.

8   Q    So, in that process, did you discuss the issues with the

9   company with both Arsenal employees and also Beyond Risk

10  folks?

11  A    Correct.

12  Q    And you may have said this in your testimony.  But did

13  you visit headquarters, also?

14  A    Pardon?  Sorry.

15  Q    Did you visit the company?

16  A    Yes, yes.  Yeah, as I've mentioned, we had -- we've had

17  boots on the ground consistently.

18  Q    After going through that process that you just described

19  and having gotten up to speed, what was your understanding of

20  the situation with the company?

21  A    The company -- the company was on a pretty aggressive

22  downward trajectory.  We learned pretty quickly we lost a

23  bunch of customers.  We had to let go a bunch of employees.

24  This thing was burning cash rather quickly.

25  Q    How about the workforce, were there layoffs associated

1    with the workforce?

2    A    There was.  I believe, at the end of 2022, I believe

3    more than 60 percent of the workforce was let go.

4    Q    Did you learn what the company did once -- or what

5    Beyond Risk did once some of these issues came to light?

6    A    We did.  You know, we looked at it from, you know, a

7    holistic approach.

8         I mean, one of the good things was they only owned it

9    for a year, so there wasn't a tremendous amount of history to

10   get through.  So we were able to gain an understanding pretty

11   quickly.

12        There were massive deficits.  These plans were -- there

13   was inconsistencies in the marketing of the plans, which

14   created massive deficits they were never going to get out of.

15   I mean deficits to the extent of probably in excess -- in

16   excess of $20 million.

17   Q    For those massive deficits that you've described, what's

18   your understanding of the cause of those deficits?

19   A    Primarily, the -- the mis-marketing of the -- of the

20   plans.  They were marketed as level-funded, as opposed to

21   self-funded.

22   Q    And just to your understanding, what is your

23   understanding of the difference between "self-funded" and

24   "level-funded."

25              MR. SUMMERS:  I'm going to object.  I mean, he's

1   not a -- Mr. Wyse is not an insurance expert, and I think

2   we're trying to define insurance terms, and I don't know that

3   he's qualified to do so.

4           THE COURT:  I -- I'm going to overrule the

5   objection.  In a world in which you use the terms, I think

6   it's fair to have him define them, say what he meant when he

7   used the terms.  So I think that's a fair question, so I'll

8   overrule the objection.

9           THE WITNESS:  Sure.  So a level -- for the -- the

10   simplest way for -- for someone as simple as me to understand

11   is that a level-funded plan has a cap to it.  There is a

12   portion that is funded by employees to an employer to this

13   plan, and that is to cover certain -- all claims that come

14   in, but there is a cap to it.  Anything beyond that cap is

15   covered by some sort of stop loss program.

16           A self-funded program is simply that.  The

17   employer's responsibility to collect premiums in a --

18   ideally, in an excess amount to cover the plans.  So the two

19   differences, one has a cap; one does not have a cap, from an

20   employer's perspective.

21   BY MR. GUERKE:

22   Q    And in your understanding, how does that lead to a

23   deficit?

24   A    Well, if you think your plan is level-funded, you think

25   that there is sufficient coverage to cover your -- the losses

1   that would exceed what the premiums were paid in, as opposed

2   to self-funded, where they were supposed to be, you know,

3   covered by the employees -- employer.  Sorry.

4   Q    At this point, after you were appointed, how did you

5   learn that or how did you gain the understanding that you

6   just described?

7   A    Through primarily conversations.  You know, and then,

8   throughout the course of the case, we just identified some

9   documents where there were these inconsistencies.

10  Q    What's your understanding of what Beyond Risk did after

11  these type of issues came to light?

12  A    My understanding is they learned of these early on, I

13  believe it was first or second quarter of 2022 and a couple

14  of months after the acquisition.  I believe that -- at that

15  point, they put some -- one or so employees into Arsenal.

16  They were getting different, more frequently report --

17  frequent reporting, I think, than previously had been done,

18  and they -- they had identified these irregularities.  They

19  put their employee in there, I believe it was a member of --

20  a prior job, he had a role at the Department of Insurance, so

21  he understood what to be looking at.

22      Shortly after that, I believe Gibson Dunn was hired to

23  perform an additional investigation.  And a result of those

24  efforts from both parties and all parties led to the

25  determination of Mr. Chandler and Mr. Law.

1    Q    And what -- what's your assessment of how that was

2    handled?

3    A    I think it was appropriate.

4    Q    Do you -- so is true that you got involved after

5    Chandler and Law were terminated?

6    A    That's correct.

7    Q    And who is Mr. Chandler?

8    A    Who is Mr. Chandler?

9    Q    Yes.

10   A    Mr. Chandler was the CEO and founder.

11   Q    How about Mr. Justin Law?  Who is -- what role did Mr.

12   Law --

13   A    Mister --

14   Q    -- play?

15   A    Mr. Law was the COO, I believe.

16   Q    Did Mr. Chandler and Mr. Law have a role with the

17   company after Beyond Risk purchased it?

18   A    Yes.

19   Q    What's your understanding of that role?

20   A    My understanding of that role is they did maintain their

21   positions of CEO and COO and were charged with continuing to

22   run the day-to-day activities.

23   Q    At some point, did you investigate potential claims

24   against Beyond Risk?

25   A    Yes, I did.

1    Q    Could you bracket for us the time period that you

2    conducted that investigation?

3    A    The formal investigation was, I believe, between --

4    almost the month of February, February 3rd through maybe the

5    28th -- or 23rd.

6    Q    Do you feel you had enough time to do the investigation?

7    A    Yes.

8    Q    Do you believe you had sufficient resources and

9    assistance?

10   A    Yes.

11   Q    What did you conclude after that process?

12   A    I concluded that there were no facts, no evidence, no

13   circumstantial evidence to give rise to any potential claim

14   against Beyond Risk.

15   Q    Let's talk about the process that you went through and

16   how you got to that conclusion.

17        What was the -- what was the goal of the investigation?

18   A    The goal of the investigation was to identify any

19   potential claims there may be against Beyond Risk that could

20   ultimately benefit the estate.

21   Q    What was included in the investigation process?

22   A    We -- I -- we requested diligence items, reviewed

23   documents, held interviews.

24   Q    What was your role in orchestrating that process?

25   A    I orchestrated the process.  I conducted the process.

1   Q   Did you have Young Conaway helping your efforts?

2   A   Yes.

3   Q   Did you review documents?

4   A   I did.

5   Q   What did you focus on?

6   A   Our -- my primary focus was on the overall -- the

7   overall focus of the investigation or my --

8   Q   The focus of the documents you reviewed.

9   A   The focus of the documents.

10   You know, we primarily looked at, you know, board

11   minutes, any sort of presentations around those, the

12   transaction, any sort of financing -- financing arrangements,

13   emails, et cetera, a whole bunch of stuff.

14   Q   Have you recently dug into the record on the

15   investigations?

16   A   I have.

17   Q   What claims -- again, this isn't a memory test.  But

18   generally, what claims did you focus on?

19   A   Focused on fiduciary claims, duty of loyalty -- or duty

20   and care -- sorry -- ERISA claims, fraudulent transfers,

21   preference claims, any sort of recharacterization claims.

22   Q   In front of you there's the binder of exhibits, and

23   we've gone over one of them.

24   Do those exhibits reflect diligence that was requested

25   from Beyond Risk, other than a couple of the emails?

1    A    Yes, they do.

2    Q    I want to talk to about that diligence.

3         Could you flip to Exhibit 2, please?  What is Exhibit 2?

4    A    Exhibit 2 is an email from Shalla (phonetic) to folks at

5    Gibson Dunn regarding diligence or document requests,

6    basically the diligence process, so document requests and

7    interview requests.

8    Q    Does this diligence request describe the categories of

9    documents requested?

10   A    Yes.

11   Q    How about interviews, are the interviews addressed in

12   this document?

13   A    Yes, they are.

14   Q    Could you flip to Exhibit 3, please?

15        What is Exhibit 3?

16   A    Exhibit 3, again, is an email from Shalla to the Gibson

17   Dunn team, dated February 10th, and goes -- solidifies or

18   memorializes the certain interview times that we would like

19   to -- to conduct.

20   Q    In response to this diligence effort, were documents

21   collected?

22   A    Yes.

23   Q    And who produced those documents?

24   A    Beyond Risk, through Gibson Dunn.

25   Q    Were interviews ultimately conducted as part of your --

1    A    Yes.

2    Q    -- process?

3    A    Sorry.  Yes, they were.

4    Q    Could you tell us, by name and position, who was

5    interviewed?

6    A    Yes.  So Andy Behrends, who is the Vice President of

7    Arsenal.

8         Blake Wakefield, who is the President of Arsenal.

9         Devin Taylor, who is the General Counsel of Beyond Risk.

10        Matt Morrell, who is a finance -- who's in the Finance

11   Department at Beyond Risk.

12        And also Andre Baldo, who was the CFO of Arsenal.

13   Q    And after this investigation, the process that you've

14   described, in your assessment of the situation, what were

15   your -- what was your conclusion?

16   A    My conclusion, again, was that there was no -- there

17   were no facts, there was no evidence, there was no

18   circumstantial evidence that would give rise to any potential

19   claims against Beyond Risk.  It was -- it was -- sorry.

20   Q    I was just going to ask you -- I didn't mean to cut you

21   off --

22   A    No --

23   Q    -- if you want to finish your answer.

24        But can you highlight some of the big picture pieces

25   that support that conclusion?  I mean, you've mentioned

1   facts, but are there any others?

2   A    Right.  It was -- it was clear that these issues all

3   existed prior to the Beyond Risk acquisition.

4        It was clear or it was known the Norman Chandler and

5   Justin Law, you know, ran the day-to-day operations.

6        It was clear that Beyond Risk, when they identified

7   these issues, they took the appropriate action.

8   Q    Did you take into account the one year of ownership?

9   A    Of course.

10  Q    And what did that mean to you?

11  A    It -- it meant that it was -- you know, there were --

12  there were allegations from Mr. Chandler and Mr. Law, you

13  know, and -- and -- this -- the short time frame was -- was -

14  - made the -- made the investigation, you know, that much

15  more focused.  And so we did -- it was -- it was -- it made

16  the investigation, you know, more fresh.

17  Q    Are you aware that Chandler -- Mr. Chandler and Mr. Law

18  have made certain allegations against Beyond Risk?

19  A    Yes.

20  Q    Have you received any substantiation or evidence to

21  support those allegations?

22  A    I have not.

23  Q    Did you determine that the debtors had some type of

24  potential claim against Beyond Risk?

25  A    The only -- the only claim that there would have been

1    was the $1.8 million of contribution that I mentioned prior.

2    Q    Could you turn to Exhibit 17 in your binder, please?

3    A    Yes.

4    Q    What is Exhibit 17?

5    A    17 is the $1.8 million that was funded to Arsenal --

6    well, sorry.

7         Exhibit 17 is a general ledger report illustrating the

8    $1.8 million that went from Beyond Risk to Arsenal.

9    Q    And what's your understanding of why those transfers

10   were made?

11   A    They were funding the cash shortfalls of Arsenal.

12   Q    And did you take this $1.8 million into account when you

13   were negotiating a settlement with Beyond Risk?

14   A    Of course.

15   Q    Have you reviewed notes from interviews?

16   A    I have.

17   Q    Is there anything that you've reviewed in those notes

18   that -- strike that.

19        Are they consistent with your conclusions?

20   A    They are.

21   Q    After you reviewed those notes, did the information in

22   the notes change your views?

23   A    They did not.

24   Q    Mr. Wyse, let's take a look at Exhibit 7, please.

25   A    7?

1  Q    Yes.

2  Q    What is Exhibit 7?

3  A    7 is an email from Andre Baldo to Norman Chandler,

4  Justin Law, and Priznik Parknip (phonetic) -- I'm going to

5  apologize for mispronouncing that name if I do -- dated

6  September 2nd, 2021.

7  Q    Why is that -- is that date significant to you?

8  A    Yes, it is.  It is -- this is prior to the acquisition

9  by Beyond Risk.

10  Q    What's the subject of this email?

11  A    This is a to-do list for operations.

12  Q    Is there a part of this that's highlighted?

13  A    There is.

14  Q    Yeah.  What's the -- in your view, what's the import of

15  this email?

16  A    It is -- it is highlighted.  And what is significant

17  about this is they need to update their mark -- the to-do --

18  one of the big to-dos -- and it's highlighted -- is that they

19  need to update their marketing material to make it clear that

20  it's self-funding.

21  Q    Could you turn to the next exhibit in your binder,

22  Exhibit 8, please?

23  A    Yes.

24  Q    What is Exhibit 8?

25  A    Exhibit 8 is an email from Justin Law to Jeff Sutherland

1  dated November 23rd, 2021.

2  Q    And again, is that date significant in your mind?

3  A    Yes, it is.  And this, again, is before the acquisition

4  by Beyond Risk.

5  Q    What's the subject of this email?

6  A    It is Re:  IronRe Health draft deficit collection plan,

7  11/22/2021.

8  Q    What is significant about this email to you?

9  A    The significance is the deficit existed prior to the

10  acquisition by the -- by Beyond Risk.

11  Q    Could you take a look at Exhibit 9, please, and 10?  I

12  think we're going to look at 9 and 10 together.

13  A    Okay.

14  Q    What is Exhibit 9 and then Exhibit 10?

15  A    Exhibit 9 is an email from -- there's two emails:

16       There's -- the first one, going in sequence here, is an

17  email from Bill Lawrence to Rick Holmes regarding a letter

18  that went out to the group.

19       And then there is a subsequent forward from Rick Holmes

20  to Patrick Wallace at Beyond Risk, forwarding the letter on.

21  Q    Is it your understanding that Exhibit 10 is the letter

22  that's attached to that email?

23  A    That is my understanding, correct.

24  Q    What is -- are Exhibit 9 and 10 relevant to you?

25  A    Very relevant.

1    Q    Why is that?

2    A    And if you just read the first sentence of the letter,

3    it says:

4            "Thank you for choosing IronRe Health to administer

5    your level-funded health benefit program."

6    Q    Why is that significant to you?

7    A    Because it's not a level-funded program.

8    Q    And if you'd flip to Exhibit 10, is that addressed in

9    Exhibit 10?  I'm sorry.  Is the level-funded part that you

10   just described contained in Exhibit 10?

11   A    Yes.

12   Q    If you'd look at the top of that letter, the first

13   sentence, could you read that first sentence, please?

14   A    Yes.

15           "Thank you for choosing IronRe Health to administer

16   your level-funded health benefit program."

17   Q    Could you turn to Exhibit 11, please?

18        What is Exhibit 11?

19   A    Exhibit 11 is a letter dated June 3rd, 2022, to Jack

20   [sic] -- Dr. Jack Studstill at the Alabama Dental Association

21   Welfare and Benefit Plan.

22   Q    And what is significant of this letter in your view?

23   A    In my conclusion, it's the third paragraph here, where

24   it says that there -- as of March 31st, 2022, there is a

25   deficit of $3.5 million.

1    Q    Turn to Exhibit 12, please.

2         Describe Exhibit 12.

3    A    Yes.  Exhibit 12 is a letter dated June 3rd, 2022, to

4    the Alabama Dental Association Welfare and Benefit Plan, to

5    Zack -- which I would assume would be the Zack -- Dr. Zack

6    Studstill from prior.  And this further mentions -- and this

7    letter is from Justin Law.  I apologize.  But this now --

8    there was a 3.5-million-dollar deficit.  And this says that,

9    as of this date, there are $300,000 -- or in excess of $300

10   [sic] of unpaid claims.

11   Q    And what -- does the timing of this letter have any

12   significance to you, to June 2022?

13   A    The -- it does.  It -- it's a -- this is -- this stuff

14   has happened on and has -- has accumulated.

15   Q    All right.  I'd like you to take a look at Exhibit 13

16   and 14.  We're going to talk about those two together.

17   A    Uh-huh.

18   Q    What is Exhibit 13?

19   A    Exhibit 13 is a letter from IronRe Insurance Company

20   dated June 14th, 2022, to Southern Food Services, Inc., to

21   the attention of Clay Jones.

22   Q    Is Southern Food Services, Inc. a customer or client of

23   the debtors?

24   A    Yes.

25   Q    And what is significant in this letter to you?

1    A    Again, this is showing, in Paragraph 3, that, as of

2    March 31st, 2022, there is seven hundred and thirty -- in

3    excess of $730,000 of deficit.

4    Q    And this debtor -- I'm sorry.  This letter is dated June

5    14, 2022.  Is that fair?

6    A    Correct.

7    Q    And if you flip to Exhibit 14, what's the date of that

8    letter?

9    A    Exhibit 14 is June 16th, 2022.

10   Q    Was that two days later?

11   A    That would be two days later.

12   Q    What is Exhibit 14?

13   A    This is a response to Mr. Law from Spain & Gillon, which

14   are the -- they are -- they represent Southern Foodservice

15   Management, which, again, as you've stated, is dated June

16   16th, 2022, in response to Mr. Law's letter about the

17   deficit.

18   Q    Are there parts of this letter that are relevant and

19   significant to you?

20   A    There are.  It's the -- the third paragraph, which

21   states:

22           "My client was shocked to learn for the very first

23   time in your letter that there was a seven-hundred-and-

24   thirty-two-thousand-five-hundred-fifty-one-dollars-and-

25   twenty-nine-cent deficit in their health plan."

1    Q    Did you view Exhibit 13, the June 14th letter, and the

2    June 16th letter as collection efforts?

3    A    Yes.

4    Q    And how did you assess the collection efforts, as

5    described here?

6    A    How would I assess the collection efforts?

7    Q    Yeah, that -- the response that the company had to the

8    collection efforts.

9    A    Yeah.  There was a very low probability that that

10   customer was going to pay.

11   Q    Would you turn to Exhibit 15, please?

12        What is Exhibit 15?

13   A    15 is an email from Britt Taylor to Priznik Parknip,

14   dated November 3rd, 2022.

15   Q    And who is Britt Taylor?

16   A    Britt Taylor, I believe, was the CEO or President or was

17   leading the Iron Reinsurance.

18   Q    What's significant about this exhibit in your mind?

19   A    It mention here's that -- it mentions here that there is

20   a potential sale of a receivable from 2021.

21   Q    Would you turn to Exhibit 18, please?

22   A    18?

23   Q    Yes.

24        What is Exhibit 18?

25   A    Exhibit 18 is the -- an internal Arsenal document,

1  business records of the plan of -- to -- that they would --

2  this is the plan of the captive plans.

3  Q    The insurance plan?

4  A    That thing, yes.

5  Q    What's the date?

6  A    The date is October 15th, 2022 -- '20 -- sorry --

7  October 15th, 2020.

8  Q    Could you flip to the -- Page 4, the introduction?

9  Specifically, the second paragraph.

10      In this plan document, how is the plan being described?

11 A    It's described as a self-funded employee benefit plan.

12 Q    Let's take a look at 19, Exhibit 19, please.

13      What is Exhibit 19?

14 A    Exhibit 19 is a string of emails --

15 Q    I'm sorry.  I don't think that's the one I want.

16      What is your Exhibit --

17 A    No.

18 Q    -- 20?

19 A    I think 20 is the broker reference, so --

20 Q    Yes.  Oh, that's --

21 A    Yeah.

22 Q    That's my mistake.  Let's look at Exhibit 20, please.

23 A    Exhibit 20.  Okay.

24 Q    What is Exhibit 20?

25 A    Exhibit 20 os, again, a document produced by IronRe

1  Health and it's the broker reference guide.  And this is what

2  is basically the cheat sheet for brokers to go out and sell

3  the plans.

4  Q    If you could turn to the second page or what's been

5  marked as Page 2 of this document, the second paragraph under

6  "Who We Are."

7       How are the plans described in this document?

8  A         "These programs allow members to stabilize health

9  benefit costs by providing a unique, specialized, level-

10  funded program tailored to small and mid-sized business."

11  Q    Did that description of level-funded program, as

12  compared to what you discussed with us in Exhibit 18, have

13  significance to you?

14  A    Yes.  They're two totally different programs.

15  Q    Why does that matter?

16  A    Because they were mis-marketing.

17  Q    Let's take a look at Exhibit 16, please.

18       What is Exhibit 16?

19  A    16 is a letter dated November 17th, 2020, to -- from

20  Ballard Spahr to Gibson Dunn.

21  Q    And who does Ballard Spahr represent?

22  A    Ballard Spahr represents Mr. Chandler and Mr. Law.

23  Q    Does this letter include allegations that Mr. Chandler

24  and Mr. Law are making related to Beyond Risk?

25  A    Yes.

1    Q    Let's take a look at Exhibit 4, please.  Do you have

2    Exhibit 4 in front of you?

3    A    I do.

4    Q    What is Exhibit 4?

5    A    Exhibit 4 is an email from Marshall King to the Young

6    Conaway team, dated February 20 -- Monday, February 27th,

7    2023.  And it is forwarding a letter that they received from

8    Ballard Spahr.

9    Q    Is that forwarded letter attached and reflective -- or

10    included as Exhibit 5 in your binder?

11    A    It is.

12    Q    Let's focus on Number 5 in your binder.

13    Similar to the last Ballard Spahr letter we discussed,

14    does this one also include allegations relating to Beyond

15    Risk?

16    A    It does.

17    Q    Specifically, if you look at page -- the third page, are

18    there bullet points with various allegations?

19    A    Several of them.

20    Q    Were Mr. Chandler and Mr. Law asked to provide evidence

21    to support the allegations that they made in the two letters

22    we just went through?

23    A    Yes, they were.

24    Q    Have Mr. Chandler or Mr. Law provided any evidence or

25    substantiation of those allegations to you?

1   A    No.

2   Q    If you look at exhibit -- could you look at Exhibit 20,

3   please?

4   A    19?

5   Q    Yes.  I'm sorry.  19.  It must be reversed in my binder.

6        Let's start at the top of 19.  It's an email.  But could

7   you give us the details of what this document is?

8   A    Sure.  Again, these -- this is a string of emails

9   between the Ballard Spahr team and the Young Conaway team

10  regarding substantiation for the allegations that were made

11  in the letter.

12  Q    If you'd --

13  A    Letters.

14  Q    -- flip to the beginning, the first two emails in that

15  string.

16       Is it your understanding that requests were made to Mr.

17  Chandler and Mr. Law to share any evidence they have

18  supporting allegations against Beyond Risk?

19  A    Yes.

20  Q    And did you receive any of that?

21  A    No.

22  Q    How about requests for interviews?  Was there a request

23  made to interview Mr. Chandler?

24  A    There was.

25  Q    Did Mr. Chandler sit for an interview?

1    A    He did not.

2         (Pause in proceedings)

3    Q    Were the documents we went over in this binder produced

4    as part of the investigation that you conducted?

5    A    Yes.

6    Q    And were they provided in response to the diligence

7    requests that we went over today?

8    A    Yes.

9    Q    Were these documents reviewed as part of your work in

10   the case?

11   A    Yes.

12        MR. GUERKE:  And Your Honor, we move the binder of

13   exhibits into evidence.

14        THE COURT:  Any objection?

15        MR. SUMMERS:  (Not identified) No objection.

16        THE COURT:  Okay.  They will be admitted.

17        (Debtors' Exhibits 1 through 20 received in evidence)

18   BY MR. GUERKE:

19   Q    Switching gears a little bit, Mr. Wyse.  Sure.

20        MR. GUERKE:  May I approach the witness, Your

21   Honor?

22        THE COURT:  You may.

23        MR. GUERKE:  Thank you, sir.

24   BY MR. GUERKE:

25   Q    If the debtors pursued litigation against Beyond Risk,

1    in your view, what are the probabilities of success in that

2    effort?

3    A    Very low.

4    Q    Why is that?

5    A    There are no facts or evidence to support us going to

6    chase anything.  Maybe there's the $1.8 million of

7    recharacterization, but ...

8    Q    Similar question.  Would you expect difficulties in

9    trying to collect money on claims against Beyond Risk?

10   A    Yes.

11   Q    And what are those difficulties you would envision?

12   A    There would be the likelihood of success.

13        There would be, you know, we don't have any money.

14   We're going against, you know, Beyond Risk that has, you

15   know, very competent counsel and probably a tremendous amount

16   of defenses.

17   Q    Would you consider that type of litigation, pursuing

18   Beyond Risk, to be complex?

19   A    Indeed.

20   Q    How about litigating against Beyond Risk, the expense;

21   how would you take into account the expense, the costs, and

22   the convenience or inconvenience of that effort?

23   A    Very expensive and extremely inconvenient.

24   Q    Do you have any sense -- and I know you're not an

25   attorney -- on how long litigation like that could last?

1    A    My sense would be probably no less than a year.

2    Q    In your view, is litigating against Beyond Risk in the

3    best interests of the creditors?

4    A    No.

5    Q    Why is that?

6    A    There's likely no recovery for them at all.  There's

7    likely no recovery.  I mean, I assume that's how the

8    settlement falls apart.  They have advanced us three-plus

9    million dollars and will have a secured claim.  There will be

10   -- that goes on top of the general unsecured creditors.

11   Q    In your business judgment, is the settlement fair and

12   essential to the plan?

13   A    Yes.

14   Q    In your business judgment, is the settlement and plan in

15   the best interests of the creditors?

16   A    Yes.

17   Q    You've just described why that is, so I won't ask you

18   that question.  Thank you, Mr. Wyse.

19            MR. GUERKE:  Thank you, Your Honor.  Those are my

20   only questions for you.

21            THE COURT:  Okay.  Thank you very much.

22            Is there cross-examination?

23            MR. SUMMERS:  Yeah.  May I approach with our

24   exhibit books?

25            THE COURT:  Certainly.

1    (Participants confer)

2              THE COURT:  You wouldn't happen to have one more of

3    those, would you?

4              MR. SUMMERS:  I do, I've got two of them.

5              THE COURT:  That's fine.  Thank you.

6    (Participants confer)

7                        CROSS-EXAMINATION

8    BY MR. SUMMERS:

9    Q    Good morning, Mr. Wyse.

10   A    Good morning, Mr. Summers.

11   Q    Now I'm going to start with asking some questions about

12   the investigation process.  And specifically, the emails that

13   I think are in your binder as Exhibit 19, in the debtors'

14   exhibits.

15   A    Yes.

16   Q    If you'd turn to Page 4 of the sets of emails, do you

17   see the email Elizabeth Justison to Tim Katsiff of February

18   21st, 2023 at two o'clock p.m.?

19   A    Yes, 2:02 p.m.

20   Q    Okay.

21   A    Yes.

22   Q    And was this the first request that you're aware of that

23   was made to interview Mr. Chandler?

24   A    I don't believe so.  I believe, in -- at -- when we were

25   at the outset of the case, when there was an objection, we

1    asked to interview Mr. Chandler.

2    Q    Isn't it in connection with the DIP financing, you asked

3    --

4    A    I --

5    Q    -- to depose Mr. Chandler?

6    A    I believe so.

7    Q    And you -- when we withdrew the DIP objection, you

8    withdrew the request to depose Mr. Chandler, correct?

9    A    I would assume so, yes.

10   Q    Okay.  So -- but there -- in connection with the

11   investigation into claims, there was no request to interview

12   Mr. Chandler until this February 21st email, correct?

13   A    I believe that's correct.

14   Q    Okay.  And what day did Young Conaway present their

15   conclusions to you about the investigation?

16   A    Their conclusions of their part of the investigation, I

17   believe it was February 22nd --

18   Q    So the next day --

19   A    -- or 23rd.

20   Q    -- correct?

21   A    Yeah.

22   Q    Okay.  If you can turn to Exhibit 5 in --

23   A    In your --

24   Q    -- the binder --

25   A    -- binder?

1     Q     -- the small binder that I handed --

2     A     Small binder.

3     Q     -- handed you of Mr. Chandler and Mr. Law's exhibits.

4     A     Exhibit 5 you said?

5     Q     Yes, sir.

6           (Pause in proceedings)

7     Q     Is this the -- well, is this document the minutes from

8     the meeting that you had with Young Conaway on February 22nd,

9     2023, about the investigation into claims against Beyond

10    Risk?

11    A     Yes.

12    Q     And in -- and so that is, in fact, the date that the

13    meeting occurred on, correct?

14    A     I believe so, yes.

15    Q     And staying with this document, if you look at the

16    beginning, it indicates that the meeting started at 10:45

17    a.m.  Do you see that?  And the meeting concluded at 11:26

18    a.m.  Do you believe that to accurately reflect the beginning

19    and end of that meeting?

20    A     I believe so.

21    Q     And blocked out under attorney/client privilege under

22    Paragraph 2, there appears to have been a paragraph about

23    final findings.

24    A     Uh-huh.

25    Q     Do you see that?

1    A    I do.

2    Q    Were you provided -- you were not provided any other

3    written report by Young Conaway other than these final

4    findings in these minutes.  Is that correct?

5    A    There was a report that we reviewed on -- on Zoom.

6    Q    Was it this report or was it something else?

7    A    These are the minutes.

8    Q    These are the minutes.

9         And isn't it correct that, on March 8th, 2023, Mr.

10   Katsiff offered to allow Mr. Chandler to be interviewed,

11   provided that the debtors agree to waive a Rule 2004 exam?

12   A    I do recall seeing that in the email chain.

13   Q    And isn't it correct that, on March 9th, 2023, the very

14   next day, the debtors filed the first version of the plan

15   with a -- with the -- all of the elements of the Beyond Risk

16   settlement?

17   A    That timing sounds right.

18   Q    And the debtors never requested, in connection with the

19   investigation, to take the two thousand -- a 2004 exam of Mr.

20   Chandler, correct?

21   A    I don't believe so.

22   Q    And the debtors have, in fact, not taken a 2004 exam of

23   Mr. Chandler, correct?

24   A    No.

25   Q    And so, by the time, on March 8th, that the offer is

1  made, you've already negotiated a settlement with Beyond

2  Risk, correct?

3  A    The settlement was negotiated, yes.

4  Q    Yeah, it was fully negotiated by March 8th or before.

5       (Pause in proceedings)

6  Q    So, with respect to the debtors' exhibits, when did you

7  -- that have been admitted as 1 through 20 -- and let's go

8  exhibits -- try to do it in bold strokes here -- Exhibits 2

9  through 20.

10      Did you review these before or after you deposed you on

11 April 24th, 2023?

12 A    I'd have to look at all of them individually, but likely

13 after.

14 Q    And that was after you had already reached the

15 settlement with Beyond Risk, correct?

16 A    That's correct.

17 Q    Other than Andre Baldo, no one was interviewed that was

18 not also a member of Beyond Risk's executive management team

19 in connection with the investigation, correct?

20 A    I don't believe Matt Morrell is a member of the

21 executive management team at Beyond Risk.

22 Q    Was Matt Morrell -- but Matt Morrell, prior to his

23 employment at Arsenal, was employed by Beyond Risk, correct?

24 A    I -- I don't know for certain.  I believe so.  He -- I

25 think he still is a Beyond Risk employee.  He was.

1    Q    And you did not personally participate in the interviews

2    of the five witnesses that were interviewed, correct?

3    A    I did not.

4    Q    Each of the interviews of the witnesses lasted for an

5    hour or less.  Is that correct?

6    A    That's my understanding.

7    Q    And in -- did the -- Justin Law was not deposed or

8    interviewed as part of the investigation, correct?

9    A    Correct.

10   Q    And he was never even -- no one even asked to interview

11   or depose Justin Law, correct?

12   A    Correct.

13   Q    And you don't know why Mr. Law wasn't interviewed or

14   deposed, correct?

15   A    I don't.

16   Q    And at least prior to April 24th, you hadn't reviewed

17   any emails in connection with the investigation of claims

18   against Beyond Risk, correct?

19   A    Could you say that again?  Could you ask me again,

20   please?

21   Q    Sure.

22        Prior to April 24th, when I deposed you, you had not

23   reviewed any emails in connection with the investigation into

24   claims against Beyond Risk?

25   A    I had not personally reviewed them, no.

1    Q    And Daniel Cho was not interviewed or deposed as part of

2    the investigation, correct?

3    A    Daniel Cho was not interviewed, no.

4    Q    And Daniel Cho is Beyond Risk's Vice President of

5    Operations.  Is that correct?

6    A    That sounds right.

7    Q    And Daniel Cho also served as Arsenal's interim Chief

8    Operating Officer, beginning in May 2022?

9    A    I am not sure.

10   Q    Okay.  And Patrick Wallace was not interviewed as part

11   of the investigation, correct?

12   A    Patrick Wallace was not interviewed, no.

13   Q    Okay.  And Patrick Wallace was Beyond Risk's Chief

14   Revenue Officer, correct?

15   A    That's my understanding, yes.

16   Q    And you're aware that Mr. Chandler alleges that it was

17   Mr. Wallace that directed sales operations at Arsenal Health.

18   A    I'm aware of that allegation.

19   Q    Was there anything done to investigate that particular

20   allegation with respect to Mr. Wallace?

21   A    There were definitely subsequent conversations around

22   had any of the clients of Arsenal been diverted to any entity

23   controlled by Beyond Risk, to which there were none.

24   Q    Now was that investigation limited to whether existing

25   customers were diverted to Beyond Risk?

1    A    I don't believe it was existing customers.

2    Q    Was there an investigation into whether customer leads

3    were diverted to Beyond Risk, to your knowledge?

4    A    I'm sorry?  Could you ask that again?

5    Q    Yeah.  Do you believe that customer leads were diverted

6    away from Arsenal?

7    A    No.

8    Q    Did anyone ask -- or did anyone ask the people

9    interviewed if Beyond Risk limited Arsenal to new customers

10   with 26 to 50 employees?

11   A    I don't remember the specifics of all of the interviews.

12   I read the notes.  I was not -- I did not participate in the

13   interviews.

14   Q    Uh-huh.  Beyond Risk -- is Beyond Risk in a similar type

15   of -- does Beyond Risk operate a similar type of business as

16   Arsenal, correct?

17   A    They're in the insurance space, yes.

18   Q    Okay.  And Beyond Risk has at least one affiliate that

19   operates a similar type of business, correct?

20   A    I believe so.

21   Q    And that was Bev Management, correct?

22   A    BevCap.

23   Q    BevCap?

24        And then did you investigate an entity called "Origin"?

25   A    I recall the name.  I don't know if there was any

1    separate investigation around Origin.  I don't recall.

2    Q    Okay.  And it's correct that no one asked Andrew

3    Behrends if he directed the commingling of funds in a single

4    account at Iron Reassurance [sic] beginning in April 2022.

5    A    Could you repeat that question, please?

6    Q    Sure.

7         During the interviews, no one asked if Andrew Behrends

8    directed commingling of all funds in a single account at Iron

9    Reassurance beginning in April 2022, correct?

10   A    I was not part of the interviews.

11   Q    Have you seen any -- have you done any investigation

12   into whether Andrew Behrends directed commingling of all

13   funds in a single account?

14   A    I believe there was a conversation around it and there

15   was no direction from Andy Behrends direct -- directing the

16   commingling of funds.  I believe they were already

17   commingled.

18   Q    And what documents did you review to make you believe

19   they were already commingled before April 2022?

20   A    That -- I don't recall a specific document, more

21   probably around conversations.

22   Q    Okay.  But you reviewed financial documents, right?  So

23   you would think that would be something you would --

24   A    Sure.

25   Q    -- recall.

1    A    Yes.

2    Q    So when did you read marketing documents with respect to

3    the insurance plans?

4    A    Oh, within the past several weeks.

5    Q    Did anyone investigate how often Andy Behrends and Blake

6    Wakefield met with Mr. Chandler after Beyond Risk acquired

7    Arsenal?

8    A    Anybody investigate how often?  Could you repeat the

9    question, please?

10   Q    Yeah.  Did Andy Behrends and Blake Wakefield have weekly

11   meetings with Mr. Chandler?

12   A    I seem to recollect that there were weekly reporting, I

13   believe, that they instilled.

14   Q    Great.

15        And those meetings began in January 2022, shortly after

16   the trans -- Beyond Risk acquired Arsenal, correct?

17   A    I'm not sure when they started.

18   Q    And isn't it true that Andy Behrends and Blake Wakefield

19   began directing Mr. Chandler as to what he was do -- to do on

20   a weekly basis after Beyond Risk acquired Arsenal?

21   A    I don't recall every hearing that.  Mr. Chandler and Mr.

22   Law were running the day-to-day activities.  Beyond -- Andy

23   and Blake were on the board of managers and getting updates,

24   but they wouldn't be directing the day-to-day operations.

25   Q    Well, at some point, they did, right?  I mean, in April

1    2022, at least, they started a more active role, correct?

2    A    Well, that's when they found the inconsistencies and,

3    you know, potential wrongdoings and they started taking a

4    closer look at what they just bought.

5    Q    Okay.

6         (Pause in proceedings)

7    Q    Did you investigate whether Blake Wakefield directed

8    Arsenal not to pursue collections of plan deficits in January

9    2022?

10   A    Can you repeat that, please?

11   Q    Sure.

12        Did you investigate whether Blake Wakefield directed

13   Arsenal not to pursue collections of insurance plan deficits

14   in January 2022?

15   A    I don't recall that specifically.

16   Q    Do you know what investigation was done into that

17   allegation?

18   A    Could you repeat what the -- the allegation was for me -

19   -

20   Q    Yeah.

21   A    -- please?

22   Q    That Mr. Wakefield directed Arsenal not to pursue

23   collection of plan deficits.

24   A    I don't recall what specific investigation was done

25   around that specific item or that specific allegation.

1    Q    Did you investigate whether Patrick Wallace told brokers

2    that Arsenal would not collect plan -- insurance plan

3    deficits?

4    A    We never spoke with Patrick Wallace.

5    Q    If you could turn to Exhibit 7?

6    A    Of yours?

7    Q    Of my exhibits, yes.

8    A    Yes.

9    Q    Can you turn to the last page, which is Bates-labeled

10   1899?

11   A    Okay.

12   Q    All right.  And -- well, I guess I should identify it

13   first.  This is the interview notes from Andre Baldo.  Do you

14   see that on the first page?  Is that correct?

15   A    Interview outline, Andre Baldo, yes.  Correct.

16   Q    Okay.  And if you turn then to 1899, under the second

17   work product, do you see here:

18        "Did Beyond Risk prevent the debtors from

19   collecting more than 10 million of receivables?

20        "Answer:  No.  I'd say it was a topic of

21   discussion.  Andre was not part of those discussions, doesn't

22   know details."

23        And then it says:

24        "A difference in opinion re:  Going after and

25   collecting or not doing so."

1          Do you see that?

2     A    I do.

3     Q    Okay.  What -- and you look further:

4               "Difference in Opinion.  Chandler wanted to go and

5     collect and the other view was not to do so."

6          Do you see that?

7     A    That is -- yes, I do see that.

8     Q    This under the 10 million?  Okay.

9     A    Uh-huh.

10    Q    So who was it that was of the other view not to do so,

11    not to go after the plan deficits?

12    A    I don't recall.

13    Q    Wasn't that the Beyond Risk, the officers that had dual

14    roles at Beyond Risk and Arsenal?

15    A    I -- I don't recall that, sir.

16    Q    You never evaluated whether the debtors have claims

17    against the plan sponsors, correct?  The insurance plan

18    sponsors.

19    A    Insurance plan sponsors.  If a debtor -- if the debtors

20    had claims against them?

21    Q    Yes, legal claims against the plan sponsors.

22    A    I -- I believe we did look at that.

23    Q    Do you recall what documents were reviewed in connection

24    with that?

25    A    I don't.

1    Q    Did you review any legal documents, contracts, actual

2    contracts between customers and Arsenal?

3    A    We looked at some of the service agreements, I recall

4    seeing some of those.  It was -- there was a lot of them.

5    Q    Right.

6         And those documents, am I correct that those legal

7    documents, the contracts, refer to the plans, the insurance

8    plans as self-funded plans, correct?

9    A    The legal documents that we showed earlier identified as

10   a self-funded plan, which -- but contradicted the marketing

11   materials going to the broker.

12   Q    If you'd look at Exhibit 6 in my binder.

13   A    Yes.

14   Q    And is -- am I correct that this is a -- the form of

15   administrative services agreement that Arsenal used?

16   A    It -- it says that at the top.  I -- I -- there's no

17   date or anything on it.  I -- I don't know.

18   Q    Okay.

19   A    That's an administrative services agreement, it does say

20   that.

21   Q    Okay.  Can you turn to Page 2, where 1.12 is?

22   A    1.12?

23   Q    Uh-huh.

24   A    Yes.

25   Q    It says:

1          "'Plan' means the self-funded employee welfare

2     benefit plan, which is the subject of this agreement."

3          Do you see that?

4     A     I do.

5     Q     Okay.  And that's consistent with what you already

6     testified to, that the legal documents described, the actual

7     contracts described these plans as self-funded plans,

8     correct?

9               MR. GUERKE:  Objection, Your Honor, to the use of

10    the "legal document" terms.  Counsel made an objection

11    earlier in the case about legal conclusions, so we would

12    object, to the extent that he is asking for a legal

13    conclusion here --

14              THE COURT:  I think --

15              MR. GUERKE:  -- in his question.

16              THE COURT:  I'm -- in this context, I'm going to

17    overrule the objection.  I think he's just asking what the

18    document says.  If we -- if he asks for the witness' judgment

19    about a legal conclusion, we'll address -- that -- your --

20    it's without prejudice to your taking that up if that

21    happens.

22              So you can answer the question.

23              THE WITNESS:  All right.  I am not making a legal

24    conclusion, but this --

25              MR. SUMMERS:  I am not asking you to.

1    THE WITNESS:  No.

2    (Laughter)

3    THE WITNESS:  This document says "self-funded," as

4  does the other legal document that we showed earlier, same

5  words.

6  BY MR. SUMMERS:

7  Q    As CRO, you didn't develop a strategy with respect to

8  collecting plan deficits, correct?

9  A    There was no strategy developed to collect plan

10  deficits, no.

11  Q    Okay.

12  A    I did not develop one.

13  Q    And Beyond Risk never developed a strategy to collect

14  plan deficits, correct?

15  A    I -- I don't -- I don't -- I do believe there were -- or

16  hearing conversations about collecting plan deficits.  But

17  when looking at how the clients perceived the plan, as

18  opposed to how the -- Arsenal perceived the plan, the

19  likelihood of collection, as illustrated earlier, was highly

20  unlikely.

21  Q    Do you know how much in dollars of the plan deficits

22  arose between April 2022 and the filing of this bankruptcy

23  case at the end of January of 2023?

24  A    I -- I don't recall specifically.

25  Q    Okay.  Now the debtors lost customers between October

1    2022 and the filing of the bankruptcy, correct?

2    A    Correct.

3    Q    And one of those customers that they lost was Peco

4    Foods, correct?

5    A    Correct.

6    Q    And Peco --

7    A    That was --

8    Q    -- Foods was the debtors' largest customer, correct?

9    A    That's my understanding, correct.

10   Q    Now Peco Foods had renewed its contract for 2023, before

11   Mr. Chandler and Mr. Law were terminated, correct?

12   A    I don't know that for certain.

13   Q    Okay.  Did you direct any investigation into the

14   circumstances under which Peco Foods terminated its contract

15   with Arsenal?

16   A    I don't believe there was any specific investigation

17   around Peco Foods.

18   Q    When did you learn that Peco Foods was the debtors'

19   largest customer?

20   A    I recall seeing it, and then I think you reminded me in

21   my deposition.

22   Q    Okay.  Did you investigate why the debtors lost other

23   customers besides Peco Foods?

24   A    It was their -- the -- I don't believe the claims were

25   being paid.  And yes, I mean, it was -- it was a complete

1  snowball effect.  We had 600 customers at one point and -- I

2  believe at the beginning of the acquisition.  And by the

3  filing, I think we had 40, maybe marginally more, but

4  significantly less than what we started with.

5  Q    I'm going to go back to Exhibit 1.

6  A    Of yours?

7  Q    No, actually of yours, the debtors'.

8        (Participants confer)

9  A    Okay.

10 Q    And Exhibit 1 is the Board of Managers for Beyond Risk

11 minutes from the December 21st meeting, correct?

12 A    That's correct.

13 Q    If you'd turn to the third page, which is Bates-labeled

14 1215.

15 A    Yes.

16 Q    Okay.  In the middle of the page, you have, "Resolved

17 further," then one, two, three, four.  And this is -- am I

18 correct that these are items that may not -- you may not do

19 without the prior consent of BR Intermediate, Beyond Risk,

20 and the board?

21 A    Correct.

22 Q    And number four, you were not allowed to initiate

23 material litigation on behalf of the companies, correct?

24 A    Yes.

25 Q    So that would prohibit you -- is it your understanding

1   that would prohibit you from commencing litigation against

2   Beyond Risk, correct?

3   A    That may be deemed material.  But if I had facts to

4   support it, I would certainly raise it.

5   Q    But you would have to ask Beyond Risk for permission to

6   sue Beyond Risk, correct?

7   A    According to this, correct, if that's deemed material

8   litigation.

9   Q    What about litigation against plan sponsors for

10  insurance plan deficits?  Wouldn't that be a material

11  litigation, as well?

12  A    I guess that could be deemed material.

13  Q    The -- I think you testified earlier that the plan

14  deficits were in excess of 20 million.

15  A    It was a big number.

16  Q    Okay.

17  A    That was an estimate.

18  Q    Okay.  You would consider that material, correct?  A

19  claim to collect $20 million.

20  A    Twenty million dollars, yeah, across probably 4 to 600

21  plan sponsors, in total.  Yeah, twenty million dollars is a

22  lot of money.  But in the -- you know, the sum of the -- as

23  the sum of the parts.  But as the parts, they may be much

24  smaller numbers.

25  Q    Well -- okay.  Understood.

1    When you were engaged, you were contacted by a lawyer at

2  Gibson Dunn, correct?

3  A    Correct.

4  Q    And Gibson Dunn represents Beyond Risk, correct?

5  A    Correct.

6  Q    Okay.  And then you also communicated, prior to being

7  engaged, with Andy Behrends and Devin Taylor, correct?

8  A    Yes.

9  Q    And in fact, Blake Wakefield, who's the CEO of Beyond

10  Risk, signed your engagement letter, correct?

11  A    I don't recall, but that sounds correct.  He'd be a

12  likely person to sign it.

13    (Pause in proceedings)

14    MR. SUMMERS:  And now I would like to move for the

15  admission of what were in my binder as Exhibits 5, 6, and 7.

16    THE COURT:  Any objection?

17    MR. GUERKE:  No objection, Your Honor, to the

18  admission into evidence, as long as they're kept

19  confidential, the same way ours were.

20    MR. SUMMERS:  And that is fine with us, Your Honor.

21    THE COURT:  So they will be admitted, subject to

22  that same principle.

23    (Chandler/Law Exhibits 5 through 7 received in evidence)

24    MR. SUMMERS:  Thank you, Mr. Wyse.  Thank you, Your

25  Honor.

1          THE WITNESS:  Yes.  All right.

2          THE COURT:  Okay.

3      (Pause in proceedings)

4          THE COURT:  Ms. Casey.

5          MS. CASEY:  Good morning, Your Honor.  Linda Casey

6   on behalf of the United States Trustee.  I have just a very

7   few, brief questions.

8                      CROSS-EXAMINATION

9   BY MS. CASEY:

10  Q    You had testified that you believe that there are

11  sufficient funds to pay administrative and priority claims

12  and that the budget accounts for all administrative claims to

13  be satisfied.

14       Is your testimony -- is your conclusion that there are

15  sufficient funds based on any assumption that there will be a

16  reduction of asserted administrative priority claims or are

17  there funds available to pay them in their full amounts as

18  they're currently asserted, other than the Benebay claim?

19  Does that make sense to -- is that --

20  A    That --

21  Q    -- too confusing?  I can rephrase it if you need me to.

22  A    We have accounted for what we believe the administrative

23  and priority claims in the budget.

24  Q    Okay.  Does the budget -- so what I'm asking is:  Has

25  the analysis been done as to asserted administrative claims?

1    Have you assumed any of them will be reduced when putting

2    them in the budget, that there will be objections to those

3    claims?

4    A    We reduced the Benebay asserted claim.  I'm not certain

5    of any others.

6    Q    Okay.  And the Benebay claim is reduced to the

7    settlement agreement, correct?

8    A    Subject to the settlement, correct.

9              MS. CASEY:  That's all, Your Honor.  Thank you.

10             THE COURT:  Okay.  Thank you.

11             Redirect?  Mr. Guerke.

12             MR. GUERKE:  Very briefly, Your Honor.

13                      REDIRECT EXAMINATION

14   BY MR. GUERKE:

15   Q    Mr. Wyse, is your investigation and your efforts leading

16   to today ongoing?

17   A    Have they been ongoing?

18   Q    Yes.

19   A    Of course.

20   Q    And when you were alerted to allegations from Chandler

21   and Law, did you follow up to seek information?

22   A    Of course.

23   Q    Did you determine that plan funds were commingled?

24   A    Yes.

25   Q    Considering that, how would you view attempts at

1    pursuing claims against insurance plan sponsors for those

2    deficits if the funds are commingled?

3    A    Next to impossible.

4    Q    Thank you.

5            MR. GUERKE:  That's it, Your Honor.

6            THE COURT:  Okay.  Any further questions?

7            MR. SUMMERS:  No, Your Honor.

8            THE COURT:  Okay.  Mr. Wyse, thank you for your

9    testimony today.  You can step down.

10        (Witness excused)

11           THE COURT:  From Mr. Beach?

12           MR. BEACH:  Thank you, Your Honor.

13        I know we're short on time, so I won't make any

14   presentation now.  I suggest we go directly to the

15   objections, if Your Honor --

16           THE COURT:  Yeah.  Well, let me make sure that

17   everyone who wants to present evidence has had that

18   opportunity.

19           MR. BEACH:  Oh --

20           THE COURT:  So has --

21           MR. BEACH:  -- my fault.

22           THE COURT:  So, from the debtors' side, does that

23   complete your evidentiary case?

24           MR. BEACH:  That does complete our case.

25           THE COURT:  Okay.  And do any of the objectors

1    seeks to present evidence, other than what's come in already?

2              MR. SUMMERS:  No, Your Honor.

3              THE COURT:  Ms. Casey?

4              MS. CASEY:  No, Your Honor.

5              THE COURT:  Okay.  So that then brings us to the

6    argument.  And why don't -- so I have a hard-ish stop at

7    1:30.  I could run potentially to 2, if absolutely necessary.

8    But why don't we proceed on the assumption that, if all we

9    have is legal argument, that we can do that in -- it seems to

10   me that ought to be -- I think I understand what the issues

11   are, so I think that ought to be sufficient.  But why don't

12   we try?  And if we run into trouble, we'll figure something

13   out.

14             MR. BEACH:  Thank you, Your Honor.

15             THE COURT:  So, with that, Mr. Beach, let me give

16   you the opportunity to be heard.

17             MR. BEACH:  Yeah, just really quickly in terms of

18   my understanding of what the outstanding objections are, at

19   least the material ones.

20             My understanding is that the United States Trustee

21   is objecting to the inclusion of the debtors' officers in the

22   releases that are contained in the plan.  That's item number

23   one.

24             Item number two is that the U.S. Trustee is

25   objecting to the fact that there is a portion of the releases

1    with respect to known claims, as opposed to unknown claims,

2    that does not include a carveout for fraud, wilful

3    misconduct, and gross negligence.  While, for any unknown

4    claims or facts and circumstances that are unknown, it does

5    include that carveout.  But that, obviously, is a material

6    term of the settlement and the releases.

7         And then the third point that I believe the U.S.

8    Trustee is going to raise is with respect to the exculpation,

9    in that it says, to the extent that certain parties, agents,

10   and representatives are estate fiduciaries, then they are

11   included in the exculpation.

12        My understanding with respect to Chandler and Law

13   is that their objection is more broadly to the settlement and

14   the releases included in the settlement.  So I believe those

15   are the primary --

16        THE COURT:  Okay.  Let me isolate the moving parts.

17   And this would be helpful to make sure that I understand what

18   the -- what's live.

19        So I take it -- let me -- sorry to interrupt the

20   flow.  But Ms. Casey, I take it the testimony you just heard,

21   does that resolve your objection with respect to the

22   feasibility/payment of administrative claims?

23        MS. CASEY:  Yes, Your Honor.

24        THE COURT:  Okay.  So you disagree with Mr. Beach's

25   description of the issues that remain live.

1          MS. CASEY:  Technically, we also object to the

2     release of Beyond Risk.  But I was going to say that these

3     parties have set forth --

4          THE COURT:  Oh --

5          MS. CASEY:  -- the record and the argument and --

6          THE COURT:  Okay.

7          MS. CASEY:  -- we believe --

8          THE COURT:  So we've got --

9          MS. CASEY:  -- Your Honor --

10         THE COURT:  So what I've got is essentially four

11    issues in front of me.  I've got the broad objection to the

12    settlement at large and then three more specific objections.

13    And let me make sure I've got those in my head correctly.

14         There's the inclusion of the debtors' officers.  Is

15    that in -- is the objection there with respect to the release

16    of the estate claim or of the third-party release?

17         MS. CASEY:  The estates.

18         THE COURT:  Okay.  And the absence of the carveout

19    for fraud with respect to known claims.

20         MR. BEACH:  Claims that were investigated and known

21    and the facts and circumstances surrounding them.

22         THE COURT:  Okay.  And then, with respect to the

23    exculpation, just the dispute with respect to the exculpation

24    is with respect to exculpating the officers in their capacity

25    as fiduciaries?

1          MR. BEACH:  No, it's -- as I understand it, it's --

2     there -- it includes -- the exculpation includes the debtors,

3     the managing member because it's a managed member LLC, and

4     the "professionals" as defined in the plan.  And then it says

5     and to the extent that agents and representatives are

6     fiduciaries of the estate, then they are also exculpated.  My

7     understanding is that that latter part is what Ms. Casey or

8     the U.S. Trustee is objecting to.

9          THE COURT:  I see.  But the language is limited to

10     "to the extent" --

11          MR. BEACH:  Yes, Your Honor.

12          THE COURT:  "-- that they were fiduciaries."

13          MR. BEACH:  Yes, Your Honor.

14          THE COURT:  Okay.  Okay.  So that's helpful.

15          Why don't I give all of you a chance to be heard on

16     the objections.

17          MR. BEACH:  Okay.  Your Honor, I -- unless you

18     would like a presentation from me at this point, I think it

19     might be more efficient to hear from the objectors --

20          THE COURT:  I --

21          MR. BEACH:  -- and then hear --

22          THE COURT:  I think that's right.  You'll have

23     plenty of opportunity to be heard.  But why don't I first

24     hear what the objections are and then we'll get back to you

25     with your responses.

1          MR. BEACH:  Thank you, Your Honor.

2          THE COURT:  Okay.  Mr. Summers.

3          MR. SUMMERS:  Good afternoon again, Your Honor.

4     Matthew Summers on behalf of Norman Chandler and Justin Law.

5          I'm mindful of the Court's time.  But our objection

6     here is to the release of Beyond Risk and the members of

7     Beyond Risk management that served simultaneously as officers

8     of Beyond Risk and employees of Beyond Risk, as well as

9     managing the debtors.

10          We believe that the counter narrative of this case,

11     which is the allegations that have been raised by Mr.

12     Chandler with respect to the timing of commingling of funds,

13     the failure to pursue plan deficits -- which I think is, in

14     part, linked to the commingling issues -- that -- you know,

15     and potential liability under ERISA, that these -- for

16     control over the debtor -- that these types of claims were

17     not properly investigated and vetted, and that there was a

18     rush here to give Beyond Risk what it was seeking in this

19     case, which was, in part, a release of claims directly

20     against it or against its officers for which it might be

21     responsible for indemnification.

22          And the investigation itself and the decision to

23     settle, the investigation, the interviews consisted of five

24     interviews, four of whom were top management or employees of

25     Beyond Risk.  So you were asking the people that Mr. Chandler

1     accused of misconduct or wrongdoing during the time Beyond

2     Risk owned Arsenal, you're asking them whether they did

3     anything wrong.  And of course the answer is going to be no,

4     it was the other guys.  That doesn't seem, to me, to be

5     sufficient here to support the settlement.

6          The debtors should have interviewed Norman

7     Chandler, they should have interviewed Justin Law, they

8     should have interviewed Mr. Cho, they should have interviewed

9     Patrick -- Patrick Hawkins [sic].  They should have

10    interviewed these people, they were available.  It was

11    necessary to get to the allegations that Mr. Chandler has

12    made that there was control exercised by Arsenal that really

13    impaired the value of the business and the operations of the

14    business.  And the debtors here have, you know, taken the

15    view and conducted a narrow investigation, didn't really

16    fully vet these issues.  And so we believe that it's not

17    appropriate to -- not appropriate for Beyond Risk and the

18    Beyond Risk managers, employees to be released.

19         It's also telling that there -- the negotiation of

20    this agreement, of this settlement was done at a time that

21    Mr. Wyse didn't really know much about the claims that he was

22    making the decision to settle.

23         I think the settlement is fully baked by the time

24    we get to March 8th and the plan -- the first version of the

25    plan is filed on March 9th.  And even at the end of April,

April 24th, when I depose him, he hadn't reviewed all of
these documents that are being relied on to support the
settlement and the reasonableness of the settlement.  And
it's not until after that deposition and today that we go --
Mr. Wyse goes back and, I guess, reviews the documents, I
guess tries to backfill with factual support.

          But that doesn't give confidence that there was a
fair, fully vetted investigation that occurred in February or
in arm's length negotiation that was fully informed by the
person who was supposed to be in charge of that negotiation
and trying to make the decisions about whether to settle the
claims or not and he doesn't have a fundamental understanding
of what the documents are.

          He hasn't taken the time to review the documents,
he didn't take the time to sit in on the interviews.  These
inter -- and the interviews weren't that long.  I mean, this
isn't like interviews that went eight hours a day.  These are
interviews that lasted less than an hour.  It's five hours,
literally, and he couldn't make the time.

          So, you know, it's -- and you know, those things
combined with the failure to expand beyond the people that
are accused of the wrongdoing that make this settlement one
that shouldn't be approved at this time.

          Moreover, I question the actual consideration
that's being given here by Beyond Risk.  The debtors have

1   attempted to identify things that make this case look like it

2   was worth the time being in a Subchapter V, rather than just

3   being a Chapter 7.  I'm not sure that putting creditors

4   behind three-plus million dollars in DIP financing for a

5   failed sale process, you know, the creditors would say I'm

6   better off today as a result of what happened in this case

7   than I was when the case was filed.

8         So, when you combine that with this investigation

9   that was, you know, from a weak position and wasn't a full

10  vet and done by somebody -- besides all the issues with the

11  investigation, it was done by somebody that couldn't actually

12  sue the party it's supposed to be investigating, right?

13        There was -- Mr. Wyse, under that board minutes --

14  there's nothing inconsistent with this in the record -- he

15  couldn't actually sue Beyond Risk.  He couldn't sue the plan

16  sponsors.  He couldn't do the things that were probably

17  necessary --

18              THE COURT:  Well --

19              MR. SUMMERS:  -- to collect.

20              THE COURT:  -- why is the ability to bring the lit

21  -- I mean, in a world in which it seemed likely that whatever

22  litigation was going to happen was going to be brought by a

23  trust afterwards --

24              MR. SUMMERS:  Uh-huh.

25              THE COURT:  -- why does his inability to sue during

1    the bankruptcy case make that much of a difference to the

2    integrity of the judgment with respect to the appropriateness

3    of the settlement?

4              MR. SUMMERS:  Well, I think -- I do think that it

5    matters because you can't credibly threaten that you can sue

6    and Beyond Risk --

7              THE COURT:  No, you can --

8              MR. SUMMERS:  -- is counting --

9              THE COURT:  You can --

10             MR. SUMMERS:  -- on a release --

11             THE COURT:  You can threaten that --

12             MR. SUMMERS:  I'll put a plan trustee in place,

13   they'll say --

14             THE COURT:  Or have the case converted and you'll

15   be sued all day long, right?  I'm an independent -- I mean,

16   I'm just -- I'm not taking a side.  I'm just trying to

17   understand --

18             MR. SUMMERS:  Uh-huh.

19             THE COURT:  -- the nature of this objection.

20             It seems to me the structure here was we've got a

21   person who's independent, I understand you're challenging his

22   independence.  But if you have an independent person who's

23   asked is this a reasonable settlement or not, and if it's not

24   a reasonable settlement, I'll direct that the case be

25   converted and you'll be sued by a Chapter 7 Trustee, why is

1    that dynamic not a fair dynamic for how to set this up?

2            MR. SUMMERS:  Yeah.  Well, I think that, you know,

3    they should have, you know, a much more powerful position in

4    settlement negotiations, that it can actually -- you know,

5    you actually can threaten, you know, immediate suit, rather

6    than some suit distant down the road in the future that might

7    come.

8            And there might be many reasons they might not want

9    to convert it to a Chapter 7, so it might not actually be a

10   real threat; whereas, a threat of filing litigation might be

11   a real threat.

12           THE COURT:  Okay.  I understand your position.

13           MR. SUMMERS:  So, as to independence, so, you know,

14   Mr. Wyse and his company were selected by Beyond Risk, right?

15   And they're investigating the very people at the company, at

16   Arsenal and Beyond Risk, who are otherwise directing them in

17   this case.  And that is the same with respect to Young

18   Conaway.  And while he has the right to settle, he's still --

19           THE COURT:  So what --

20           MR. SUMMERS:  -- and he's --

21           THE COURT:  -- specific --

22           MR. SUMMERS:  -- still not --

23           THE COURT:  -- govern --

24           MR. SUMMERS:  -- reporting to --

25           THE COURT:  What specific --

1          MR. SUMMERS:  -- these people --

2          THE COURT:  -- governance mechanisms ought to have

3     been employed here that were not?

4          MR. SUMMERS:  Yeah.  So, I mean, there could have

5     been an independent committee -- there wasn't -- that would

6     have overseen Mr. Wyse.  And I'm not sure why that was.

7          THE COURT:  But an independent committee, the -- I

8     mean, is still subject to the same concerns that you have

9     with respect to Mr. Wyse, right?

10         MR. SUMMERS:  Well, I don't know that that's

11    necessarily true because, at the board level, I mean, they're

12    not -- board members are quite free to do what they want,

13    right?  They're not reporting to the very officers and direct

14    -- officers --

15         THE COURT:  Okay.

16         MR. SUMMERS:  -- that they're investigating.

17    They're above that.  And so that's a distinction here that I

18    think is important.  And counsel would also be reporting

19    directly to that special committee.  And so it's not the same

20    thing here.

21         And it's unfortunate because we -- you know, there

22    was an easy option, and that option would be to give the

23    Subchapter V Trustee expanded powers to have conducted this

24    investigation.  And so there was a true independent --

25         THE COURT:  Okay.

1          MR. SUMMERS:  -- mindful of --

2          THE COURT:  But your client --

3          MR. SUMMERS:  -- the costs here.

4          THE COURT:  -- was a party-in-interest all along,

5     right?

6          MR. SUMMERS:  That is correct.

7          THE COURT:  And did you file a motion asking to

8     expand the powers of the Subchapter V Trustee for this

9     purpose?

10          MR. SUMMERS:  No, we did not.  The plan was filed,

11    you know, after we were not invest -- you know, after --

12          THE COURT:  Okay.

13          MR. SUMMERS:  -- and the --

14          THE COURT:  But the --

15          MR. SUMMERS:  -- fact we weren't --

16          THE COURT:  -- fact that --

17          MR. SUMMERS:  -- going to be --

18          THE COURT:  -- there was --

19          MR. SUMMERS:  -- interviewed.

20          THE COURT:  The structure of how this was

21    proceeding was essentially known from the filing of the

22    petition, right?  The appointment of Mr. Wyse as the CRO, all

23    that was --

24          MR. SUMMERS:  That --

25          THE COURT:  -- set forth in the --

```
1                    MR. SUMMERS:  That was --

2                    THE COURT:  -- first-day --

3                    MR. SUMMERS:  Certainly.

4                    THE COURT:  -- declaration.

5                    MR. SUMMERS:  Yes.  Certainly, that was --

6                    THE COURT:  And the notion that what he would be

7       doing was conducting negotiations with the DIP lender over a

8       plan settlement, that wasn't a surprise to you, was it?

9                    MR. SUMMERS:  No.  I mean, I think that was clearly

10      -- you know, it was clearly laid out something --

11                   THE COURT:  Okay.

12                   MR. SUMMERS:  -- he could be doing, yes.

13                   THE COURT:  Okay.

14                   MR. SUMMERS:  And we also, at least by late

15      February, knew that the debtors were actively performing the

16      investigation --

17                   THE COURT:  Right.

18                   MR. SUMMERS:  -- I think --

19                   THE COURT:  Look --

20                   MR. SUMMERS:  -- there's no --

21                   THE COURT:  -- all I'm saying --

22                   MR. SUMMERS:  -- question.

23                   THE COURT:  -- is -- and while I understand your

24      point --

25                   MR. SUMMERS:  Uh-huh.
```

1          THE COURT:  -- I -- none -- if this had happened in

2     the dark of night, I would have more sympathy --

3          MR. SUMMERS:  Uh-huh.

4          THE COURT:  -- for it than in a world in which it

5     all happened, essentially, in the open.  And there are

6     motions that could have been filed here, there are lots of

7     motions.  You could have sought the appointment of a regular

8     creditors' committee.  Lots of things could have been done

9     that weren't done and here I am.

10         MR. SUMMERS:  Understood.

11         THE COURT:  And the -- to me, in asking am I going

12    to refuse to approve it because there are other things that

13    could have been done, the fact that no one asked me to do

14    those things seems not irrelevant.

15         MR. SUMMERS:  Understood, Your Honor.

16         So -- yeah, so I think Your Honor understands our

17    position.  But you know, we believe that there needs -- you

18    know, that there needs to be a proper investigation and that

19    we need to go back and really focus in on -- we need to know

20    -- you know, the debtors need to know when the commingling

21    happened and have -- you know, they need to know, you know,

22    what the answer is as to why they weren't pursuing collection

23    efforts.  And they really need to, you know, interview

24    additional people and interview the people that are asserting

25    these allegations.

1          THE COURT:  Okay.

2          MR. SUMMERS:  Thank you, Your Honor.

3          THE COURT:  Thank you very much.  I appreciate it.

4          Ms. Casey.

5          MS. CASEY:  Again, for the record, Linda Casey on

6    behalf of the United States Trustee.

7          Taking a little bit of a step back, I did want to

8    point out that the objecting parties filed their objection

9    under seal and they filed a motino to seal it with the

10   objections to be heard today.

11         Just so that Your Honor knows, we had had

12   discussions.  I had indicated the United States Trustee does

13   object to that.  And similar to the exhibits, we're going to

14   deal with that --

15         THE COURT:  Okay.

16         MS. CASEY:  -- after the --

17         THE COURT:  So I won't --

18         MS. CASEY:  -- confirmation hearing --

19         THE COURT:  -- act on any --

20         MS. CASEY:  -- with that, too.

21         THE COURT:  -- motions to seal --

22         MS. CASEY:  Correct.

23         THE COURT:  -- give the parties the opportunity to

24   talk.  If you work it out and file a -- something under

25   certification, I will presumably enter it.  And if you

1    disagree, we will have a hearing when we have a minute to

2    breathe to sort through those issues.

3              MS. CASEY:  Correct.

4              THE COURT:  Is proceeding that way objectionable to

5    anybody?

6         (No verbal response)

7              THE COURT:  Okay.

8              MS. CASEY:  Okay.

9              THE COURT:  That will be our deal.

10             MS. CASEY:  So, as to the objections, as I

11   indicated earlier, I think the record has been made that the

12   plan is feasible, so that has satisfied that objection.

13             As to the objection related to the debtors' release

14   of Beyond Risk, we filed our objection.  And I think the

15   parties -- other parties, besides myself, have brought it to

16   Your Honor's attention, so I'm not going to add anything to

17   that.

18             THE COURT:  Well, actually, not to be annoying --

19             MS. CASEY:  Okay.

20             THE COURT:  -- but the parties who have raised it

21   have their own agenda, not that that makes their points

22   incorrect.  But in light of -- I mean, tell me what is your

23   position with respect -- in light of the evidence you've

24   heard, with respect to the reasonableness of the settlement?

25             MS. CASEY:  As to Beyond Risk --

1        THE COURT:  I understand that -- holding aside the

2   specific features --

3        MS. CASEY:  Right.

4        THE COURT:  -- that -- on which your rights are

5   reserved.  But on the question of, look, has -- let me back

6   up here.

7        MS. CASEY:  Uh-huh.

8        THE COURT:  And then this is for the debtors' side,

9   let me just -- so you know where I'm coming from.

10       To me, this is an insider transaction.

11       MS. CASEY:  Uh-huh.

12       THE COURT:  I understand that this is not a DIP

13  loan or an asset sale, and one could cobble together an

14  argument --

15       MS. CASEY:  Uh-huh.

16       THE COURT:  -- that it's subject to ordinary

17  business judgment review.  I don't see why, as a matter of

18  principle, that ought to be the case.

19       We've got what is fundamentally an insider

20  transaction.  I,in this case, don't have a committee because

21  it's a Sub V case.

22       MS. CASEY:  Uh-huh.

23       THE COURT:  This is -- in this case, I'm going to

24  get to in a second the question of the role of the Sub V

25  Trustee post-confirmation.  But because there is one, I also

1    can't really expect a disinterested assessment of the

2    transaction from the perspective of a Sub V Trustee.

3              MS. CASEY:  Right.

4              THE COURT:  As a result, I think I'm required --

5    I've got an objection, I'm required --

6              MS. CASEY:  Uh-huh.

7              THE COURT:  -- to form a judgment.  I've heard some

8    evidence.

9              MS. CASEY:  Uh-huh.

10             THE COURT:  And to the extent your office is taking

11   the view that that evidence is insufficient, I guess I want

12   to --

13             MS. CASEY:  Okay.

14             THE COURT:  -- understand your position.  I don't

15   mean to put you on the spot.

16             MS. CASEY:  That's okay.

17             My client is concerned about the release here.  My

18   client believes that the Master Mortgage and Zenith factors

19   are the correct standard.  And we have a plan that we don't

20   have an independent committee looking at this.  We have a

21   plan that did not even go out for solicitation, rather just

22   presumed that all of the parties are going to -- all of the

23   unsecured creditors are rejecting the plan, so -- and we do

24   not have payment in full of all of the creditors.  So we have

25   a bunch of the Master Mortgage and the Zenith factors --

1            THE COURT:  Right.

2            MS. CASEY:  -- not being met.

3            THE COURT:  But for an -- I understand there's case

4    law.

5            MS. CASEY:  Right.

6            THE COURT:  Indeed, Master Mortgage itself,

7    arguably, is an estate release claim.  But it can't be the

8    case --

9            MS. CASEY:  Uh-huh.

10           THE COURT:  -- that if -- I mean, let's back up.

11           MS. CASEY:  Okay.

12           THE COURT:  Just from first principles and common

13   sense, the estate has a million-dollar receivable, it wants

14   to settle it for $900,000, but it's with an insider.

15           MS. CASEY:  Uh-huh.

16           THE COURT:  It can't -- there's more than $900,000

17   of debt, so creditors aren't going to be paid in full.

18           MS. CASEY:  Right.

19           THE COURT:  It can't be that's a reason why the

20   estate can't do that, right?

21           MS. CASEY:  Correct.

22           THE COURT:  So it seems to me that, at the end of

23   the day, what I've got -- and tell me if you disagree with

24   this -- is not the literal application of like fairness and

25   necessity in the strict sense --

1          MS. CASEY:  Uh-huh.

2          THE COURT:  -- but more like if we have an insider

3     transaction like an insider DIP loan or an insider asset

4     sale, where I'm much less deferential to the debtor's

5     business judgment because there is reason to have concerns

6     about its independence.

7          MS. CASEY:  Uh-huh.

8          THE COURT:  And so there's some measure of

9     heightened scrutiny, but not the same standard as to oppose -

10    - as to approve a non-consensual third-party release.

11         MS. CASEY:  Right.

12         THE COURT:  Am I thinking about that the wrong way?

13         MS. CASEY:  I don't think that you are.  And I

14    think that, you know -- again, my client has concerns here:

15         My client is concerned that this is an insider.

16         My client is concerned that, at the first-day

17    hearing, they said they know that they should leave something

18    behind for the general unsecured creditors, and what's being

19    left behind is litigation claims against the same parties

20    that they are also pursuing on their own independent claims.

21         THE COURT:  Right.  Those are separate claims,

22    right?

23         MS. CASEY:  Right.

24         THE COURT:  That you --

25         MS. CASEY:  They are separate claims.  In fact, the

1    fact that they're separate claims is probably why we don't

2    see a sharing agreement here.  But it is also -- one of our

3    concerns is, you know, the -- my understanding is that there

4    is no ERISA insurance.  So we're talking individuals, are

5    they recovery-proof, can they satisfy claims against --

6              THE COURT:  I --

7              MS. CASEY:  -- both of the parties.  So we have

8    concerns here, and I would say that that's why we're not

9    removing our objection.

10              We think this is an insider, it should be subject

11    to strict to strict scrutiny.  We are concerned that -- you

12    know, the debtors came in, I heard the presentation.  I think

13    we take a slightly different view.

14              Since the beginning of the case, we've been

15    questioning why is there a sale process going on, why are we

16    sending the sales, there's nothign here to sell.  It turns

17    out there's nothing here to sell.

18              THE COURT:  Okay.

19              MS. CASEY:  We, you know --

20              THE COURT:  The response might be you don't know

21    unless you try.

22              MS. CASEY:  Right.  That may be their response, but

23    I think everybody had strong suspicions --

24              THE COURT:  Okay.

25              MS. CASEY:  -- there was nothing to sell.

1  The soft landing of the health claimants is not

2  occurring because of this case.  They're going to occur

3  because the Department of Labor is going to, after this case,

4  seek an independent fiduciary.  That could have been done

5  outside the bankruptcy case.

6  So we do think that this should be analyzed as an

7  insider transaction with strict scrutiny with the whole view.

8  And so we're not backing down on our --

9  THE COURT:  Okay.

10  MS. CASEY:  -- objection to it.

11  THE COURT:  From -- I understand there's not a

12  statutory prohibition, but I take it your office doesn't

13  object to the post-confirmation role of the Sub V Trustee.

14  MS. CASEY:  As the liquidating trustee?

15  THE COURT:  Right.

16  MS. CASEY:  We're not objecting in this case.

17  THE COURT:  Okay.  Okay.  That's -- you've answered

18  my question.

19  Okay.  So why don't we turn to the three specific

20  points that you've raised.

21  MS. CASEY:  Okay.  So the first --

22  THE COURT:  Well, I'm sorry.  I'll let you control

23  your argument.

24  MS. CASEY:  That's fine.

25  THE COURT:  But --

1    MS. CASEY:  No, that's fine.

2    The first one is the release.  Now we have a unique

3    situation here, where the officers of the debtors are also

4    officers of Beyond Risk.  And this objection is to their

5    release wearing their hat as the officer of the debtors.

6    And the case law is clear that the substantial

7    contribution cannot just be doing their job.  Having been

8    officers during the case and working towards the

9    reorganization is not sufficient contribution to justify a

10   release by the debtors of their own officers.  And we have no

11   record of these officers providing any contribution or

12   consideration for the debtors' release.

13   We also have case law that suggests that what the

14   debtors' officers are entitled to is exculpation; and that,

15   by providing the debtors' release, which goes beyond that

16   exculpation, especially without any consideration, is

17   inappropriate.

18   So we do think that it is clear that the debtors'

19   officers, in their capacity as debtors' officers, have not

20   provided any consideration and should not be included --

21   THE COURT:  Okay.

22   MS. CASEY:  -- within the --

23   THE COURT:  And what's the --

24   MS. CASEY:  -- release.

25   THE COURT:  What's the clearest case that supports

1    that argument.

2            MS. CASEY:  I'd have to pull it up, but the three

3    cases are Washington Mutual, Tribune, and Genesis --

4            THE COURT:  Okay.

5            MS. CASEY:  -- where they say that there needs to

6    be a financial contribution and specifically that the hard

7    work is compensated through their salary; and, therefore,

8    it's not --

9            THE COURT:  But is that --

10           MS. CASEY:  -- sufficient for --

11           THE COURT:  Are those --

12           MS. CASEY:  -- contribution.

13           THE COURT:  Are those cases in the context of

14   estate releases, as opposed to third-party releases?

15           MS. CASEY:  I think there was one that was a third-

16   party release; I thought the other two were estate releases/

17           THE COURT:  Okay.

18           MS. CASEY:  But I'd have to go back and double-

19   check to answer that fully.

20           THE COURT:  Okay.

21           MS. CASEY:  I do know that the Third Circuit case

22   that they relied on was third-party releases, so that was

23   what -- you know, I think it was Continental was in respect

24   of third-party --

25           THE COURT:  Right.

1          MS. CASEY:  -- releases --

2          THE COURT:  Of course.

3          MS. CASEY:  -- when they said it had to be a

4     substantial financial contribution.

5          THE COURT:  And I mean, why doesn't -- I mean, why

6     is this question any different from what we were just talking

7     about --

8          MS. CASEY:  Uh-huh.

9          THE COURT:  -- about the standard for judging the

10    settlement?  Why -- I mean, look, if there's case law that

11    tells me it's different, then I'll respect the case law.

12         But from first principles, I mean, this is part of

13    a global settlement.  It's an insider transaction, I've got

14    to look at it carefully.  But if the -- if it's -- if I were

15    to conclude that what Beyond Risk has done here is sufficient

16    to justify an arm's length release of Beyond Risk and, as

17    part of that, Beyond Risk says it's also really important to

18    us that our people get releases of the estate causes of

19    action and -- why isn't that just part of the mix, as opposed

20    to a separate analysis?

21         MS. CASEY:  Well, here, you have the complicated

22    factor that the Beyond Risk people are also the debtors'

23    people.

24         THE COURT:  I understand.

25         MS. CASEY:  And so that does make a difference.

1    And that's sort of why we're cutting the hairs between

2    whether it's the Beyond Risk officers as Beyond Risk officers

3    --

4              THE COURT:  Uh-huh.

5              MS. CASEY:  -- versus the debtors' officers.

6              And what we have here is estate fiduciaries that

7    are acting in this case, they're entitled to exculpation.

8    They are not providing any consideration for the releases.

9    And so, therefore, you know, under -- even if you were to

10   say, okay, look, the strict scrutiny, you know, any -- we

11   don't even have any testimony as to whether the debtors

12   investigated claims against their own officers.

13             THE COURT:  Okay.

14             MS. CASEY:  We have testimony --

15             THE COURT:  I understand.

16             MS. CASEY:  -- related to it --

17             THE COURT:  So you --

18             MS. CASEY:  -- against --

19             THE COURT:  Your view is --

20             MS. CASEY:  Beyond Risk.

21             THE COURT:  -- that, if the estate has a claim

22   against the individual -- its officers --

23             MS. CASEY:  Uh-huh.

24             THE COURT:  -- that is on account of conduct that

25   took place before the petition date, it should be preserved

1   and put into the trust.

2             MS. CASEY:  Correct, Your Honor.

3             THE COURT:  Okay.

4             MS. CASEY:  And then, in connection with that, you

5   know, if Your Honor were to find that somehow the Beyond Risk

6   settlement should include the officers of the debtors and,

7   therefore, this release is appropriate, we also object to the

8   language that the carveout -- which is your standard carveout

9   -- says:

10            "-- shall not operate to waive or release any

11  causes of action of any debtors arising out of facts and

12  circumstances unknown to the debtors and the debtors' related

13  parties arising from fraud, gross negligence, wilful

14  misconduct, or criminal conduct."

15            In the exculpation, the debtors -- you know, the

16  debtors' fiduciaries are not entitled to being exculpated

17  from fraud, gross negligence, wilful misconduct, or criminal

18  contact for any actions that occurs during the bankruptcy

19  case.  And we, quite frankly, find it sort of offensive that

20  known causes of action for fraud, gross negligence, wilful

21  misconduct, or criminal conduct can be released.

22            I understand the debtors' position is, well, we're

23  not aware of any.  And quite frankly, that should be enough

24  to say, well, then you don't need to carve it out of the

25  exculpation -- of the proviso.  So it should simply say that

1   any cause of action arising from fraud, gross negligence,

2   wilful misconduct, or criminal conduct is excluded from the

3   release as to all parties, quite frankly.

4          You certainly don't want to find a circumstance

5   where there is fraud, gross negligence, wilful -- you know, a

6   genuine cause of action on that, and then have a fight as to

7   whether the facts and circumstances were known or not known

8   to the debtors because it's -- remember, it's not only just

9   any known claim of fraud, it's any claim of fraud based on

10  known facts.  So the debtors might be releasing a claim of

11  fraud that they're not aware they they have that claim of

12  fraud, but they're aware of the facts and they just --

13          THE COURT:  Okay.

14          MS. CASEY:  -- haven't --

15          THE COURT:  I mean --

16          MS. CASEY:  -- come together.

17          THE COURT:  -- if they're aware of the facts,

18  they're presumably charged with understanding the

19  consequences.

20          MS. CASEY:  Perhaps.  But again, we think that it's

21  inappropriate.  And we think that the argument against that,

22  well, we don't know of any, just is -- speaks too loudly.  If

23  you don't know of any, then there's no reason to carve it

24  out.  And if there are any, they shouldn't be released

25  without a fulsome record as to what those claims are that

they're being substantially -- you know, especially when

you're dealing with insiders being released, Beyond Risk and

the debtors' officers and directors.  We think it's

completely inappropriate to try to release known claims of

fraud, gross negligence, wilful misconduct, and criminal

conduct.

THE COURT:  Okay.

MS. CASEY:  The last one is the exculpated parties.

We have narrowed it down from what was in the original plan,

so that the only issue now is exculpating parties to the

extent that the Court determines that they've acted as

fiduciaries for agents and representatives.

And Your Honor, exculpation is the standard of care

of estate fiduciaries before your court -- before Your Honor

from the petition date to the effective date.

THE COURT:  Right.

MS. CASEY:  And it's -- it should be a limited

number of people.  Your Honor is the person who should decide

who is and is not a fiduciary.

If they have any agents or representatives that

they believe are fiduciaries, they can present it to your

court now.  We think it's inappropriate to have a court

outside of this Bankruptcy Court determine who are estate

fiduciaries and some time in the future.  We think it's a

waste of resources to have to come back to Your Honor at some

1    -- you know, reopen the case to determine whether they are

2    estate fiduciaries.

3           The case law is clear that the estate fiduciaries

4    are the debtors, the reorganized debtors, the officers and

5    directors -- or, if they're not a corporation, managing

6    members -- the estate-retained professionals and, in an

7    appropriate case, the committee and the committee's

8    professionals.

9           If they believe there are any other fiduciaries who

10   are entitled to that, it is the United States Trustee's

11   position that they should be identified, establish that they

12   are fiduciaries and included in the exculpation, and it

13   should not be an additional hurdle for future litigants to

14   determine whether they are or are not fiduciaries and

15   determine which court has jurisdictions.  It's before Your

16   Honor today, it's Your Honor's order.  We think that it

17   should be determined today as to who they are.

18                THE COURT:  Okay.  I understand that position.

19                MS. CASEY:  Thank you.

20                THE COURT:  Thank you.

21           Okay.  Mr. Beach, I guess it's you.

22                MR. BEACH:  Thank you, Your Honor.

23                THE COURT:  So you can say whatever you want, but

24   among the things that you say, I'd be interested in your view

25   of what the standard is that I should apply to the overall

1  approval of the settlement, in light of the conversation that

2  you heard, and then the specific points and, in particular,

3  to the extent that there is authority to support what you're

4  asking for --

5          MR. BEACH:  Sure, Your Honor.

6          THE COURT:  -- if those --

7          MR. BEACH:  I'll start --

8          THE COURT:  -- questions are fair.

9          MR. BEACH:  Excuse me?

10          THE COURT:  If those questions are fair ones, and

11  even --

12          MR. BEACH:  Absolutely.

13          THE COURT:  -- if they're not.

14      (Laughter)

15          MR. BEACH:  Absolutely.

16          Your Honor, I'll start with the standard.  The

17  standard is business judgment here and I'll tell you my

18  reasoning for that.

19          THE COURT:  Uh-huh.

20          MR. BEACH:  However, if it was entire fairness or

21  some more strict scrutiny, we've met it here.

22          There is zero evidence to the contrary in the

23  record that this settlement does not fall well within the

24  lowest bounds of reasonableness, meet all of the Martin

25  standards, meet all of the Zenith standards, meet all of the

1    Master Mortgage standards, all of those standards.  And we

2    can walk through them if we need to, but they've all been met

3    here.

4              But the reason I think --

5              THE COURT:  Well --

6              MR. BEACH:  -- it's business judgment --

7              THE COURT:  -- to the extent --

8              MR. BEACH:  -- Your Honor --

9              THE COURT:  To the extent Master Mortgage says one

10   of the considerations are creditors being paid in full,

11   that's not one of the factors that cuts your way, right?

12             MR. BEACH:  Yeah.  But Your Honor, I would -- I

13   think that provision has been interpreted in different ways.

14   I know that it does say paid in full, but we are paying

15   administrative claims in full --

16             THE COURT:  I understand.

17             MR. BEACH:  -- priority claims in full, which would

18   get likely no recovery in a Chapter 7 scenario.

19             And there will be a recovery or there's anticipated

20   to be a recovery for general unsecured creditors.  As Your

21   Honor may recall, the largest unsecured creditor is the

22   Department of Labor and recoveries on distributions from the

23   Department of Labor will go to the benefit of the healthcare

24   --

25             THE COURT:  Uh-huh.

1            MR. BEACH:  -- claims that are outstanding, as

2      well.  So I don't fully concede that point, but I understand

3      --

4            THE COURT:  Okay.

5            MR. BEACH:  -- what the -- what that particular

6      case says.

7            But Your Honor, I believe business judgment applies

8      here.  And I find it --

9            THE COURT:  Why does that make sense?

10            MR. BEACH:  Excuse me?

11            THE COURT:  I mean, just from first principles,

12      right?  The -- why would we apply a lesser standard to a

13      settlement between the debtor and its parent when it's this

14      type of plan settlement than we would if it was borrowing

15      money or selling an asset?  Just from -- as a matter of like

16      common sense, why is that a rational thing to do.

17            MR. BEACH:  Yes.  I mean, the presumption is

18      business judgment, Your Honor, and we start there.

19            Now I know that you're saying this is a settlement

20      between the parent and a subsidiary, therefore, it's

21      presumptively an insider transaction.  However, if that were

22      the case law, no one would ever need to set up an indepentent

23      committee because that would mean nothig because all that

24      you'd be -- because you immediately go to the entire fairness

25      standard and the business judgment standard doesn't apply at

1    all.

2           I will say, Your Honor, that Chandler and Law

3    raised this issue on the first day of this bankruptcy case.

4    And we cited the LLC act and the fact that it was a proper

5    delegation of an officer of the company to man an independent

6    committee.  I don't have that cite --

7           THE COURT:  No, I understand.

8           MR. BEACH:  -- in front of me --

9           THE COURT:  Let me --

10          MR. BEACH:  -- but it's in the --

11          THE COURT:  Let me just -- look, my views on this

12   might be a little bit idiosyncratic, but I actually think

13   they're not, which is:  I think the question in front of me

14   is not a question of state -- the state law duties that one

15   would impose if one were looking, after the fact, to

16   challenge the transaction, but a standard that comes from

17   bankruptcy law and that business judgment, when used in the

18   context of 363, for example, is not the -- literally the same

19   thing as the business judgment standard under state law.

20          And I think the question in front of me now, by my

21   lights, is not literally entire fairness, but is simply a

22   bankruptcy principle that says we have some wariness of

23   transactions with insiders and require some greater showing

24   than just it's, you know, the debtors telling you that they

25   thought about it.  And so that's how I'm thinking about it,

1  which is that I think I need to take a closer look than I

2  would if you were selling to a stranger, but that the

3  standard is a bankruptcy law standard about how I think about

4  this type of settlement, not a state law literal entire

5  fairness standard.

6          And look, the fact that the debtor brought in an

7  independent person weighs in that balance.  It's relevant to

8  how I think about the transaction.  Obviously, if it were --

9  if there was no intermediary with any purported independence,

10  that would concern me more, and that the point of the

11  independence is to get me past the heightened standard.

12          So that's how I'm thinking about it.  You're

13  welcome to try to persuade me I'm thinking about it wrong.

14  But to do that, you're going to need either clear authority

15  or some reason.  So that's what I got.

16          MR. BEACH:  Yeah.  Respectfully, Your Honor, I do

17  believe that the business judgment rule does apply here.  I

18  understand that Your Honor has a -- sounds like a business

19  judgment plus view of how this should be viewed.  But Your

20  Honor, I believe that blurring the lines of what the proper

21  standard is to determine if a settlement is appropriate in

22  this context, I think creates an issue udner state law.

23          I understand the Bankruptcy Code -- or the

24  Bankruptcy Court is a court of equity, and you have the

25  authority to look at different things.  But in terms of what

1     the standard is, I think the standard is a state law

2     standard.  I don't recall anything in the Bankruptcy Code

3     that would say -- other than the case law and the Martin

4     Factors and things like that, that you would need to look at,

5     that actually changes the standard of review on the issue.

6                THE COURT:  The plan --

7                MR. BEACH:  That being said --

8                THE COURT:  The plan needs to be fair and

9     equitable.

10               MR. BEACH:  Agreed, agreed that it does need to be

11    fair and equitable.  It is a settlemetn in the context of the

12    plan.  We do think the settlement is fair and equitable.

13               THE COURT:  Right.  No.  Okay.  So -- all right.  I

14    don't think I need -- I -- look, I don't think I need to spar

15    with you about the standard.  This is helpful.  I appreciate

16    your position.

17               I think what would be most helpful would be the --

18    your responses to the specific points Ms. Casey raises; and,

19    in particular, I'm interested in as to, you know, the

20    releases of the debtors' officers and any authority you might

21    have to support what you're doing.

22               MR. BEACH:  Yes, Your Honor.  And I'll start

23    generally.

24               The consideration for a settlement is consideration

25    that is, you know, a primary focus of the settlement overall.

1    Is that consideration proper for this -- for the scope of the

2    releases that are being provided.

3         And now there's other consideration, other than the

4    cash that's being waived, the cash that's being subordinated,

5    the cash that's going into the liquidating trust, in terms

6    of, you know, some of the issues that Ms. Casey raised

7    earlier.  But the cash under this settlement -- and I know

8    Your Honor gets plenty of settlements with less consideration

9    and it becomes a harder issue.

10        The testimony that you've heard, the only evidence

11   before you, Your Honor, is that the consideration -- or that

12   the claims that are being released here, including claims

13   against officers, the consideration is -- far exceeds what

14   the value of those claims are because the testimony from Mr.

15   Wyse was that there are no claims, other than the

16   recharacterization of the 1.8 million, which is part of the

17   settlement.  They're actually waiving that claim.  I don't

18   believe it's a recharacterization.  But that would be the

19   claim that was being brought.

20        So I would suggest to Your Honor that you need to

21   look at the consideration point, in terms of how it relates

22   to the settlement overall.  And there is no evidence that

23   would suggest that consideration is inadequate, both for

24   Beyond Risk, but also for the officers of the debtors, as

25   well.

1    Two of those officers are affiliated with Beyond

2    Risk, but I believe one is not -- or two are not, if you

3    include Mr. Wyse, as well.  But the consideration in the

4    settlement is consideration that should be applied in

5    connection with the settlement overall, and there is no

6    evidence to the contrary of that.

7         In terms of specific case law on that, I did --

8         THE COURT:  Yeah, like --

9         MR. BEACH:  -- try to go through it, Your Honor.

10   But I'm pretty sure every settlement, there's, you know --

11        THE COURT:  No.  Here's my specific question.  I'm

12   not -- I apologize.  Is -- are there cases in which a -- the

13   debtor's own officers receive releases of estate claims, I

14   guess, in the absence of -- I take it you're -- so the -- I

15   see.

16        So your point is, look, the consideration that is

17   being paid is consideration for those settlements, that the

18   law requires consideration.  You can't just walk away from

19   them, but it requires consideration.  And here, the

20   consideration is part of a global settlement and there's no

21   real parsing it.

22        MR. BEACH:  Yes, Your Honor.  And it happens all

23   the time that officers are released.  In fact, in --

24        THE COURT:  No --

25        MR. BEACH:  -- a case you recently did, in the In

1    Re Kabbage case, Number 22-10951.  That was the case the

2    officers were released --

3              THE COURT:  Right.

4              MR. BEACH:  -- in connection --

5              THE COURT:  You know how --

6              MR. BEACH:  -- with a --

7              THE COURT:  -- we all feel --

8              MR. BEACH:  -- plan settle --

9              THE COURT:  -- when you cite orders we've signed on

10   issues that weren't objected to, right?

11        (Laughter)

12             MR. BEACH:  Understood, Your Honor.

13             THE COURT:  But no, I hear you.

14             And then the question -- look, the notion -- I

15   mean, what I know from the cases is that those can't be given

16   away.

17             MR. BEACH:  Understood.

18             THE COURT:  And I understand your point about the

19   consideration, essentially being aggregate consideration, so

20   I think I follow where you are there.

21             MR. BEACH:  Yeah.  And I would submit, Your Honor,

22   that, in every plan settlement there is, it -- you know,

23   there is often parties who are not the direct parties giving

24   the consideration, but that that consideration is for the

25   benefit of the parties that are proposed to be released under

1      --

2                  THE COURT:  Right.

3                  MR. BEACH:  -- the plan.

4                  THE COURT:  No --

5                  MR. BEACH:  And that is a necessary part of the

6      releases and the settlement overall.  It's critical for

7      Beyond Risk, if they're going to provide this consideration,

8      that there be some level --

9                  THE COURT:  Okay.

10                 MR. BEACH:  -- of finality --

11                 THE COURT:  Can we --

12                 MR. BEACH:  -- to the --

13                 THE COURT:  Can we --

14                 MR. BEACH:  -- situation.

15                 THE COURT:  -- talk about the issue of the scope of

16     the release and the question of the carveout?

17                 MR. BEACH:  Yes.

18                 THE COURT:  So what you are saying, as I understand

19     it, is, all right, look, if there's something that we don't

20     know about that we discover, and it turns out we find or the

21     litigation trust finds that one of these people committed

22     fraud, then that's outside of the scope of the release and

23     the exculpation and they can be sued.

24                 MR. BEACH:  Yeah.

25                 THE COURT:  But if we know the facts today, then we

1    don't want to hear later that that gave rise to a claim of

2    fraud.  That's your position.

3            MR. BEACH:  Yes, Your Honor.  And there are a

4    number of settlements where the parties require that there be

5    no carveout because they want finality.  We have agreed and

6    Beyond Risk has agreed to make it clear that, if facts and

7    circumstances are not known at this point, then there is a

8    carveout for those type of claims --

9            THE COURT:  And --

10           MR. BEACH:  -- but not for --

11           THE COURT:  And what's your -- what -- is there

12   authority that addresses this specific question of the scope

13   of an appropriate carveout or is this just something that we

14   all make up as we go?

15           MR. BEACH:  Your Honor, I don't have a case sitting

16   here today where I can provide that it specifically delves

17   into the issue of a carveout.  I mean, I think these

18   carveouts started 10, 12, 15 years ago.  Before that,

19   releases didn't have any carveouts in them and folks thought

20   it was generally appropriate, but not in every circumstance -

21   -

22           THE COURT:  And what's your --

23           MR. BEACH:  -- when finality was --

24           THE COURT:  -- response to Ms. Casey's point that

25   says, look, here we are and we have the ability to bring some

1    clarity to this, and if I do what you're asking, I've now

2    opened the door for a fight in some court somewhere else,

3    sometime down the road, about what was and wasn't known as of

4    today and whether the basis for a claim of fraud -- just the

5    -- her point is -- and I'm cartooning it and I'm sure she

6    says it better than I do -- is that doing it this way

7    introduces more uncertainty and angst into the system than is

8    necessary.

9         MR. BEACH:  Well, Your Honor, keep in mind these

10   are estate causes of action.  There's still an opt-out

11   period.  The Department of Labor and other parties, plan

12   participants and plan sponsors, have until September 27th to

13   opt out.  We are talking about estate releases.

14        Mr. Homony, the Subchapter V Trustee, who will be

15   the liquidating trustee, is not objecting to this.  I don't

16   believe he has a concern -- I don't mean to speak for him,

17   apologies.  But I don't believe he's got a concern about the

18   way this is structured because, if there are new facts and

19   circumstances that come to light, that issue will be

20   addressed at the time it needs to be addressed.

21        THE COURT:  Okay.

22        MR. BEACH:  And it would be in this court because I

23   believe these are all claims that the liquidating trustee

24   would be pursuing, not in another court.  Third-party claims

25   are a whole different situation.

1          THE COURT:  Okay.  Now time for my unfair question.

2     Do you think this is what Congress had in mind when it

3     adopted Subchapter V?

4          (Laughter)

5          MR. BEACH:  "This" meaning --

6          THE COURT:  A case --

7          MR. BEACH:  -- this case?

8          THE COURT:  A case like this one.

9          Here's why it's relevant to me.  Look, this is very

10    clever lawyering and I tip my hat to everyone involved.  But

11    the way this was engineered is I've got exactly no one who is

12    truly independent offering an economic view of this.  We --

13    because it's in Sub V, I don't have a committee looking over

14    the shoulder telling me we think this is good or bad.

15    Because there's no vote, I have no indication from the

16    creditor body.  And because the Subchapter V Trustee -- and

17    I'm not criticizing this, it's just a feature -- has an

18    economic stake in plan confirmation, there is no one -- if I

19    ask -- if I'm asked the question is this good or bad for

20    creditors, you know, I have one objection from a creditor,

21    but they have their own agenda.

22          So I'm sort of left by myself to try to figure this

23    out, particularly in light of my view, with which you

24    disagree, that I've got to take a closer look because this

25    involves insiders.  So my view of this is I'm required to

1    take a closer look at it and I really -- I'm getting no help,

2    and that's because you set it up that way.

3         And I'm not -- I say that not as a criticism.  I

4    think the Code permits you to do what you've done, but I

5    think it's complicated my job a little bit.  And I don't know

6    what the point of making these observations is, other than

7    for me to whine.

8        (Laughter)

9            THE COURT:  But --

10           MR. BEACH:  I -- may I just comment --

11           THE COURT:  Yes --

12           MR. BEACH:  -- briefly --

13           THE COURT:  -- you may.

14           MR. BEACH:  -- on that?

15        Your Honor, this -- there has been more oversight

16   in this case than any other case I've been involved in, in my

17   career.  The department -- as you see, the United States

18   Trustee has objected to every single thing we've done in this

19   case.

20        The Department of Labor literally has been on the

21   phone with us every single day since the beginning of this

22   case -- hat's a little loose to say "literally," but close to

23   that, it's been almost every day -- and has been looking very

24   closely at these issues.

25            The only economic stakeholders -- and thousands

1    were noticed -- that objected to the plan is the Chandler and

2    Law creditors -- who I say loosely because they are the

3    targets of the litigation.  Their motivation is simple.  They

4    filed an objection to the DIP at the beginning of the case to

5    blow it up.  As soon as their client was going to be deposed,

6    they dropped the objection.

7         They were silent over the course of the case, but

8    they whispered things to the U.S. Trustee and created other

9    acrimony in the background.

10        Then they objected to the plan.  In connection with

11   the investigation, we asked to interview Mr. Chandler.  We

12   had to give up a legal right on a 2004 examination in order

13   to do that.

14        So, Your Honor, there are -- and we have talked to

15   -- "we," the debtors generally, have talked to thousands of

16   creditors over the course of this bankruptcy.

17        So I understand your point.  I respect the position

18   that you're in, which is a little unique, althoguh there are

19   many cases without an unsecured creditors' committee.  But I

20   would respectfully suggest, Your Honor, there has been so

21   much oversight in this case.

22        THE COURT:  Fair enough.

23        And look, I signed up for the job, so I'm not ...

24        (Laughter)

25        THE COURT:  I'm not complaining.  Okay.  I

1   appreciate that.

2          Let me let you -- give you the chance if there are

3   additional points you want to make.

4          MR. BEACH:  There's just one other point from the

5   United States Trustee regarding the exculpation, Your Honor.

6          Your Honor, I -- we believe we have narrowed that

7   exculpation to the point where it shouldn't and can't be

8   narrowed any further.  It appears as though the U.S. Trustee

9   is trending towards an approach where we have a list of --

10          THE COURT:  Of names --

11          MR. BEACH:  -- individual parties --

12          THE COURT:  -- right.

13          MR. BEACH:  -- which is not appropriate and would

14   create issues in every case that are unnecessary because they

15   are likely never have to be dealt with.  And if they do have

16   to be dealt with, it is only in the context of someone files

17   a complaint, someone raises exculpation as a defense, and

18   then that issue has to be determined.  That is not a today

19   issue, Your Honor.  And it is limited by to the extent of,

20   and we think that's appropriate.

21          THE COURT:  Okay.

22          MR. BEACH:  Your Honor, I'm happy to address other

23   issues.  I know we are --

24          THE COURT:  I think we're okay --

25          MR. BEACH:  Okay.

1          THE COURT:  -- time-wise.  If there's anything you

2    want -- if there's anything that anyone wants the chance to

3    say, I want to be sure to give them that opportunity.

4          MR. FELDMAN:  Good afternoon, Your Honor.  David

5    Feldman, Gibson, Dunn & Crutcher, on behalf of the DIP lender

6    Beyond Risk.

7          You know, Your Honor, at the outset of this case,

8    we talked about, you know, the reason why my client was doing

9    what they're doing.  There has been some, you know,

10   commentary in pleadings and other things about the -- by the

11   trustee and, you know, the Chandler folks about our desire to

12   achieve a, you know, release here.

13         Frankly, as Your Honor can see with this case, we

14   put in more than $5 million over the past -- you know, during

15   the course of the case and a million-eight prior to that to

16   prop up this company that we bought only less than a year

17   earlier for $43 million and, frankly, are now, but for --

18   other than our litigation claims against Chandler, walking

19   away with zero.

20         There were likely much less expensive ways for us

21   to negotiate, you know, a release here and a walkway.  We

22   could have put it into Chapter 7, negotiated with a Chapter 7

23   Trustee.

24         But it was important to Beyond Risk, because they

25   are involved in this kind of business, to have as smooth a

1   walkway as possible.  We funded all of those conversations

2   that took place between Arsenal and the Department of Labor,

3   to make sure that the Department of Labor was satisfied with

4   the handoff that's happening here.  We funded all of those

5   discussions, much to the chagrin of my client and the general

6   -- you know, and their general counsel, who, you know,

7   complained about it bitterly, but continued to pay for it, as

8   we, you know, paved the way for as smooth a transition from

9   what was really a mess of a -- a mess of a situation.

10          And of course, having put more than $5 million into

11  this situation to allow for as smooth as possible of an exit

12  here, our client wants finality and wants a walkaway.  And

13  that's the reason why we said we'll put the money in, we'll

14  fund the case, but we're not going to turn around -- we're

15  not funding into a situation where we're going to get sued.

16          So let me just comment very briefly on two -- on

17  the two points regarding the known/unknown issue and on the

18  release of the director -- the officers.

19          The reason we care about the release of the

20  officers is we're looking to close off as many backdoor post-

21  confirmation litigations against us or against someone for

22  whom we have financial liability.  Those -- as -- I imagine

23  this is somewhere in the record, the organizational documents

24  of the company.  Those parties, the officers of that company

25  are entitled to indemnity from Beyond Risk.

1    And if they don't get a release as part of this

2  deal, we're essentially on the hook.  It's -- it is a back

3  door that we need to close off.  We can't be in a situation -

4  - and as part of our deal of basically largely walking away

5  from $5 million of, you know, further investment here, we

6  can't be in a situation here where this back door is left

7  open, so someone can bring a claim against those parties for

8  which we'll be financially liable.

9    Similarly, on the issue with regard to, you know,

10  known or unknown, you know, fraud claims, this is a pretty

11  simple position that we -- frankly, just to be clear, in the

12  negotiations, the Young Conaway firm came out and said we

13  need the standard fraud, wilful misconduct, you know,

14  carveout.

15    It was our response to say, listen, you know what

16  you know today and whatever exists today, if you think it's

17  fraud, whatever you think it is, we're saying we're going to

18  walk away from the significant investment we made into this

19  company only if we're getting a release from what exists

20  today, if you find something new down the road and it turns

21  out to be fraud, we understand that, but you know what you

22  know today.  The debtor knows what it knows today.  You've

23  done an investigation, we paid for that, as well.  And

24  frankly, we don't want to -- basically, those facts to be

25  recast by somebody else later on.  So, again, we're -- this

1    is another back door opened up that we're being sued again

2    after we're looking for the walkaway.

3            Listen, we're not walking -- unfortunately, Beyond

4    Risk is not walking away from this whole Arsenal situation

5    because they're going to be -- you know, my client and

6    another team from lawyers from Gibson Dunn is going to be,

7    you know, down the street in Chancery Court for the next, you

8    know, two years, litigating over --

9            THE COURT:  Okay.

10           MR. FELDMAN:  -- you know --

11           THE COURT:  But that's your --

12           MR. FELDMAN:  -- who did what --

13           THE COURT:  -- affirmative --

14           MR. FELDMAN:  -- but --

15           THE COURT:  That's your affirmative claim, right?

16           MR. BEACH:  No, no.  Right.  So what I'm saying is

17   we're not -- but as to the bankruptcy case and what's

18   remaining here on the estate, our deal is we basically get --

19   we walk away from these significant dollars we have to put in

20   to get a smooth walkaway from the plan sponsors and for, you

21   know, anybody else in the deal that cares about -- and

22   unsecured creditors and give them something they can go

23   pursue and a trustee to pursue it.  But in exchange, we want

24   to know that we have finality and that we're not leaving any

25   back doors open.

1      THE COURT:  Okay.

2      MR. FELDMAN:  Thank you, Your Honor.

3      THE COURT:  Thank you, Mr. Feldman.

4      I'm going to continue in my quest to be unfair.

5  Mr. Gerson, can I ask you a question?

6      MR. GERSON:  Certainly.

7      THE COURT:  So --

8      MR. GERSON:  That's why I'm here.

9      THE COURT:  So you're, in some ways, in the shoes

10 of the most significant economic stakeholder here.  You filed

11 an objection -- a reservation of rights that you --

12     MR. GERSON:  Yes.

13     THE COURT:  -- that I take it is now effectively

14 withdrawn.

15     MR. GERSON:  Yes, that's true.

16     THE COURT:  So I take it -- does the Department of

17 Labor have a position with respect to whether the plan should

18 be confirmed?

19     MR. GERSON:  The Department of Labor withdrew --

20 you know, settled, so we have no objection.

21     THE COURT:  Okay.

22     MR. GERSON:  The broader question of whether the

23 plan should be confirmed or not is not --

24     THE COURT:  I understand.

25     MR. GERSON:  -- an issue that would be --

1    THE COURT:  Okay.  You answered my question.  Thank

2  you.

3    THE COURT:  Okay.  I'm going to take five minutes

4  and will come back at one o'clock and tell folks where I've

5  landed, so give me that.

6    And with that, we are in recess.  Thank you.

7    (Recess taken at 12:54 p.m.)

8    (Proceedings resume at 1:00 p.m.)

9    (Call to order of the Court)

10   THE COURT:  Be seated.

11   Okay.  So let me start by thanking everyone.  The

12  hearing today was extremely helpful.  I appreciate the

13  professionalism and the hard work all around.  I thought all

14  of the arguments that were raised were arguments where there

15  were fair points to be made and I very much appreciate it.

16   To start with the punch line, I'm going to confirm

17  the plan.  I have a tweak to the confirmation order that I'll

18  get to.  But let me explain my reasoning, which won't

19  surprise anyone.

20   Let me start by saying I don't think -- to answer

21  my own question, I don't think this is what Congress had in

22  mind ...

23   (Laughter)

24   THE COURT:  ... when it adopted Subchapter V of the

25  Bankruptcy Code.  I think that this use, cast positively, can

1    be described as "innovative" and "creative."  And if one were

2    less inclined to be charitable, one might describe it as --

3    calling it a "misuse" would be too strong.  But as a means to

4    circumvent protections that ought otherwise be available, so

5    that's that.

6         I also, as I -- this is no surprise to anyone in

7    light of my so-called questions -- believe that the standard

8    that I ought to apply to the settlement is not ordinary

9    business judgment where very heavy deference is paid to the

10   debtor's judgment that, throughout bankruptcy law, where

11   there are transactions within insiders, courts look more

12   carefully at them.  And I can't think of any reason why the -

13   - in the context of this settlement, we ought to essentially

14   create an exception to that general principle.

15        I also think that that's a question of federal law,

16   the construction of the Bankruptcy Code, and that I'm not --

17   it's not a function of the standard that a State Court would

18   apply in an after-the-fact lawsuit under state law.

19        I'm satisfied here that what was done meets that

20   standard; that there were steps taken to put in place an

21   independent fiduciary who conducted an investigation with his

22   own counsel.

23        Could one talk about more elaborate protections?

24   Sure.  Might that have been advisable?  It wouldn't have

25   hurt.  But I don't think its absence dooms the exercise.

1     In particular, my conclusion about the

2  reasonableness is informed by the fact that there is an

3  objecting party, that objecting party was afforded the

4  opportunity to take discovery, and the actual evidence of

5  claims against the insider is purely speculative.  And so my

6  judgment that this is appropriate is in part an assessment of

7  the un -- not -- is informed by a process that I think is

8  sufficient, even if not the gold standard, but sufficient.

9     And the ultimate results, which is that, at the end

10  of an investigation and affording an opposing party the

11  opportunity to look at it, no one has come forward with any

12  actual evidence that, when I look at it, leads me to conclude

13  that there's a claim here.  And so it's the fact-specific

14  circumstances that lead me to conclude that this settlement

15  is an appropriate one.

16     Look, I hear the story that this is done, you know,

17  for very noble purposes, in order to -- in a way independent

18  of any self-interest, in order to do good by other people.  I

19  don't think I have to, in order to confirm this plan, accept

20  every bit of that story.  I understand there's also a

21  counter-story that is, look, this is a commercial transaction

22  and a judgment about minimizing litigation risk, and every

23  dollar that was spent was done, not to make life better for

24  other people, but because it was less expensive than any

25  alternative.  I'm not sure there would be anything wrong with

that, if that's what were happening.  But in any event, I

don't think I need to resolve a dispute about anyone's

motives here to conclude that, as an economic matter, this is

an appropriate settlement that warrants approval.

With respect to the specific issues in the U.S.

Trustee's objection, I'm satisfied that I'm not required, in

order to find consideration on behalf of the debtors'

officers, to find consideration in the settlement that is

segregable [sic] and that is -- that, where they've reached

into their pocket to pay a dollar, I think that this can and

should be viewed in the aggregate, and that there's nothing

at all unusual or uncommon in a settlement for Party A to

make a payment for the benefit of Party B.

And so I think the question here is:  In the

aggregate, is the amount that is -- of consideration that is

being given sufficient to justify the releases?  And so I'm

comfortable that including the debtors' officers in the

releases is appropriate.

I hear and respect the U.S. Trustee's position

about the need to identify, with respect to the exculpation,

individuals who are the fiduciaries.  And we could live in a

world in which, in order to exculpate, we had an order that

identified the humans who are the beneficiary of the

exculpation.  That hasn't been a practice that has otherwise

been adopted, at least by me, and I'm not aware that my

1    colleagues have.

2         And I'm going to, at least in this context,

3    overrule that objection.  If the law on this develops in a

4    different way, I'll decide tomorrow's case tomorrow.  But for

5    the purposes of where -- what is standard in this court as of

6    now, I'm comfortable that limiting the exculpation to people

7    who can show that they are fiduciaries and with respect to

8    claims that arise out of their fiduciary capacity is

9    appropriate.  Does that leave disputes for another day?

10   Maybe it does.  But I'm satisfied that that's not

11   inappropriate.

12        The issue that gave me the greatest pause is the

13   question about the limitation with respect to known -- the

14   absence of a carveout for fraud with respect to known claims.

15   That provision strikes me as unusual.  And in approving it

16   here, I'm not saying that I'll approve it everywhere.  But I

17   think this is context-specific.

18        And what we've got in this case are all sorts of

19   allegations of wrongdoing being tossed around, a specific

20   investigation that took place that looked into claims of

21   wrongdoing.  And in that context, I think it's not

22   commercially unreasonable, as Mr. Feldman described it, for

23   the individuals to say, look, if you've got a claim for fraud

24   based on what you found, tell me what it is, and if you have

25   one, let's talk about it.  And in the absence of that, I'm

1    entitled, after an investigation, not to hear tomorrow that

2    something was fraudulent, the basis for which is known today.

3            So I'm -- again, it's not -- this is not a general

4    proposition of law.  It's a very fact-specific ruling in the

5    context of this case.  But in this case and in these

6    circumstances, I'm satisfied that that release is

7    permissible.

8            So I think that resolves the issues that were in

9    front of me.

10           My only tweak to the confirmation order -- and I

11   think I can do this myself.  This is one I've pointed out

12   before, so some of you may not be surprised by this, and it's

13   because I'm a nerd.  I don't know if you guys know that.

14       (Laughter)

15           THE COURT:  But in what is now on Page 33 of the

16   redline of the confirmation order, and what is Paragraph 92,

17   it says:

18           "This order is a final order and the appeal" --

19   "and the period in which an appeal must be filed shall

20   commence upon the entry hereof."

21           My own view is that that is ruling on the

22   jurisdiction of an appellate court, and that is up to the

23   Appellate Court to decide its own jurisdiction, and the

24   finality of my order is a matter to be decided by -- not by

25   me.

1    So what I -- the tweak that I would make here --

2    and it's one I've made in a variety of other similar orders -

3    - is to change that order so it says:

4         "This order is intended to be a final order, such

5    that the period in which an appeal must be filed would

6    commence upon the entry hereof."

7         And we -- I think we can do that in chambers.  If

8    someone wants to tell me I shouldn't do that, this is your

9    chance.

10         UNIDENTIFIED:  That's fine.

11         THE COURT:  Okay.  Hearing none, we will make that

12   change.

13         And otherwise, upon -- if this order is -- well,

14   let me say this:  If this order has been uploaded, we'll make

15   that change; if it hasn't been uploaded, you can try to make

16   the change or we can make it ...

17       (Participants confer)

18         THE COURT:  Ms. Justison.

19         MS. JUSTISON:  Good morning, Your Honor.  Liz

20   Justison of Young Conaway on behalf of the debtors.

21         We need to make a change to the plan to address the

22   exculpation change that was discussed, which is limiting it

23   to agents and representatives.

24         THE COURT:  Got it.

25         MS. JUSTISON:  So, given that, we will file a

1  revised plan and a redline and we'll make the change to the

2  order, as well.

3          THE COURT:  Okay.  Do you have -- I read that very

4  quickly.  Do you have what it should say?

5          MS. JUSTISON:  Yes, we do.

6          THE COURT:  Okay.  Terrific.

7          MS. JUSTISON:  Thank you.

8          THE COURT:  Okay.  Ms. Casey.

9          MS. CASEY:  I'm not aware -- and I apologize

10 because I haven't talked -- there had been some changes to

11 the order at my request, and I don't know if that was part of

12 the redline that was submitted to the Court.

13         MS. JUSTISON:  Those changes were in the redline

14 that was submitted, Your Honor.

15         THE COURT:  Okay.  So when -- okay.  So do you

16 require anything under certification, or are you okay, Ms.

17 Casey?

18         MS. CASEY:  No, no.  If it was part of the redline,

19 that's fine.  I just didn't -- it happened too quick, I

20 didn't see it.

21         THE COURT:  Totally understand.  Everyone is doing

22 their best and I appreciate that.

23         Okay.  Let me ask this:  Is there any other way in

24 which the Court can be help -- so you will submit a redline.

25 And when it's submitted and uploaded, we will go ahead and

1    enter that order.

2              MS. JUSTISON:  Yes, Your Honor.

3              THE COURT:  Is there any other way in which the

4    Court can be helpful to the parties today?

5              MR. BEACH:  No, thank you, Your Honor.  We really

6    appreciate your time.  I know it's a busy day.

7              THE COURT:  It's my job.

8              MR. SUMMERS:  Yeah, thank you.

9              THE COURT:  Mr. Summers?

10             MR. SUMMERS:  I want to thank you, as well, Your

11   Honor, for your time today.

12             THE COURT:  Very -- this is the job I signed up

13   for, happy to do it.

14        (Laughter)

15             THE COURT:  This was very -- look, this was very

16   interesting, the issues were challenging, they were very well

17   presented.  The question was -- you know, was a fair one.

18   Like in any case with really good lawyers, no one is bringing

19   me issues that -- where there isn't room for disagreement.

20   And no one should take from my resolution of them any

21   disrespect for the good arguments that folks made.

22             So, with that and my thanks to everyone, we're

23   adjourned.  Thank you.

24             COUNSEL:  Thank you, Your Honor.  Thank you, Your

25   Honor.

1     (Proceedings concluded at 1:12 p.m.)

2                         *****

3                    <u>CERTIFICATION</u>

4          I certify that the foregoing is a correct

5     transcript from the electronic sound recording of the

6     proceedings in the above-entitled matter to the best of my

7     knowledge and ability.

8

9

10

11

12

13    _____         May 30, 2023

14    Coleen Rand, AAERT Cert. No. 341

15    Certified Court Transcriptionist

16    For Reliable

17

18

19

20

21

22

23

24

25